UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE BOEING COMPANY, W. JAMES McNERNEY, JR. and SCOTT E. CARSON, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

Plaintiff, by its attorneys, alleges the following based on the investigation of counsel which included a review of United States Securities and Exchange Commission ("SEC") filings by The Boeing Company ("Boeing" or the "Company"), press releases issued by Boeing, public statements issued by defendants, securities analysts' reports about the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of all persons who acquired the common stock of Boeing during the period between May 4, 2009 and June 22, 2009 (the "Class Period"), alleging that defendants committed violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated by the SEC, 17 C.F.R. §240.10b-5, during the Class Period.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted in this complaint pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). Defendants maintain their principal executive office at 100 N. Riverside, Chicago, Illinois 60606-1596. Certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate wire and telephone communications.

## CLASS ACTION ALLEGATIONS

5.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of all persons who acquired the common stock of Boeing during the Class Period ("the Class").  Excluded from the Class are defendants, members of their immediate families, and officers and directors of Boeing and their immediate families.

6.     The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  More than 200 million shares of Boeing common stock (ticker symbol "BA") were traded on the New York Stock Exchange ("NYSE") during the Class Period.

7.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and each member of the Class purchased the Company's common stock during the Class Period and sustained injury as a result.

8.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

9.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation an impossible hurdle for members of the Class to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of the case as a class action.

10.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- 2 -

(a)     Whether defendants' acts and omissions as alleged in the complaint violated the Exchange Act; and

(b)     Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## THE PARTIES

**Plaintiff**

11.     City of Livonia Employees' Retirement System acquired the common stock of Boeing during the Class Period and was damaged as the result of defendants' wrongdoing alleged in this complaint, as set forth in the certification attached hereto.

**Defendants**

12.     Boeing has organized its business in five principal segments, including the Commercial Airplanes segment.  The Commercial Airplanes segment is involved in developing, producing and marketing commercial jet aircraft to the commercial airline industry worldwide. Boeing's newest commercial airplane in development is the 787 Dreamliner ("787").  Boeing's principal competitor is Airbus SAS which is also developing a new airplane, in competition to the 787, called the A380.

13.     W. James McNerney, Jr. ("McNerney") was, at all relevant times, the Company's Executive Chairman, President and Chief Executive Officer.

14.     Scott E. Carson ("Carson") was, at all relevant times, the Company's Executive Vice President, President and Chief Executive Officer of Boeing's Commercial Airplanes segment and Member of the Executive Council.

## FACTUAL ALLEGATIONS

**Pre-Class Period Statements**

15.     The 787 is Boeing's principal next generation commercial airplane and has been eagerly awaited by the commercial airline market and the financial market since it was first announced in 2004.   Since its announcement, Boeing has made numerous announcements concerning the number of orders for the 787 it has received from commercial airlines, worldwide, the positive results of the testing process for the 787 and also the timetable for the maiden flight of the 787 and commercial delivery of the 787.

16.     On December 11, 2008, Boeing provided an updated schedule for the 787.   The maiden flight was moved back two quarters to the second quarter of 2009, ending June 30, 2009, and the first delivery of the 787 to a commercial airline was moved back two quarters to the first quarter of 2010.   In its press release, Boeing stated that the "new schedule reflects the impact of disruption caused by the recent Machinists' strike along with the requirement to replace certain fasteners in early production airplanes."   Carson stated in the press release, "'Our industry team has made progress with structural testing, systems hardware qualification, and production, but we must adjust our schedule for these two unexpected disruptions.'"   Boeing's 787 program vice president, Pat Shanahan ("Shanahan"), stated in the press release, "'We're laser focused on what needs to be done to prepare for first flight. . . .   We will overcome this set of circumstances as we have others in the past, and we understand clearly what needs to be done moving forward.'"   The announced delay caused a drop in the price of Boeing common stock.

