**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| | ) | Case No. 1:09-cv-07143 |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| v. | ) ) | DEMAND FOR JURY TRIAL |
| THE BOEING COMPANY, W. JAMES McNERNEY, JR. and SCOTT E. CARSON, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Mark Filip
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Tel.  (312) 862-2000
Fax  (312) 862-2200
mark.filip@kirkland.com

John A. Eisenberg
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200
john.eisenberg@kirkland.com

*Attorneys for Defendants The Boeing Company, W. James McNerney, Jr. and Scott E. Carson*

March 25, 2010

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT .........................................................................................................................6

I.     PLAINTIFF LACKS STANDING TO CHALLENGE ANY STATEMENTS
       MADE AFTER JUNE 5, 2009. ...........................................................................7

II.    THE COMPLAINT FAILS TO PLEAD WITH PARTICULARITY ANY
       STATEMENTS THAT WERE FALSE OR MISLEADING WHEN MADE. ..................7

       A.     At Least Two Fundamental Flaws Pervade The Complaint. ...................................7

       B.     Plaintiff Fails To State A Claim With Respect To Any Statements. ......................9

III.   THE AMENDED COMPLAINT FAILS TO ALLEGE WITH
       PARTICULARITY FACTS GIVING RISE TO A "STRONG INFERENCE" OF
       SCIENTER. ........................................................................................................16

       A.     Plaintiff Fails To Plead Facts Giving Rise To A Strong Inference Of
              Scienter. .................................................................................................17

       B.     Any Inference Of Scienter Is Utterly Lacking With Respect To Messrs.
              McNerney And Carson. .............................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001)......................................... 9, 14, 15

*Asher v. Baxter Int'l Inc.*, 377 F.3d 727 (7th Cir. 2004)................................................. 8

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ...................... 8, 10

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................. 7, 18, 20

*Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009) ........................ 8, 10, 12

*Eisenstadt v. Cent. Corp.*, 113 F.3d 738 (7th Cir. 1997) ..................................................... 9, 12, 14

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007)......................................... passim

*In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276 (7th Cir. 1996).................................... 6

*In re IBM Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) .......................................................... 10

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004) ............................. 3

*Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941 (N.D. Ill. 2004) ..................................................... 7

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006)......................... passim

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................. 8

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008)............................................................. passim

*Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir. 1992) ........................................... 7, 8

*Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791 (N.D. Ill. 2007)..................................................... 20

*Stoneridge Inv. P'ners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)................................ 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)....................................... passim

*Zerger v. Midway Games, Inc.*, 2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)............................... 7

**Statutes**

15 U.S.C. § 78t(a) ....................................................................................................................... 20

15 U.S.C. § 78u-4(a)(2)(A)(iv) ...................................................................................................... 7

15 U.S.C. § 78u-4(b)(1) ............................................................................................................. 8

15 U.S.C. § 78u-4(b)(1)(B) ........................................................................................................ 6

15 U.S.C. § 78u-4(b)(2) ....................................................................................................... 6, 18

15 U.S.C. § 78u-4(b)(3)(A) ........................................................................................................ 6

15 U.S.C. § 78u-5(c)(1)(A)-(B) ................................................................................................. 8

15 U.S.C. § 78u-5(i)(1)(B) ......................................................................................................... 7

5 U.S.C. § 78u-5(c)(1)(B) ........................................................................................................ 19

**Other Authorities**

*Oxford English Dictionary* (2d ed. 1989) ..................................................................................... 5

## **INTRODUCTION**

According to Plaintiff, Boeing knew in early May 2009 that its revolutionary new aircraft, the 787 Dreamliner, would not make first flight by the end of June as planned, and that Boeing committed "fraud" because it waited until June 23 to announce that delay.  In fact, Plaintiff alleges that Boeing committed "fraud" with virtually every utterance it made related to the 787, however tangential, during this period.  Plaintiff, however, offers not one single fact to show that Boeing knew, in early May, that the plane would not fly as scheduled or that Boeing made any statements with intent to defraud.  And Plaintiff does not offer an even remotely plausible theory for why Boeing would wait until late June to announce a delay.

Its entire support for its fraud allegations comprises little more than Boeing's *own* public statements, stitched together with a stock price drop and an announced setback on an important new product.  This is classic "fraud by hindsight," and it is precisely the sort of frivolous, vexatious litigation Congress passed the Private Securities Litigation Reform Act ("PSLRA") to prevent.  The PSLRA requires a plaintiff to plead fraud with specificity, and to allege specific facts that create a *strong inference* defendant acted with intent to defraud.  Plaintiff's story, supported by particularized facts, must be at least as plausible as other possible inferences.

The Amended Complaint ("Complaint" or "AC")—which is 57 pages long and took 8 months to concoct—fails *each and every one* of these requirements.

Boeing explained to the public on June 23 that in May (in one of many hundreds of tests conducted on the path to aircraft certification), it encountered an anomaly in structural testing of the side-of-body joint where the wing meets the fuselage.  Boeing explained that, after finding the anomaly in a physical test, it analyzed the result over the next few weeks, retested the joint, analyzed the data further, and ultimately concluded that the best course of action was not to fly in June, but instead to modify the joint and fly when it was confident the problem had been

addressed.  The announcement was made mere days after the retest analysis and a decision by senior management.  A successful first flight occurred less than six months later.  Indeed, the course of events reveals nothing more than the frequently-disclosed reality of developing something as complex as a new airplane—much less the revolutionary 787—that must safely transport millions around the world.  The investing public was fully aware of the 787's revolutionary design and the challenges of its development.  Boeing repeatedly cautioned—in formal and informal public statements, including, tellingly, the very statements the Complaint cites—that many tests must be performed and much analysis completed; that uncertainty abounds in development programs; and that the plane would fly only when it was ready.