17.     In Boeing's SEC Form 10-K for 2008, issued February 9, 2009, signed by, *inter alia*, McNerney, Boeing reiterated the schedule for the 787 announced on December 11, 2008, and described the 787 program as follows:

> We are in the final stages of assembly of the initial airplanes and planning for flight test.   The risks that we are always inherent in the latter stages of new airplane

program production remain.  We continue to address challenges associated with assembly of the first few airplanes, including management of our extended global supply chain, completion and integration of traveled work, weight and systems integration.  We are also continuing efforts to satisfy customer mission and performance needs in light of the anticipated weight of their respective aircraft. During 2008, we announced schedule delays for the 787 airplane.  First flight of the 787-8 airplane has moved from the second quarter of 2008 into the second quarter of 2009.  Delivery of the first 787 moved from early 2009 into the first quarter of 2010.  Delivery schedules for 787 derivative airplanes may also be impacted.  The revised schedule reflects the cumulative impacts of disruption caused by the recent IAM strike, the requirement to replace certain fasteners in early production airplanes, as well as the impact from the challenges mentioned above.  We continue to work with our customers and suppliers to assess the specific impacts of schedule changes, including delivery delays and supplier assertions associated with such changes.  A number of our customers have contractual remedies that may be implicated by our revised plan for the 787.  We continue to address customer claims and requests for other contractual relief as they arise.

18.     In the SEC Form 10-K, Boeing stated that the backlog of orders for the 787 had increased in 2008 to 910, up from 817 in 2007.

19.     On April 22, 2009, Boeing issued its SEC Form 10-Q for the first quarter of 2009, earnings press release and First Quarter 2009 Performance Review.  In the 10-Q, Boeing reiterated the schedule for the 787 announced on December 11, 2008, and described the 787 program as follows:

We are in the final stages of assembly of the initial airplanes and planning for flight test.  The risks that are always inherent in the latter stages of new airplane program production remain.  We continue to address challenges associated with assembly of the first few airplanes, including management of our extended global supply chain, completion and integration of traveled work, weight and systems integration.  We are also continuing efforts to satisfy customer mission and performance needs in light of the anticipated weight of their respective aircraft.  First flight of the 787-8 is targeted for the second quarter of 2008 with delivery in the first quarter of 2010.  The schedule reflects the cumulative impacts of disruption caused by the 2008 IAM strike, the requirement to replace certain fasteners in early production airplanes, as well as the impact from the challenges mentioned above.  We continue to work with our customers and suppliers to assess the specific impacts of schedule changes, including delivery delays and supplier assertions associated with such changes.  A number of our customers have contractual remedies that may be implicated by our revised plan for the 787.  We continue to address customer claims and requests for other contractual relief as they arise.

20.     In the earnings press release, Boeing stated:

Progress on the new 787 Dreamliner continues on the revised schedule announced in December. The company expects the first flight to occur in the second quarter of 2009 with deliveries to begin in the first quarter of 2010. Recent milestones include completion of build-verification tests on Airplane 1, clearance of all systems hardware and Rolls-Royce engines for first flight, completion of power-on for Airplane 2, and the beginning of final assembly for the sixth and final flight test airplane. The program saw orders for 32 airplanes cancelled by mutual agreement with customers during the quarter. Total firm orders are now 886 airplanes from 57 customers.

21.     In the First Quarter 2009 Performance Review, Boeing and defendant McNerney stated:

–     All 787 systems hardware and software, Rolls-Royce engines cleared for first flight

–     Airplane 1 factory gauntlet test complete

–     Began assembly of final flight test airplane

**Class Period Misrepresentations**

22.     As the date for the maiden flight of the 787 approached, defendants made a series of misleading statements to the market concerning the results of the testing process for the 787 and Boeing's ability to meet the schedule for the first flight and the delivery of the 787. Defendants made these false and misleading statements in an effort to: (a) forestall further cancellations of orders for the 787, particularly as the orders for its competition, the A380, were gaining ground; (b) conceal from the market the material fact, known to defendants, that the 787 had a structural problem in its design that would prevent the first flight of the 787 by June 30, 2009, and delivery in the first quarter of 2010; and (c) enable Boeing to make a positive presentation concerning the test results for the 787 and the schedule for the first flight and delivery of the 787 at the Paris Air Show, scheduled for June 15-18, 2009, at which Boeing hoped to receive additional orders for the 787 and beat out the showing made by Airbus for its A380.