Boeing's explanation—that it had concluded just days earlier that first flight should be delayed—is far more compelling than Plaintiff's unsupported inference of fraud.  To accept Plaintiff's theory—that Boeing knew in May the plane would not fly, but waited until June to reveal it—requires believing that Boeing continued to test and prepare for first flight as an elaborate ruse to conceal the delay and that Boeing would gain from the delay.  But this is implausible—customers could have cancelled their orders just as easily after the announcement.

In short, the Complaint is utterly frivolous.  The PSLRA and established Supreme Court and Seventh Circuit precedent mandate dismissal for at least four reasons:

- Many of the statements relied upon occurred *after* Plaintiff purchased Boeing securities and therefore could not have influenced its decision to buy.  Under settled Seventh Circuit law, Plaintiff lacks standing to complain of these statements.  *See infra*, Part I.

- As to the remainder, Plaintiff fails to plead any facts that show fraud, and instead relies on pure speculation and unfounded or impermissible inferences, thus failing to satisfy the PSLRA's requirement to plead fraud with particularity.  *See infra*, Part II.

- Other statements of which Plaintiff complains are not actionable under the securities laws because they are "forward looking"—predictions about the future.  *See infra*, Part II.

- Plaintiff does not begin to satisfy the PSLRA's bedrock requirement to plead particular facts creating a "strong inference" of fraudulent intent—scienter.  In fact, Plaintiff's allegations give rise to a strong inference of the *absence* of scienter.  *See infra*, Part III.

## STATEMENT OF FACTS

The 787 is a cutting-edge commercial passenger aircraft.  AC ¶ 35.[1]  Designed with state-of-the-art technologies, it is the product of years of research and engineering by Boeing and its worldwide partners.  *Id.* ¶¶ 36-40.  Boeing has performed numerous tests to prepare for FAA certification and for delivery to customers.  *Id.* ¶¶ 40, 50.  For example, Boeing announced, in November 2008, that it had completed testing of a full-scale composite "wing box" of the 787.  *Id.* ¶ 48.  During this "critical load" test, engineers subjected a stand-alone wing and wing-box structure to more than 150 percent of any load expected in service.  *Id.* ¶¶ 48-49.  Boeing explained that this test allowed it to "determin[e] the strength of the structure" and to "verify the analytical methods [it had] used to calculate the loads the structure will have to carry."  *Id.* ¶ 49.

In December 2008, Boeing scheduled the 787's first test flight for the second quarter of 2009.  *Id.* ¶¶ 51-52.  In doing so, Boeing cautioned that projected flight schedules were necessarily "forward-looking" and subject to a variety of risk factors, including Boeing's "ability to meet development, production and certification schedules for the . . . 787 program and the ability to meet scheduled deliveries of the . . . 787 airplane."  Ex. A (Dec. 11, 2008 press release; AC ¶¶ 51-52).[2]  Boeing continued to test the 787.  On April 21, 2009, Boeing conducted a "load limit" test on a replica of the plane's wings, subjecting it to the highest loads expected in service.

---

[1] For purposes of this motion to dismiss, Plaintiff's allegations must be taken as true.  By reciting these allegations neither Boeing nor Messrs. McNerney and Carson in any way concede that they are accurate.

[2] In considering a motion to dismiss a securities fraud action, "courts must consider the complaint in its entirety [and] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 n.1 (N.D. Ill. 2004) (courts can examine documents attached to motion to dismiss if they are central to the claim and referred to in the complaint).

AC ¶ 61.  Boeing conducted another wing-load stress test "[o]n or about" May 17.  *Id.* ¶ 77.

As testing proceeded, Boeing made a series of public disclosures explicitly warning that Boeing's forward-looking statements—predictions about the future, including the date of first flight—"are based upon assumptions about future events that may not prove to be accurate"; that "[t]hese statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict"; and that "[a]ctual outcomes and results may differ materially from what is expressed or forecasted."  Ex. B at i (2008 Form 10-K; AC ¶ 58); *see also*, *e.g.*, Ex. A; Ex. C at 23-24 (2009 Q1 Form 10-Q; AC ¶ 65); Ex. D (Apr. 22, 2009 press release; AC ¶ 62).  In SEC filings, Boeing specifically warned that "risks . . . are always inherent in the latter stages of new airplane program production" and that "technical or quality issues" may result in "schedule delays."  Ex. B at 29-30; Ex. C at 31.  The listed risks included "the ability to successfully develop and timely produce the 787" and "the potential for technical or quality issues on development programs."  Ex. B at i-ii; Ex. C at 23.

Boeing made other public statements about the progress of 787 testing.  On May 3, 2009, Boeing reported that the "initial results" of the April 21 wing test were "positive" but that Boeing "continue[d] to analyze the data."  AC ¶ 73.  On May 21, Boeing reported that the 787 had completed its first engine runs.  *Id.* ¶ 78.  At a May 27 conference, according to a *Reuters* article, W. James NcNerney. Jr. (Boeing's Chairman, President, and CEO, *id.* ¶ 33) said that he thought that the 787 would fly in June, but cautioned that the delivery schedule "could be disrupted by a mechanical issue coming to light during the test flight."  *Id.* ¶ 79.  In late May 2009, Boeing announced that it was simulating 787 in-flight conditions.  *Id.* ¶¶ 80-82.  During this time, Boeing employees "work[ed] essentially around the clock."  *Id.* ¶ 68; *id.* ¶¶ 7, 81.