23.     On Sunday May 3, 2009, Boeing issued a press release discussing the current status

of the 787 program, stating:

> The Boeing 787 Dreamliner that will fly later this quarter has moved to the flight
> line.  Fuel testing – the first in the next phase of extensive checks the airplane must
> undergo – will begin in the next few days.

The Vice President and General Manager of the 787 program, Scott Fancher ("Fancher"), stated:

"'We are making great progress, and moving ever-closer to first flight.'"

24.     Boeing also stated in the press release:

> In recent weeks, the 787 (designated ZA001) completed a rigorous series of
> tests including build verification tests, structures and systems integration tests,
> landing gear swings and factory gauntlet, which is the full simulation of the first
> flight using the actual airplane.  With Chief Pilot Mike Carriker at the controls, the
> simulation tested all flight controls, hardware and software.  The simulation also
> included manual and automatic landings and an extensive suite of subsequent ground
> tests.

Fancher stated: "'These results give us confidence in our ability to move into further gauntlet testing

using either ground power or the airplane's engines or auxiliary power unit.  This is a significant

milestone on the path to first flight.'"

25.     Boeing continued in the press release:

> All structural tests required on the static airframe prior to first flight also are
> complete.  The final test occurred April 21 when the wing and trailing edges were
> subjected to their limit load – the highest loads expected to be seen in service.  The
> load is about the same as the airplane experiencing 2.5 times the force of gravity.

Fancher stated: "'We continue to analyze the data, but the initial results are positive.'"

26.     Boeing ended the press release by stating:

> All the necessary structural tests required prior to first flight are now complete.
>
> Now on the flight line, [the 787] will undergo additional airplane power and
> systems tests as well as engine runs.  After completing final systems checks and
> high-speed taxi tests, the airplane will be ready for first flight, which is on schedule
> for later this quarter.
>
> The 787 Dreamliner has orders for 886 airplanes from 57 customers.

- 7 -

27.    The statements in the press release, quoted in ¶¶23-26, above, were misleading because defendants knew and failed to disclose that there was a structural problem with the 787, that is, the wing was not properly attached to the body of the airplane.  Defendants also knew and failed to disclose that the structural defect, despite all of the purported successful test results for the 787 touted by defendants, would cause an undeterminable delay in the schedule for the first flight of the 787 beyond June 2009 and delivery of the 787 beyond the first quarter of 2010.  Boeing's misleading press release had its desired effect on the market, and the price of Boeing common stock rose immediately by 2.4% to close at $41.77 on May 4, 2009, and continued to rise, closing at $44.20 on May 6, 2009.

28.    Boeing continued with its misrepresentations to the market.  On May 21, 2009, Boeing issued a press release, which stated:

> Boeing continued to make steady progress toward the first flight of the 787 Dreamliner, completing the first engine runs on the all-new airplane.  The occasion marks the first all-electric start of a commercial jetliner engine on a twin-aisle commercial jetliner; the engines had been started electronically in test facilities earlier.

Fancher stated: "'We are very pleased with the performance on the engines during the test.  We will now get ready for our intermediate and final gauntlet tests.'"

29.    On June 1, 2009, *Bloomberg* reported that Boeing began a flight simulation test on the 787, quoting a Boeing e-mail which stated that the test "'is expected to take about seven days, but it's more important to get the testing done correctly than to meet a schedule.'"  The news story also referred to defendant McNerney's statement that the 787 is "Priority No. 1" for Boeing.  Boeing's stock price rose to $47.70 with the announcement of the commencement of the flight simulation test.