Notwithstanding, on June 23 Boeing announced that a postponement of first flight was

necessary in order "to reinforce an area within the side-of-body section," a type of "[s]tructural modification . . . not uncommon in the development of new airplanes." *Id.* ¶ 100. On a conference call that day with reporters and analysts, Boeing management explained the decision to postpone first flight was based on the discovery during wing testing of "stress in an area of the side-of-body structure that was in excess of expectations." *Id.* ¶ 102. Scott Carson (then-President and CEO of the Commercial Airplanes segment, *id.* ¶ 34) explained that Boeing "discovered in a test condition several weeks ago an anomaly . . . . We believed that we had a solution that would allow us to move to the flight test program." *Id.* ¶ 104. He recounted that Boeing "had been through preliminary analysis of the data and [believed] that the airplane could enter flight test with a credible test envelope as [they] worked relatively minor modifications." *Id.* ¶ 105. Initial information, that is, indicated that first flight could take place with useful flight parameters (*e.g.*, speeds and altitudes, *see Oxford English Dictionary* 1055 (2d ed. 1989) (defining "flight envelope")). As Mr. Carson explained, it was not until Boeing "retested [the structure] and followed that retest with additional analysis late last week" that Boeing "chose to delay the flight and incorporate the change." AC ¶ 104.

Plaintiff filed this lawsuit on November 13, 2009, alleging that Boeing and Messrs. McNerney and Carson knew just after the April 21 wing test that the 787 could not meet its first flight date, but failed to disclose this until June 23. On December 15, one month after Plaintiff filed this suit, and less than six months after Boeing announced the delay, the 787's historic first flight took place. *Id.* ¶ 21. Plaintiff later filed this Amended Complaint. Count I alleges that Boeing and Messrs. McNerney and Carson violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Count II asserts a claim under Section 20(a) of the Act, which imposes joint and several liability on persons who "control" another person liable under the Act.

## ARGUMENT

To state a claim under Rule 10b-5, a plaintiff must allege that the defendant (1) made a misstatement or omission of material fact, (2) with fraudulent intent (scienter), (3) in connection with the purchase or sale of securities, (4) on which plaintiff justifiably relied, and (5) that reliance caused plaintiff's damages.  *See Stoneridge Inv. P'ners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Scienter "is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).  Rule 10b-5 claims sound in fraud and are thus subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements.  *See In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996).

The PSLRA imposes even more demanding standards for pleading securities fraud claims.  Congress enacted the PSLRA to deter "abusive litigation by private parties," including the practice of pleading "fraud by hindsight" whenever a company's stock price drops.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*").  The PSLRA addresses these concerns in several ways, including:

- Providing that "the court *shall* . . . dismiss the complaint," if the plaintiff fails to meet *any* of the following three requirements, 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added):

  - The plaintiff must "specify each statement alleged to have been misleading, [and] the . . . reasons why the statement is misleading." *Id*. § 78u-4(b)(1)(B).

  - For allegations made on information and belief, the plaintiff must "state with particularity all facts on which [its] belief is formed." *Id*.

  - "[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required" scienter.  *Id*. § 78u-4(b)(2) (emphasis added).

- Heightening protection for "forward-looking statements," defined to include "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." *Id*. § 78u-5(i)(1)(B).

The Complaint does not remotely satisfy these PSLRA requirements and must be dismissed.

I. **PLAINTIFF LACKS STANDING TO CHALLENGE ANY STATEMENTS MADE AFTER JUNE 5, 2009.**

Plaintiff alleges that it "acquired [Boeing] common stock during the Class Period[,] as set forth in the certification attached to the original complaint."  AC ¶ 31.  The PSLRA requires that this sworn certification "set[] forth *all* of the transactions of the plaintiff in the security that is the subject of the complaint during the class period."   15 U.S.C. § 78u-4(a)(2)(A)(iv)  (emphasis added).  Plaintiff's certification indicates that it purchased Boeing common stock only on June 5, 2009.  *See* Ex. E at 4.  Under settled law, Plaintiff lacks standing to challenge any statements made *after* that date, for the commonsense reason that they could not possibly have influenced either the decision to buy or the purchase price.  *See, e.g.*, *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992); *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *4 & n.1 (N.D. Ill. Oct. 19, 2009) (describing this rule as "well settled and unambiguous" in the Seventh Circuit; collecting cases).  Nor can Plaintiff attempt in a class action to represent others who, unlike Plaintiff, *did* purchase shares after June 5.  *See, e.g.*, *Roots*, 965 F.3d at 1420 n.6; *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 705-06 (N.D. Ill. 2005) (cataloging cases).  Accordingly, under settled law, the Court need not consider any statements made by Boeing after June 5, 2009.

II. **THE COMPLAINT FAILS TO PLEAD WITH PARTICULARITY ANY STATEMENTS THAT WERE FALSE OR MISLEADING WHEN MADE.**

The Complaint fails to state a claim because it falls far short of the PSLRA's pleading requirements and because it relies on non-actionable statements and impermissible inferences.