30.    On June 4, 2009, Boeing issued a press release announcing its presentation schedule at the upcoming Paris Air Show.  Boeing announced that Carson would make a presentation on June

15 at 9:30 and Shanahan, Boeing Commercial Airplanes Vice President and General Manager of Airplane Programs, would make a presentation on June 16 at 1:00 concerning the 787. As in Boeing's earlier press releases, defendants did not disclose the structural flaw in the 787 and that the structural defect would prevent Boeing from conducting the first flight of the 787 by June 30, 2009, and delivery of the 787 in the first quarter of 2010. The next day, Boeing's stock price continued its climb, rising 4% to close at $52.65.

31.    On June 8, 2009, as the date for the Paris Air Show drew close, Boeing issued another press release, stating:

> Boeing has completed the intermediate gauntlet phase of testing on the first 787 Dreamliner.
>
> During the testing, pilots and engineers simulated multiple scenarios using all airplane systems as if the aircraft were in flight, including power, avionics and flight controls. Test scenarios ranged from standard flights to single and multiple systems failures during flights.
>
> Intermediate gauntlet testing included about one week's worth of operations on the airplane and hundreds of discrete test conditions.

Fancher stated: "'The team has done an incredible job supporting an exhaustive test regimen. . . . I couldn't be more proud. We will continue to take a hard look at the results, make adjustments and finish up our testing so we can get to first flight.'"

32.    On June 9, 2009, McNerney stated, as quoted in the media, that "'I think the airplane will fly in June. We will embark on a flight test program as we described it.'" McNerney is further reported to have said that "he expects the first 787 deliveries in the first quarter of 2010. But he said that there is always the chance that the schedule could be disrupted by a mechanical issue coming to light during the test flight."

33.    On June 15, 2009, during the Paris Air Show, Boeing issued another press release, stating:

The second Boeing 787 Dreamliner has moved to the flight line to begin fuel testing. This is the second of six 787s being used in the all-new airplane's flight-test program.

\*        \*        \*

Each of the six test-flight airplanes will be used for a specific set of tests during the flight-test program.  This airplane, designated ZA002, will focus on systems performance.  Like its predecessor, ZA001, this airplane has successfully completed a rigorous series of tests while still in the factory.  Fuel testing began immediately upon the airplane entering the fuel dock.

ZA002 features the livery of the Dreamliner's launch customer, ANA (All Nippon Airways) of Japan.

Fancher stated: "'ANA will be the first to fly the 787 Dreamliner in commercial service. . . . We are honored to fly in ANA livery throughout the flight-test program as a tribute to our partnership in bringing this all-new airplane to market.'"  The press release stated that Boeing had 865 orders for the 787 from 56 airlines.  The press release was reprinted on June 16, 2009, and Fancher was quoted in the press release, stating: "'Momentum continues to build with each milestone achieved.'"

34.    Carson used his presentation at the Paris Air Show on June 15, 2009, to state, as reported by *Bloomberg*, that Boeing is "'absolutely committed'" to a first flight of the 787 "within the next two weeks [by June 30, 2009]."  Carson's statement was misleading because he knew and failed to disclose that there was a structural problem with the 787 and that it would delay the first flight of the 787 beyond June 30, 2009.

35.    As reported by *Reuters* on June 16, 2009, Boeing, through its commercial planes marketing chief, Randy Tinseth, reiterated at the Paris Air Show that the new 787 would fly before the end of June.  *Bloomberg* reported in a televised interview of defendant Carson from the Paris Air Show on June 16, 2009, that Carson had stated: "'I personally believe the [787] could fly today,'" and that the 787 cleared the intermediate gauntlet testing that simulates flight conditions and multiple systems failures "'in much better condition than we'd anticipated.'"

- 10 -

36.    On June 17, 2009, Boeing announced that final assembly had begun on the first 787 destined for delivery to launch customer ANA and that "[d]eliveries are scheduled to begin in the first quarter of 2010." Fancher is quoted, stating: "'This is a great day for the 787 team.'"