A. **At Least Two Fundamental Flaws Pervade The Complaint.**

*First*, the Complaint states that its allegations are "based on the investigation of counsel," AC Preamble, which are equivalent to allegations made "on information and belief."  *E.g.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003); *Johnson v. Tellabs, Inc.*,

303 F. Supp. 2d 941, 952-53 (N.D. Ill. 2004), *rev'd in part on other grounds sub nom. Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) ("*Tellabs I*"), *vacated on other grounds*, *Tellabs II*, 551 U.S. 308.  The PSLRA sets an even higher standard for pleading securities fraud on information and belief, requiring "the complaint [to] state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1).   To meet this standard, Plaintiff must plead facts drawn from documents or knowledgeable sources "sufficient to support a reasonable belief" that the statements were false or misleading when made.  *Tellabs I*, 437 F.3d at 595 (quotation marks omitted); *see also, e.g.*, *Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145-47 (3d Cir. 2004); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  Plaintiff repeatedly fails to meet this requirement and instead rests on allegations amounting to mere guesses and impermissible inferences, including "fraud by hindsight" that, under Seventh Circuit precedent, cannot give rise to a claim under the PSLRA or Rule 9(b).  *See, e.g.*, *Higginbotham*, 495 F.3d at 759-60; *Roots*, 965 F.2d at 1419.

*Second*, the Complaint relies on forward-looking statements, puffery, and the theory that an allegation of investigation supports an inference of fraud.  But none of these helps Plaintiff.

A forward-looking statement cannot give rise to liability if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or, independently, if the plaintiff fails to show that it "was made with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(A)-(B).  In a fraud-on-the-market case, such as this, AC ¶ 167, statements are not actionable if they are in fact forward looking and the company provided meaningful cautionary language prior to, or at the time of, the statements.  *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *Desai*

*v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009).  As explained below, the forward-looking statements at issue here are simply not actionable under the PSLRA.

Moreover, the Seventh Circuit has specifically held that "*general* expressions of satisfaction" about the status of an ongoing process are non-actionable "puffery," unless the "process has been stopped."  *Eisenstadt v. Cent. Corp.*, 113 F.3d 738, 745 (7th Cir. 1997). Because Plaintiff does not plead facts that show that the "process [of moving toward first flight] ha[d] been stopped," positive commentary on that process is not actionable.

Finally, Plaintiff repeatedly attempts to infer fraud based on allegations that Boeing conducted additional tests on the wing.  But this ignores Seventh Circuit precedent, instructing that "[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention."  *Higginbotham*, 495 F.3d at 760-61; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 691, 695 (7th Cir. 2008); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001).  Fraud cannot be inferred from the mere fact of subsequent investigation or testing.

## B.       Plaintiff Fails To State A Claim With Respect To Any Statements.

More specifically, Plaintiff fails to state a claim under the PSLRA for any statement made before June 5, which are the only statements even potentially at issue in this case.

### *May 3, 2009 press release*

Plaintiff challenges statements in a May 3 press release announcing the 787's move to the flight line.  AC ¶¶ 71-75.  The press release explained that the 787 recently had undergone a "rigorous series" of tests; that further "extensive checks" were still needed; and that Boeing was "making great progress, and moving ever-closer to first flight."  *Id.* ¶¶ 71-72.  The press release stated that Boeing had completed "[a]ll structural tests required on the static airframe prior to first flight," including a test subjecting the aircraft's wings to its "limit load—the highest loads

expected to be seen in service." *Id.* ¶ 73.  The press release characterized the "initial results" as "positive," but warned that Boeing "continue[d] to analyze the data." *Id.*  The press release predicted that the 787 "will fly later this quarter." *Id.* ¶ 71.

Preliminarily, Plaintiff cannot challenge any statements in this press release because it issued before the start of the Class Period, which Plaintiff defines to begin on May 4, 2009, *id.* ¶ 1.  *See, e.g.*, *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *Desai*, 654 F. Supp. 2d at 855.  Plaintiff's challenge, moreover, fails for multiple other reasons, as well.

*First*, the Complaint falls far short of the PSLRA's exacting pleading requirements for allegations made on information and belief.  Plaintiff's claims with respect to each statement rest on the assertion that Boeing already "knew about" the allegedly negative "final results" of the April 21 test.  AC ¶ 75.  But Plaintiff must plead *facts* based on specific documents or knowledgeable sources sufficient to support this contention.  *See, e.g.*, *Novak*, 216 F.3d at 314.

Plaintiff tries to meet this burden by claiming that *unidentified* "internal e-mails sent before May 3, 2009," notified "Boeing employees and defendants" that first flight would be delayed, AC ¶ 75; that Boeing later said that it expected results from tests on the wing in November and December to take ten days, *id.* ¶¶ 133-34; and that Boeing later revealed that it had conducted a subsequent test on the wing, *id.* ¶ 140.

Precedent teaches that supposed documentary evidence, such as the alleged emails, cannot begin to satisfy the PSLRA's requirement that Plaintiff plead facts "sufficient to support a reasonable belief" that the statements or omissions were false or misleading when made, without "identify[ing] who authored the alleged [email], when it was authored, who reviewed [it], and what data its conclusions were based upon."  *Chubb*, 394 F.3d at 147; *see also Adams*, 340 F.3d at 1103.  The vague reference to unspecified "emails" fails under settled law.

Moreover, that Boeing expected results from subsequent (and potentially different) tests within ten days of those tests says *nothing* about when Boeing actually received final (or even preliminary) results from earlier tests, *nothing* about when Boeing reached conclusions based on those results, and *nothing* about what those conclusions were.   Plaintiff offers no internal documents, sources, or other facts to support its leap, as the PSLRA requires.  *See, e.g.*, *id.*

Finally, Plaintiff quotes the release's statement that Boeing had completed "[a]ll structural tests required on the static airframe prior to first flight," noting that Boeing later decided to conduct additional wing tests.  But this does not show that Boeing ever concluded that it was *required* to do additional structural tests for first flight (versus as one of many hundreds of tests conducted to achieve ultimate certification) or that Boeing knew on May 3 that it would eventually perform additional tests.  Plaintiff's own quotations from the June 23 conference call suggest only that Boeing *later* performed more tests and later *chose* to postpone first flight based upon information subsequently gleaned.  AC ¶¶ 101-02.