37.    The statements in the press releases quoted in ¶¶28-36 were misleading because defendants knew and failed to disclose the structural defect in the design of the 787, that is, that the wing was not properly attached to the body of the airplane. The press releases are also misleading because defendants knew that, despite the purported successful completion of the intermediate gauntlet phase of testing touted by defendants, the structural defect would cause an undeterminable delay in the schedule for the first flight of the 787 beyond June 2009 and delivery of the 787 beyond the first quarter of 2010.

**Boeing Belatedly Discloses the Truth, and Defendants
Admit They Knew the Material Facts They Did Not Disclose**

38.    Suddenly, without any warning, Boeing announced on June 23, 2009, that the "first flight of the 787 Dreamliner will be postponed due to a need to reinforce an area within the side-of-body section of the aircraft. . . . First flight and first delivery will be rescheduled following the final determination of the required modification and testing plan. It will be several weeks before the new schedule is available." Carson stated that "'[s]tructural modifications like these are not uncommon in the development of new airplanes, and this is not an issue related to our choice of materials or the assembly and installation work of our team.'"

39.    Boeing also held a conference call with analysts on June 23, 2009, to explain this dramatic disclosure. On the call, analysts peppered Carson and Fancher and Shanahan with questions, including, *inter alia*, the nature of the structural defect, the timing of the disclosure and the impact on the first flight and delivery schedules for the 787. Carson stated:

> As our release stated this morning, based on our analysis of results from tests on the static test airplane, we have determined that we need to make a modification to reinforce a limited area of structure at the side-of-the-body section of the airplane

before we begin our flight test program. Following detailed analysis which was completed late last week, we decided to postpone first flight until the modification is made and our team is satisfied that we are ready for fully productive flight testing.

40.     Shanahan elaborated, stating as follows:

Late last month during planned 787 static testing, our team was conducting a series of tests that involved bending the wings of our full-scale test airplane. These tests are part of the normal test process on the path to achieve certification. During the test, the team identified stress in an area of the side-of-the-body structure that was in excess of expectations. Our preliminary analysis of these results indicated that we could proceed with first flight.

After further testing and analysis which we finished late last week, our team concluded that a productive test flight program could not take place without structural reinforcement in limited areas with the side-of-the-body joint. We decided at that point that we should postpone first flight and make needed modifications before beginning the flight test program.

I want to be very clear here, this is a structural reinforcement issue . . . .

41.     Upon questioning by analysts, Fancher admitted that the problem concerned the critical point at which the wing is attached to the rest of the body of the airplane.

42.     Carson admitted that they knew of the structural defect back in May 2009 but had decided not to say anything when they learned of it or even at the Paris Air Show during their public and private presentations. In response to a direct question about when defendants knew of the structural defect, Carson wiggled around the answer, as follows:

[W]e discovered in a test condition several weeks ago an anomaly that we saw. We believed that we had a solution that would allow us to move to the flight test program. We retested and followed that retest with additional analysis late last week. As we looked at that analysis we concluded that to fly the airplane would have such a limited envelope on it that it wasn't productive for us to do that. And we chose to delay the flight and incorporate the change so we have a vigorous flight test envelope to work with.

43.     Upon questioning by analysts as to management's credibility, one analyst asked point blank why, if management knew of this structural problem in May, they waited until after the Paris Air Show, when the world's attention was on Boeing, to make the disclosure. Carson replied:

When we were at Paris last week we had been through the preliminary analysis of the data and were of a mind that the airplane could enter flight test with a credible flight test envelope as we worked relatively minor modifications.  The work done by the team through the week  last week narrowed the envelope to the point where on Friday we determined that to fly would be such a small envelope for us that it would be an interesting exercise in having the airplane in the air but not particularly useful in terms of preparing the airplane for certification.

So at that point is when we made the call to delay the process, identify the fix, test the fix, install the fix, and then enter a flight test program that is fully robust.