At bottom, Plaintiff jumps to the conclusion that Boeing had determined by early May it could not go forward with first flight, but provides no facts to bridge the chasm between its desired conclusion and the facts pled.  The PSLRA requires Plaintiff to plead *particularized facts* that show fraud, precisely to preclude an inferential leap, or an impermissible claim of "fraud by hindsight," *Higginbotham*, 495 F.3d at 759-60, such as the ones leveled by Plaintiff here.

*Second*, and independently, the reference to the 787 "that will fly later this quarter" is a classic forward-looking statement that cannot support a Rule 10b-5 claim, particularly given Boeing's repeated public cautionary language.  Boeing specifically and often warned that flight schedules necessarily depend upon a variety of risk factors, including "the ability to successfully develop and timely produce the 787" aircraft.  Ex. D at 8.  In SEC filings referring to the 787,

Boeing publicly stated that "[t]he risks that are always inherent in the latter stages of new airplane program production remain," and that "[a]s technical or quality issues arise, we may experience schedule delays."  Ex. B at 29-30.  The PSLRA thus squarely precludes liability for this statement.  *See, e.g.*, *Desai*, 654 F. Supp. 2d at 847-48.

The press release's remaining statements are at most positive commentary on the ongoing process of moving to first flight.  Because Plaintiff puts forth no serious facts showing that this "process ha[d] been stopped"—indeed, the Complaint itself demonstrates the opposite, *see infra* pp. 18—the statements are also non-actionable puffery.  *Eisenstadt*, 113 F.3d at 745.

### May 21, 2009 press release

Plaintiff next challenges statements that Boeing made in a May 21 press release announcing that the 787 had completed its first engine runs.  AC ¶¶ 78, 83.  The release explained that Boeing was thereby "mak[ing] steady progress toward the first flight of the 787." *Id.* ¶ 78.  The release said that Boeing was "very pleased with the performance on the engines during this test" and "will now get ready for . . . gauntlet tests."  *Id.*

Plaintiff does not appear to claim that any statements in the May 21 press release are false.  Rather, Plaintiff accuses Boeing of committing fraud by failing to "note the fact that additional stress testing was being performed on the 787 airframe wings, the reason for the testing, [and] the negative results of those tests" in a press release that addressed the essentially unrelated topic of the plane's engines.  *Id.* ¶ 83.  Again, Plaintiff's allegations fail.

*First*, Plaintiff relies on the same insufficient allegations as it did with respect to the May 3 statements, with the single addition of the alleged subsequent test of the wing "[o]n or about" May 17.  Plaintiff simply asserts that Boeing "[s]oon thereafter . . . learn[ed] that the airframe would fail this test before ultimate load."  *Id.* ¶ 77.  Plaintiff offers no facts to support this allegation and thus falls far short of the PSLRA's pleading requirements.

12

Undeterred, Plaintiff baldly asserts that, on the June 23 conference call, Mr. Carson "admitted Boeing knew of the structural defects back in May 2009 but had decided not to say anything." *Id.* ¶ 104. That is *not* what he said. Rather, *as the Complaint itself extensively quotes*, Mr. Carson stated that Boeing discovered "*several weeks ago* an anomaly" and then "retested and followed that retest with additional analysis *late last week*." *Id.* (emphases added). The Complaint also quotes another Boeing executive on the call, stating that in one of a series of tests in "late" May, Boeing "identified stress in an area of the side-of-body structure that was in excess of expectations.  Our preliminary analysis . . . indicated that we could proceed with first flight. . . .   After further testing and analysis *which we finished late last week*, our team concluded" that first flight should be postponed. *Id.* ¶ 102 (emphasis added). Plaintiff alleges no facts that even suggest Boeing knew at the time of the May 21 press release that it would eventually decide to postpone first flight.

Plaintiff also cites newspaper articles discussing the June 23 conference call and the results of the 787 wing testing.  None of these articles states any facts inconsistent with the disclosures Boeing made on the June 23 call.  Indeed, Plaintiff relies on a June 25 *Wall Street Journal* article that in fact reports that Boeing "decided late Friday [*i.e.*, June 19] to scrub the first flight." *Id.* ¶ 115. Plaintiff also relies on statements attributed to a Boeing supplier, MHI, in a *Seattle Times* article, saying that "MHI learned of the *concerns* at Boeing after a test . . . in late May." *Id.* ¶¶ 117-19 (emphasis added).  This, too, adds nothing to Boeing's comments on the June 23 conference call—that preliminary analysis of a late May test indicated that Boeing could proceed with a productive first flight, but that further testing and analysis completed late in the week before the conference call prompted Boeing then to decide to postpone first flight.

Thus, Plaintiff pleads *no facts* showing that Boeing had made the decision to postpone

first flight by May 21 or that Boeing even considered that possibility.   Indeed, essentially the
only facts pled—Boeing's own statements on the June 23 call—confirm that Boeing made this
decision late in the week before June 23.   Nor do any of these facts show Boeing was *not*
"mak[ing] steady progress toward the first flight" or that Boeing knew this.   In short, Plaintiff
does not plead facts "sufficient to support a reasonable belief" that the May 21 statements were
misleading when made.  *Tellabs I*, 437 F.3d at 595; *Adams*, 340 F.3d at 1103.