44.     The analysts clearly were not satisfied with the explanations they were hearing, and one analyst queried why, if the fix was so "small and simple," it would take so long to sort out. Fancher attempted a response, stating:

As far as the schedule to get through this, as I mentioned earlier, this is an area where we have got wing, body coming together, multiple materials, and the observed data from the static test did not match our model.  So you've got a relatively complex area of the airplane, divergence of observables from analysis, and we want to make sure that we are able to anchor those observables to the analysis and make sure we've got that rock solid before we proceed with cutting chips and getting parts to the airplane.

45.     In direct response to a question concerning Boeing's ability to meet the delivery schedule for the first quarter 2010, Carson admitted that "we don't have a reset on the schedule."

46.     In the aftermath of the belated disclosure and the answers received on the conference call, security analysts commented on defendants' lack of timely candor concerning their knowledge of the structural problem with the 787.  JPMorgan Chase aerospace analyst Joseph Nadol stated in his research report that multiple members of Boeing management had assured him in private conversations only the week before that the 787 would meet its first flight deadline and that "[t]he structural issue that has caused the latest delay cropped up several weeks ago, but there was not a hint of concern about it as management continually highlighted the impending first flight, including last week at the Paris Air Show both in public and in private.  Management acknowledged on the conference call that it discovered this issue last month but noted it only determined last Friday [June 23] that it would cause a delay to first flight.  We believe that had management been more up-front

about this situation, perhaps the modest level of credibility on this topic it had started to reestablish over the past several months could have been sustained."

47.    In immediate response to Boeing's belated June 23, 2009, disclosure of the structural defect in the 787 and its effect on the first flight and delivery schedules, the market price of Boeing's common stock dropped 6.5% to close at $43.87 per share, on huge volume of 27.3 million shares traded.  The next day, Boeing's common stock price dropped another 6% to close at $41.32 per share, on huge volume of 21.3 million shares.

48.    *The Wall Street Journal*, on June 25, 2009, reported on the dramatic disclosures, stating that "Boeing said its engineers and senior executives alike had known since May of the structural problem that will keep the jet grounded, possibly for months.  [Boeing] said it decided late Friday to scrub the first flight, which was to take place by June 30[, 2009]," and that "[w]ithout any revised timetable for test flights or deliveries, investors have been left with few clues as to when the company's marquee product might get back on track.  The uncertainty has contributed to a 12% drop in Boeing's share price over the past two days."

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5

49.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1-48 of this complaint.

50.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other members of the Class, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Boeing common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

- 14 -

51.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Boeing's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the structural problem with the 787 and its adverse impact on the first flight and delivery schedules for the 787, as alleged herein.

53.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Boeing's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the 787 in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Boeing common stock during the Class Period.

54.     The false and misleading statements made by defendants are alleged in ¶¶22-36, above.

55.     The defendants had actual knowledge of the misrepresentations and omissions of material facts alleged or acted with reckless disregard for the truth in that they failed to ascertain and

to disclose such facts, even though they have admitted that they knew of the facts and made a decision not to disclose them, even when they were touting the success of the testing process and assuring the markets that the tests of the 787 were all successful, that the results of the tests of the 787 were all positive, that the 787's first flight was on schedule for June 2009, and that delivery of the 787 was on track for the first quarter of 2010. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the structural problem in the 787 and its adverse impact on the first flight and delivery schedules of the 787 from the investing public and supporting the artificially inflated price of Boeing's common stock. As demonstrated by defendants' misstatements and omissions of material fact throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The failures to disclose the structural defect in the 787 and its negative impact on the first flight and delivery schedules are not forward-looking statements. Rather they are current, existing facts. To the extent any of the alleged misleading statements are considered forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying the fact that an existing structural defect in the 787 could cause a delay in the first flight and delivery schedules of the 787.

57.    The primary liability of McNerney and Carson arises from the fact that each of them was a high-level executive at the Company responsible for the 787 program and was privy to the material facts concerning the structural defect and the impact on the first flight and delivery timetables for the 787, and each of them made statements to the public and contributed to or

reviewed Boeing's press releases, as alleged in this complaint, concerning the development, testing

and soundness of the 787 and the first flight and delivery schedules for the 787.  Each of them was

aware of the Company's dissemination of information to the investing public concerning the 787

which they knew or recklessly disregarded was materially false and misleading.