*Second*, and independently, as noted above, positive commentary on the process of
moving to first flight—"mak[ing] steady progress"—is non-actionable puffery.  *See Eisenstadt*,
113 F.3d at 746.   Furthermore, Plaintiff's underlying assumption is that once anyone within
Boeing had any reason to conduct additional wing testing for any reason, the securities laws
barred Boeing from speaking publicly about *other aspects* of the 787 until Boeing arrived at and
announced the final results of the wing tests.   But this ignores Seventh Circuit precedent,
recognizing that "[p]rudent managers conduct inquiries" and "are entitled to investigate for a
reasonable time, until they have a full story to reveal."  *Higginbotham*, 495 F.3d at 760-61; *see
Pugh*, 521 F.3d at 691, 695; *Anderson*, 140 F. Supp. 2d at 903.

### May 27, 2009 press account of investor conference

Plaintiff next cites reports that Mr. McNerney said at a May 27 investor conference that
"I think the airplane will fly in June."  AC ¶ 79.

*First*, Plaintiff relies on precisely the same facts as it does for the May 21 press release,
and so again fails to satisfy the PSLRA's pleading requirements.   Plaintiff cannot merely rest on
its unsupported conclusion that Mr. McNerney knew then the eventual results of the tests and
that Boeing would later decide to postpone first flight.  *See, e.g.*, *Tellabs I*, 437 F.3d at 595.

*Second*, and independently, Mr. McNerney's prediction that the "airplane will fly in
June" is a forward-looking statement that falls under the PSLRA's safe harbor.

*May 30, 2009 press release and article and June 1, 2009 article*

Plaintiff next challenges statements made by Boeing officials about 787 "gauntlet testing." AC ¶¶ 80-82.  In a May 30 press release, Boeing announced that it had begun "the intermediate gauntlet" on the 787, "simulating in-flight conditions ranging from long-duration standard flights to single and multiple systems failures." *Id.* ¶ 80.  That same day, an article explained that intermediate gauntlet tests were underway. *Id.* ¶ 81.  The next day, *Bloomberg* reported that Boeing began the 787 flight-simulation test. *Id.* ¶ 82.  The article reported that, although the test was "expected to take about seven days," Boeing believed "it's more important to get the testing done correctly than to meet a schedule." *Id.*  The article reported that Mr. McNerney said that "the 787 is Priority No. 1." *Id.*

*First*, as with the May 21 press release, Plaintiff fails to sufficiently plead any fraud with respect to any of these statements.

*Second*, and independently, Plaintiff does not appear to claim that any of these statements were false, but rather that Boeing violated the securities laws by making the statements "without mentioning the April or May wing tests or their results." *Id.* ¶ 80.  But, as explained, Boeing had no obligation to announce the results of the April and May tests immediately upon conducting them or to stand silent until it reached final conclusions. *See, e.g.*, *Pugh*, 521 F.3d at 691, 695; *Higginbotham*, 495 F.3d at 760-61; *Anderson*, 140 F. Supp. 2d at 903.

*June 4, 2009 press release*

Plaintiff also challenges statements contained in a press release announcing Boeing's presentation schedule at the 2009 Paris Air Show. AC ¶ 84.  The press release simply announced that a Boeing executive "would make a presentation on June 15 at 9:30" and another executive "would make a presentation on June 16 at 1:00." *Id.*  Plaintiff alleges that the release was false or misleading because, once again, "defendants did not disclose the fact that additional stress

15

testing had been performed on the 787 wings, the reason for the testing, or the negative results of

those tests." *Id.*.  In Plaintiff's view, Boeing could not even announce its schedule at the Paris

Air Show without disclosing the results of the wing tests.  This allegation obviously does not

support a fraud claim; Plaintiff's view is not reasonable, and it is not supported by the law.[3]

## III.    THE AMENDED COMPLAINT FAILS TO ALLEGE WITH PARTICULARITY FACTS GIVING RISE TO A "STRONG INFERENCE" OF SCIENTER.

The Complaint also should be dismissed for the independent reason that it does not meet

the PSLRA's stringent requirement for pleading that the defendant acted with the requisite intent

to defraud (or scienter).  As the Seventh Circuit has explained, this PSLRA requirement is often

the biggest hurdle a plaintiff faces in a motion to dismiss a securities fraud case.  *See Tellabs I*,

437 F.3d at 600.  To survive a motion to dismiss, a plaintiff must "state with particularity facts

giving rise to a *strong inference* that the defendant acted with the required" scienter.  15 U.S.C.

§ 78u-4(b)(2) (emphasis added).  For forward-looking statements, the PSLRA requires a "strong

inference" that the defendant had "*actual knowledge*" that the statements were false when made.

*Id*. § 78u-5(c)(1)(B)(ii) (emphasis added).

A "strong inference" of scienter must be "cogent" and "at least as compelling as any

opposing inference one could draw from the facts alleged."  *Tellabs II*, 551 U.S. at 324.  This

analysis requires taking "into account plausible opposing inferences."  *Id*. at 323.  Plaintiff does

---

[3] Although Plaintiff lacks standing to challenge statements made after June 5, *see supra*, Part I, the Complaint fares no better with respect to those statements.  Some of these statements are protected by the PSLRA's safe harbor for forward-looking statements.  *See, e.g.*, AC ¶ 93 ("787 would fly before the end of June").  Others are non-actionable puffery.  *See, e.g., id*. ¶ 85 ("The team has done an incredible job . . . . I couldn't be more proud.").  As to the remaining statements, the Complaint fails for the same reasons it fails for the pre-June 5 statements.  For example, Plaintiff challenges Mr. Carson's statement that "I personally believe the airplane could fly today." *Id*. ¶ 94.  Putting aside Mr. Carson's cautionary language accompanying that statement, *id*. (noting that Boeing would not allow the plane to fly "without having done all the special checks.  We don't want to take shortcuts."), Plaintiff proffers the exact same arguments and impermissible inferences as for the pre-June 5 statements and provides no additional facts.  Accordingly, Plaintiff fails to plead facts "sufficient to support a reasonable belief" that these statements were false or misleading when made.  *Tellabs I*, 437 F.3d at 595 (quotation marks omitted).

not come close to establishing *any* inference of scienter, let alone a strong one.