58.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, alleged above, the market price of Boeing common stock was

artificially inflated during the Class Period.  In ignorance of the fact that the market price of

Boeing's common stock was artificially inflated, and relying directly or indirectly on the false and

misleading statements made by defendants, or upon the integrity of the market in which the common

stock trades, and/or in the absence of material adverse information that was known to or recklessly

disregarded by defendants, but not disclosed in public statements by defendants during the Class

Period, plaintiff and the other members of the Class acquired Boeing common stock during the Class

Period at artificially high prices and were damaged thereby.

59.    At the time of said misrepresentations and omissions, plaintiff and other members of

the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other

members of the Class and the marketplace known the truth regarding the problems with the 787, as

alleged herein, which were not disclosed by defendants, as alleged herein, plaintiff and other

members of the Class would not have acquired their Boeing common stock, or, if they had acquired

such common stock during the Class Period, they would not have done so at the artificially inflated

prices which they paid.  The market for Boeing's common stock was, at all times, an efficient market

that promptly digested current information with respect to the Company from publicly available

sources and reflected such information in the prices of the Company's stock.  Boeing's common

stock was actively traded on the NYSE.  The market price of Boeing's common stock reacted

promptly to the dissemination of public information regarding the Company.  Securities analysts

followed Boeing and published research reports regarding Boeing that were publicly available to investors. As a result of the misconduct alleged herein, the market for Boeing's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Plaintiff and the Class justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of Boeing common stock at artificially inflated prices and the subsequent decline in the price of the common stock when the truth was disclosed.

60. During the Class Period the price of Boeing's common stock was artificially inflated as a direct result of defendants' misrepresentation and omissions regarding the 787. When the truth about the 787 was finally revealed to the market on June 23, 2009, at the end of the Class Period, the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from the price of the Company's stock as a direct and proximate result of the correct disclosures, causing significant damages to plaintiff and other Class members.

61. By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

62. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

63. Plaintiff repeats and realleges each and every allegation contained in or realleged in Count I, above, as if fully set forth herein.

64. McNerney and Carson each acted as a controlling person of Boeing within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions,

participation in and/or awareness of the 787 program, McNerney and Carson each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the 787. Boeing controlled Carson and McNerney and all of its other employees.

65.　　As set forth above, Boeing, McNerney and Carson each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, defendants are each liable pursuant to §20(a) of the Exchange Act.

66.　　As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their acquisitions of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment:

A.　　Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and that plaintiff be appointed Lead Plaintiff under the Private Securities Litigation Act of 1995 and as a representative of the Class and its counsel be appointed Lead and Liaison Counsel for the Class;

B.　　Awarding compensatory damages as appropriate against defendants, in favor of plaintiff and all members of the Class, for damages sustained as a result of defendants' wrongdoing;

C.　　Awarding plaintiff and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

D.　　Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 13, 2009                    PLAINTIFF


By:  s/Marvin A. Miller
_____
MARVIN A. MILLER
LORI A. FANNING
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES OF BERNARD M.
   GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

SAMUEL H. RUDMAN
DAVID A. ROSENFELD
COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Boeing.doc

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*In re GMH Communities Trust Sec. Litig.*, No. 2:06-cv-01444-PBT (E.D. Pa.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Shepardson v. Skilled Healthcare Group, Inc., et al.*, No. 09-5416-GHK(RZx) (C.D. Cal.)
*City of Livonia Employees' Retirement System. v. Wachovia Corporation, et al.*, No. 1:09-cv-08268-RJS (S.D.N.Y.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*City of Livonia Employees' Retirement System v. Wyeth, et al.*, No. 1:07-cv-10329-RJS (S.D.N.Y.)
*In re Tetra Technologies, Inc. Sec. Litig.*, No. 4:08-cv-00965 (S.D. Tex.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _13_ day of _November_, 2009.

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

BOEING

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/05/2009 | 3,787 | $52.69 |