### A. Plaintiff Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter.

Plaintiff maintains that Boeing knew by May 3 that first flight would be delayed, AC ¶ 140, relying on unspecified internal emails, *id.* ¶ 144; on the bare assertion that its "investigation has confirmed" this timing, *id.*; and on the conjecture that Boeing must have known the final results of the April and May tests within ten days because Boeing said that results of later tests would take that long, *id.* ¶¶ 140, 143.

The Seventh Circuit has explained that in assessing scienter under the PSLRA, allegations from confidential informants "must be 'discounted,'" usually "steep[ly]," *Higginbotham*, 495 F.3d at 757, because anonymity drastically complicates the ability to assess whether information is compelling and to account for competing inferences, *see id.* at 757. Alleged emails with literally no details about the source or content must be discounted at least as steeply and therefore cannot possibly create any inference of fraudulent intent.

Plaintiff's conclusory assertion that it confirmed the timing through "investigation" adds nothing—Plaintiff must plead *facts* showing a strong inference of fraudulent intent. *See Tellabs*, 551 U.S. at 323. At bottom, Plaintiff merely divines the testing timeline based on what Boeing subsequently said about the timing for later tests. As noted above, Plaintiff provides *no facts* about these tests and in particular *no facts* suggesting any reason to believe the April and May tests were identical (or even similar) to the later tests. Plaintiff's unsupported *assumptions* that Boeing knew the results of these tests on Plaintiff's imagined timeline are the very antithesis of the PSLRA's requirement that a complaint "state with particularity facts giving rise to a strong inference" of fraudulent intent. 15 U.S.C. § 78u-4(b)(2).[4]

---

[4] Plaintiff fares no better by alleging that "Boeing representatives contacted MHI employees about the structural defect in the 787 aircraft long before informing the public." AC ¶ 141. The facts in the

Plaintiff also urges that its allegation that Boeing conducted a second, undisclosed test in late May establishes scienter.  AC ¶ 140.  This simply ignores settled precedent, which clearly holds that an investigation—the most that the existence of this testing reveals—does *not* create a strong inference of scienter.  *See, e.g.*, *Pugh*, 521 F.3d at 695; *Higginbotham*, 495 F.3d at 760-61.  Moreover, Plaintiff's contention is difficult to understand on its own terms.  The Complaint does not begin to explain why, *if Boeing already knew the side-of-body issue would require the delay of first flight*, it conducted tests (i) on the side-of-body joint "[o]n or about" May 17, AC ¶ 77, in addition to the tests it had performed in April, *id.* ¶ 61, and on the wing-box still earlier, *id.* ¶¶ 48-49; and (ii) on other systems set forth in the Complaint itself through June, *id.* ¶ 78 (engine tests); *id.* ¶¶ 80-82, 85 (gauntlet testing).  In sum, these facts "give rise to a strong inference," but of the *absence of scienter, not its presence*.

Plaintiff claims that Boeing "had a clear motive to delay dissemination of the bad news until after the Paris Air Show" to stave off cancellations of existing orders.  *Id.* ¶ 138.  This story is simply implausible, and as such fails under the PSLRA.  Plaintiff provides no cogent, let alone compelling, reason why Boeing would engage in an elaborate ruse to hide information from sophisticated consumers of expensive commercial aircraft, only to reveal the truth to them mere *days* later.  Plaintiff's claim rests on the counterintuitive assertion that purchasers of costly, cutting-edge commercial aircraft, like the 787, would have cancelled orders at the Paris Air Show had they known first flight would be postponed, but would have shyly refrained from cancelling those orders when Boeing made the announcement the very next week.  Plaintiff's theory is nonsensical and strongly cuts against a finding of scienter.  *See Tellabs*, 551 U.S. at

---

Complaint support only an inference that Boeing shared its "concerns" about the wing with MHI in "late May" before disclosing the same information to the public approximately three weeks later.  *Id.* ¶ 119.  Plaintiff pleads nothing that establishes Boeing knew of a "structural defect" that would have caused it to delay first flight, rather than a mere "concern," in late May.

325; *Pugh*, 521 F.3d at 695.  In all events, it is well settled that universal business objectives, like maximizing revenue (or minimizing losses due to cancellations), cannot serve as a basis for inferring fraud under the PSLRA.  *See, e.g.*, *Davis*, 385 F. Supp. 2d at 714 (collecting cases).

Even if Plaintiff's theory were "cogent," the Supreme Court has held that a "strong inference" of scienter must be "*at least as compelling* as any opposing inference one could draw from the facts alleged."  *Tellabs II*, 551 U.S. at 324 (emphasis added).  Assessing this requirement necessitates taking "into account plausible opposing inferences." *Id*. at 323.  For the reasons explained above, the far more plausible inference, based on the allegations in the Complaint, is that Boeing did *not* know it would decide to postpone first flight until late in the week before the June 23 conference call—precisely as Boeing's statements that day explained.[5]

**B.    Any Inference Of Scienter Is Utterly Lacking With Respect To Messrs. McNerney And Carson.**

Plaintiff's allegations of scienter with respect to Messrs. McNerney and Carson are, if possible, even weaker.  In multiple defendant cases, "plaintiff[] must create a strong inference of scienter with respect to each individual defendant."  *Pugh*, 521 F.3d at 693.  Plaintiff cannot rest on "group pleading," whereby "scienter allegations made against one defendant [are] imputed to all other defendants in the same action."  *Tellabs I*, 437 F.3d at 602.

Plaintiff alleges no facts suggesting that Messrs. McNerney and Carson knew or recklessly disregarded before late June that issues with the 787's wing would eventually lead to a discretionary decision to postpone first flight—let alone *require* a delay of first flight.  Indeed, despite the requirement that Plaintiff plead scienter—the intent to defraud—for each defendant, the Complaint mentions Messrs. McNerney and Carson only sparingly and makes no effort

---

[5]  Because Plaintiff has not substantiated its claim of scienter for non-forward-looking statements, it cannot meet the still higher standard for forward-looking statements, which require the Plaintiff to allege facts giving rise to a strong inference of "actual knowledge."  15 U.S.C. § 78u-5(c)(1)(B).

whatsoever to connect them to statements made by others.  Instead of providing individualized factual allegations, Plaintiff merely asserts Messrs. McNerney and Carson were "privy to the material facts concerning the structural defect and impact on" first flight, AC ¶ 165, and that their "liability . . . arises from the fact that each of them was a high-level executive at the Company responsible for the 787 program." *Id.*

But Plaintiff never identifies these alleged "material facts" or pleads particularized facts showing these individuals actually knew them.  Moreover, a "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement[s] based on their positions within the company."  *Davis*, 385 F. Supp. 2d at 713-14; *see also Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 803 (N.D. Ill. 2007) (rejecting the argument that "'these are the sorts of facts a CEO can hardly claim to be ignorant of,'" because it is "not a particularized basis for inferring scienter").

Accordingly, the claims against Messrs. McNerney and Carson must be dismissed.[6]

## CONCLUSION

For the foregoing reasons, Boeing and Messrs. McNerney and Carson respectfully request that this Court grant their motion to dismiss with prejudice.

Dated: March 25, 2010                                     Respectfully submitted,


                                                          /s/ Mark Filip
                                                          Mark Filip
                                                          KIRKLAND & ELLIS LLP

---

[6] Plaintiff also charges in Count II that Boeing and Messrs. McNerney and Carson are liable as control persons under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).  Such claims are "derivative, requiring proof of a separate underlying violation of the Exchange Act." *Tellabs I*, 437 F.3d at 605.  Because Plaintiff fails to allege a primary violation of the securities laws, its Section 20(a) claim must be dismissed as well.  *See id.*; *see also Pugh*, 521 F.3d at 698.

300 North LaSalle Street
Chicago, Illinois  60654
Tel.  (312) 862-2000
Fax  (312) 862-2200
mark.filip@kirkland.com

John A. Eisenberg
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200
john.eisenberg@kirkland.com

*Attorneys for Defendants The Boeing Company, W. James McNerney, Jr. and Scott E. Carson*

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2010, I caused a true and complete copy of **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULE 12(B)(6), AND COMPENDIUM OF EXHIBITS,** to be served on counsel of record by ECF with courtesy copy via e-mail, and additional counsel noted below via overnight mail with courtesy copy via e-mail:

| | |
|---|---|
| Lori A. Fanning<br>MILLER LAW LLC<br>115 S. LaSalle Street<br>Suite 2910<br>Chicago, Illinois 60603<br>Tel. (312) 332.3400<br>Fax. (312) 676-2676<br>lfanning@millerlawllc.com | Thomas E. Egler<br>COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, California 92101-3301<br>Tel. (619) 231-1058<br>Fax. (619) 231-7423<br>tome@csgrr.com |
| Deborah R. Gross<br>Robert P. Frutkin<br>LAW OFFICES OF BERNARD M.<br>GROSS, P.C.<br>Wanamaker Building<br>Suite 450<br>100 Penn Square East<br>Philadelphia, Pennsylvania 19107<br>Tel. (215) 561-3600<br>Fax. (215) 561-3000<br>debbie@bernardmgross.com<br>rpf@bernardmgross.com | Samuel H. Rudman<br>David A. Rosenfeld<br>Shannon Mckenna Matera<br>COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP<br>58 South Service Road<br>Suite 200<br>Melville, New York 11747<br>Tel. (631) 367-7100<br>Fax. (631) 367-1173<br>SRudman@csgrr.com<br>DRosenfeld@csgrr.com<br>smatera@csgrr.com |
| **BY OVERNIGHT MAIL**<br><br>Michael J. Vanoverbeke<br>Thomas C. Michaud<br>VANOVERBEKE MICHAUD &<br>TIMMONY, P.C.<br>79 Alfred Street<br>Detroit, Michigan 48201<br>Tel. (313) 578-1200<br>Fax. (313) 578-1201<br>mvanoverbeke@vmtlaw.com<br>tmichaud@vmtlaw.com | Marvin A. Miller<br>MILLER LAW LLC<br>115 S. LaSalle Street<br>Chicago, Illinois 60603<br>Tel. (312) 332-3400<br>Fax. (312) 676-2676<br>Mmiller@millerlawllc.com |

/s/ Mark Filip
Mark Filip