UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:09-cv-07143 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| vs. | ) ) | |
| THE BOEING COMPANY, et al., | ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

# TABLE OF CONTENTS

**Page**

I.     Introduction ....................................................................................................1

II.    Statement of Facts ..........................................................................................2

    A.    Defendants Set an Aggressive First Flight and Delivery Schedule, and Chose to Discuss It with Investors ..........................................................2

    B.    During the Class Period Defendants Misled Investors About Risks to the 787 First Flight and Delivery Schedules ................................................4

III.    Defendants' Motion Misstates the Facts and Misapplies the Law ...................6

    A.    Plaintiffs Have Standing for All Statements ........................................7

    B.    The Complaint Sufficiently Pleads Defendants' False and Misleading Statements and Why Each Statement Was False and Misleading When Made ..................................................................................................9

        1.    When Defendants Chose to Speak, They Assumed a Duty to Speak Fully ........................................................................................9

        2.    Defendants Impermissibly Contort the Actual Facts Alleged in an Attempt to Meet Their Case Law of Choice ................................12

        3.    Defendants' Class Period Statements Affirming On-Schedule First Flight and Delivery Are Not Puffery ........................................13

        4.    Defendants' Statements Are Not Protected by Safe Harbor ....................15

    C.    The Complaint Pleads a Strong Inference of Defendants' Scienter ....................15

        1.    Defendants Knew or Recklessly Disregarded that the 787 Wing Failed the April 21, 2009 and May 17, 2009 Stress Tests ........................16

        2.    Defendants' Motivation to Conceal 787 Wing Test Failures from Investors and Customers Supports a Strong Inference of Scienter ...........17

        3.    The Complaint's Allegations of Scienter Are Sufficiently Particularized ................................................................................19

IV.    Conclusion ....................................................................................................20

- i -

# TABLE OF AUTHORITIES

Page

## CASES

*Ackerman v. Schwartz*,
   947 F.2d 841 (7th Cir. 1991) ............................................................9

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ............................................................19

*Anderson v. Abbott Labs.*,
   140 F. Supp. 2d 894 (N.D. Ill. 2001), ............................................12

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ..........................................................15

*In re HealthCare Compare Corp. Sec. Litig.*,
   75 F.3d 276, 282 (7th Cir. 1996) ......................................................9

*Danis v. USN Commc'ns, Inc.*,
   189 F.R.D. 391 (N.D. Ill. 1999) ........................................................8

*Desai v. Gen. Growth Props.*,
   654 F. Supp. 2d 836 (N.D. Ill 2009) ...........................................9, 15

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ............................................................9

*Eisenstadt v. Centel Corp.*,
   113 F.3d 738 (7th Cir. 1997) ..........................................................13

*Gibson v. Chicago*,
   910 F.2d 1510 (7th Cir. 1990) ..........................................................6

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ..........................................................11

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ..........................................................12

*In re NeoPharm, Inc. Sec. Litig.*,
   No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862
   (N.D. Ill. Feb. 7, 2003)................................................................9, 11

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ..............................................13

- ii -

**Page**

*Jones v. Corus Bankshares, Inc.*,
 No. 09 C 1538, 2010 U.S. Dist. LEXIS 33579
 (N.D. Ill. Apr. 6, 2010) ........................................................................................7, 10, 13

*Levie v. Sears Roebuck & Co.*,
 No. 04 C 7643, 2006 U.S. Dist. LEXIS 12725
 (N.D. Ill. Mar. 22, 2006) ........................................................................................11

*Lormand v. US Unwired, Inc.*,
 565 F.3d 228 (5th Cir. 2009) ........................................................................................13

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 437 F.3d 588 (7th Cir. 2006) ........................................................................................15, 16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) ........................................................................16, 17, 18, 20

*Mason v. Medline Indus.*,
 No. 07 C 5615, 2010 U.S. Dist. LEXIS 15260
 (N.D. Ill. Feb. 18, 2010)........................................................................................6, 7

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)........................................................................................19

*Pugh v. Tribune Co.*,
 521 F.3d 686 (7th Cir. 2008) ........................................................................................12

*Roots P'Ship v. Lands' End, Inc.*,
 965 F.2d 1411 (7th Cir. 1992) ........................................................................................7, 8

*Roth v. Aon Corp*,
 No. 04 C 6835, 2008 U.S. Dist LEXIS 18471
 (N.D. Ill. Mar. 7, 2008) ........................................................................................18

*Schlifke v. Seafirst Corp.*,
 866 F.2d 935 (7th Cir. 1989) ........................................................................................11

*Stransky v. Cummins Engine Co.*,
 51 F.3d 1329 (7th Cir. 1995) ........................................................................................9

*Sundstrand Corp. v. Sun Chem. Corp.*,
 553 F.2d 1033 (7th Cir. 1977) ........................................................................................16

*Takara Trust v. Molex Inc.*,
 429 F. Supp. 2d 960 (N.D. Ill. 2006) ........................................................................................9, 10

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................10, 16, 19

*Tricontinental Indus. v. PricewaterhouseCoopers, LLP*,
    475 F.3d 824 (7th Cir. 2007) ..............................................................................7

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4 ...................................................................................................9, 15, 17
    §78u-4(b)(1) ..........................................................................................................9
    §78u-4(b)(2) ........................................................................................................15

Federal Rules of Civil Procedure
    Rule 9(b) ................................................................................................................9
    Rule 12(b)(6)..........................................................................................................6

518726_1

## I.      Introduction

The Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") alleges that by May 3, 2009, defendants at The Boeing Company ("Boeing" or the "Company") knew that their newest and fastest-selling airplane, the 787, had failed a key wing stress test. ¶75.[1]  It alleges that because of the test failure, and the remediation and re-testing the failure mandated, defendants knew that the scope of the 787 program's First Flight and its delivery schedule were at severe risk.  *Id.*  But on May 3, defendants told investors that "[a]ll the necessary structural tests required prior to first flight are now complete," that "[t]he final test occurred April 21," and that while the final results were not complete, "'the initial results are positive.'"  ¶¶73-74.  Defendants said, without qualification, that the plane was "on schedule" and would be ready for First Flight by June 30.  *Id.*  Boeing's stock price jumped up when the market opened the next day, and continued to rise.  ¶75.

After May 3, things only got worse for the 787 program.  In mid-May, defendants had to re-test the 787 wings, which failed again, this time also suffering from structural "delamination," putting the First Flight and delivery schedules at even further risk .  ¶¶77, 119-123.  Defendants, however, said nothing about it.  Instead, up through June 23, defendants made more than a dozen additional statements affirming the health of the 787 program, and re-affirmed the First Flight and first quarter 2010 delivery schedule for the airplane, while knowing that their "final" test was not final, and that subsequent tests failed.  ¶¶70-99.  This includes statements at a key trade show – the June 15-18 Paris Air Show – where, as defendants' chief salesperson said, "*[t]he highest priority* [was] keeping the 3,500 planes we have on backlog."  ¶88.  In the end, although customers had

---

[1]        Unless otherwise noted, all "¶_" or "¶¶__" references are to the Complaint.  Unless otherwise noted, all emphasis is added and all internal citations are omitted.

cancelled more than 5% of the 787s on order in the five months before the Air Show, there was not a single cancellation in Paris.

Just five days after the Air Show closed, defendants shocked the investing community. They cancelled the First Flight (which was just a week away) and, on a conference call, said they could not estimate when it, or the first delivery, would be rescheduled. Securities analysts bashed the Company, pointing to, among other things, "the Wall of Worry" about Boeing (¶112) and raising "the question of controls and credibility." ¶114. The Company's stock price dropped ***more than 12%*** over two days. ¶115.

In their motion, defendants contend that: (a) plaintiff lacks standing to proceed with regard to certain alleged false statements (Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiff's Complaint ("Defs.' Mem.") at 7); (b) the pleading does not adequately plead falsity (*id.* at 7-16); and (c) the pleading does not raise a strong inference of scienter (*id.* at 16-19). By their silence, defendants concede that the Complaint is sufficient in all other respects. As demonstrated herein, their arguments fail and the Court should deny defendants' motion in its entirety.

## II. Statement of Facts

### A. Defendants Set an Aggressive First Flight and Delivery Schedule, and Chose to Discuss It with Investors

Since it was introduced in 2003, defendants have portrayed the 787 as representing the future of the Company's Commercial Airplane division. ¶6. By the end of 2008, the 787 was Boeing's fastest-selling airplane ever, with almost 900 orders from more than 55 customers. ¶7. However, timely delivery of those orders depended on the 787 passing the FAA's intensive certification testing process on schedule. ¶7. In 2007 and 2008, defendants had encountered problems with, among other things, the 787 composite technology. ¶8. As a result, Boeing pushed back the 787's first

customer delivery 20 months, straining the Company's reputation with its customers, suppliers, the industry and investors.  ¶¶8-9, 43, 46.

In response, defendants had publicly apologized to customers and pledged that Boeing would be more open and transparent with regard to such issues, even opening the factory to the media in May 2008.  ¶¶9, 12, 18, 44, 46-47, 72-74, 78, 81-82.  They also repeatedly affirmed that Boeing would conduct the 787's First Flight testing in 2Q2009 (ending June 30, 2009) and would finish the certification process and be ready for customer delivery by the end of 1Q2010.  *See, e.g.*, ¶¶4, 7, 10, 15, 54, 71.  This schedule had been in place since December 2008.  ¶51.

As part of the intensive FAA certification process, after an airplane passes a series of tests, it can perform what is referred to as "First Flight."  ¶69.  During First Flight, the airplane is put through a battery of vigorous flight tests, *e.g.*, flying various directional patterns at different speeds and altitudes, to determine the plane's readiness for the final certification testing phase.  ¶¶40, 69, 104-105.  According to news reports, the 787's First Flight was scheduled to last between three and five-and-a-half hours.  ¶69.  The completion of First Flight, in turn, starts the final certification testing phase – another series of intensive tests to ensure quality and safety in the aircraft's design and construction.  ¶40.  Upon successful completion of the entire FAA certification process, the airplane achieves its "'Airworthiness' Certification."  ¶7.  Only then can planes be delivered to customers.

For Boeing's previous new airplane, the 777 series, the pre-Certification tests after First Flight took almost a year.  ¶¶8, 41.  For the 787, Boeing cut the schedule to nine months, spreading out the certification tests over a fleet of six airplanes and two test "airframes" working 24 hours a day.  ¶¶8, 41, 68, 81.  This compressed schedule left very little room for error or surprises.

- 3 -

**B.     During the Class Period Defendants Misled Investors About Risks to the 787 First Flight and Delivery Schedules**

In a Sunday, May 3, 2009, press release, with First Flight still set for June and delivery for 1Q2010, defendants chose to tell the public that on April 21 the 787's wings were "subjected to their limit load – the highest loads expected to be seen in service," and although the Company had not analyzed all of the data on the test, "***the initial results [were] positive***.'"  ¶¶2, 12, 73-74, 140. Defendants also chose to announce that "***[a]ll the necessary structural tests required prior to first flight are now complete***."  ¶¶2, 12, 73-74, 140.  When the NYSE opened on May 4, the price of Boeing common stock responded immediately, closing at $41.77 on that day and closed at $44.20 on May 6, 2009.  ¶75.

By May 3, 2009, however, defendants knew the final results of this April 21, 2009 wing load stress test were a disaster: the 787 design had ***failed*** to meet at least the "ultimate load" test, which must be passed before the plane can be delivered.  ¶¶13, 75, 140.  Defendants knew they would have to find the time in the 787's already compressed 24/7 certification schedule to re-design, fabricate, install and successfully test a solution, and then implement it before a full First Flight and delivery certification could take place.  ¶¶13, 75, 140.  The wing design flaw also foreclosed Boeing's ability to conduct the full three to five-and-a-half hour flight tests during First Flight.  ¶¶101-102, 104.

By mid-May, defendants had scrambled to design and install a fix for the problem and, again, unbeknownst to the public, conducted a second stress test on May 17, 2009.  ¶¶13, 77, 144.  The 787 design failed this test as well, before reaching the "ultimate load" level.  ¶¶13, 77, 144.  Defendants knew from that point forward that the plane design could not be Airworthiness Certified by the FAA without major modification.  ¶¶13, 77, 144.  Further, none of the 787s would be allowed to carry out a full-fledged First Flight because of an additional design limitation.  ¶¶13, 77, 144.  In the second test, the wings suffered from "delamination" of the composite material.  ¶¶3, 13, 77, 119, 144.  Now,

- 4 -

Boeing was scrambling to develop a fix that would also eliminate the delamination, as the potential for delamination substantially increases maintenance checks and associated costs for customers. ¶¶3, 13, 17, 55, 77, 144.  During the Class Period, defendants' statements told investors none of this.

Defendants' false public statements about First Flight and delivery continued through June 2009.  Not only was June 30 the final day of 2Q2009, the final scheduled 787 First Flight date, but the Paris Air Show was set to take place between June 15 and June 18, 2009.  ¶¶14, 70, 87.  In support of Boeing's "priority" of stopping the flood of cancellations, defendant Scott Carson ("Carson") (CEO of Boeing's Commercial Airplane Division) and other Boeing executives made repeated statements about the 787 and its schedule at the Air Show.  ¶¶14, 88, 90-94, 96.  In a June Bloomberg television interview, Carson went as far as to say that the 787 "'definitely will fly' this month."  ¶¶4, 14, 15, 94.  Similarly, Pat Shanahan ("Shanahan") and Carson made press presentations and other statements at the show touting the upcoming First Flight and delivery schedule.  As a result of these efforts, Boeing left the Paris Air Show with no cancellations.  ¶15.

But, on June 23, just five days after the Paris Air Show presentations, Boeing issued a press release cancelling First Flight and obliterating the delivery schedule.  ¶¶16, 100.  Defendants admitted the problems occurred because the 787 failed a wing stress test performed in May 2009, and that they had not yet developed a solution.  ¶¶16, 100-107.  That day, defendant Carson stated that the Company had "discovered in a test condition several weeks ago an anomaly," and then had re-tested after installing a remedy that failed as well.  ¶¶16, 104.  Many angry financial analysts immediately downgraded Boeing's stock and others slammed defendants for their lack of candor, especially after giving such positive statements at the Paris Air Show just days earlier.  ¶¶19, 108, 110-114.  As one analyst wrote:  "We believe that had management been more up-front about this situation, perhaps the modest level of credibility on this topic it had started to re-establish over the

past several months could have been sustained." ¶¶19, 108.  Over the following two days, Boeing stock lost more than 12% of its value.  ¶19.

Subsequent media reports disclosed that the problem was "more complex than originally described by the company," and that Boeing had contacted its parts vendors about the test failures long before it told investors.  ¶¶20, 118, 121-123.  Ultimately, Boeing did not announce a new First Flight and delivery schedule until August 27, 2009, setting First Flight for six months after the earlier date, in 4Q2009, and postponing delivery nine months, to the end of 2010.  ¶¶20, 124.  On the same day, Boeing also announced a $2.5 billion charge, as, among other things, half of the six-plane test fleet was now un-sellable, with "no commercial market value beyond the development effort" because of extensive re-work and modifications to the wings and wing box.  ¶¶20, 125.

On August 31, 2009, defendants announced Carson's surprise "retirement."  ¶¶21, 34, 126. He was replaced by an executive from Boeing's "Integrated Defense Systems," outside of the Commercial Airplane group.  ¶¶21, 126.  On November 30, 2009, Boeing announced that it had tested the wings again.  ¶¶21, 133.  Ten days later, on December 10, 2009, defendants announced the new design had passed the "load level" test.  ¶¶21, 134.  As a "strategy," Boeing did not even try to perform an "ultimate load" test.  ¶¶21, 134.  The First Flight finally happened on December 15, 2009 – almost six months after Carson had reassured investors and buyers that the plane would "definitely" fly within two weeks.  ¶¶21, 135.  First delivery continues to be scheduled for 4Q2010, a delay of nine months after the date maintained until June 23, 2009.  ¶¶21, 135.

## III.    Defendants' Motion Misstates the Facts and Misapplies the Law

"A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint, not its merits." *Mason v. Medline Indus.*, No. 07 C 5615, 2010 U.S. Dist. LEXIS 15260, at *4 (N.D. Ill. Feb. 18, 2010) (citing *Gibson v. Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990)).  On such a motion, "the

- 6 -

court accepts as true all well-pleaded allegations, and draws all reasonable inferences in [plaintiff's] favor." *Id.*

In order to state a securities violation claim, a plaintiff must allege: "'(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages.'" *Jones v. Corus Bankshares, Inc.*, No. 09 C 1538, 2010 U.S. Dist. LEXIS 33579, at *6 (N.D. Ill. Apr. 6, 2010) (quoting *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007)). The Complaint satisfies each element.

Initially, defendants misstate the Complaint's allegations and twist the law, apparently believing this is their only path to success. For example, from literally the first sentence of their brief, defendants set up a straw man, arguing that the Complaint alleges that as of May 3 defendants "knew" that the 787 "would not make first flight by the end of June." Defs.' Mem. at 1-2, 5, 11, 17-18. The Complaint is void of any such allegation. The Complaint alleges instead that defendants knew as of May 3 that

> the 787 design had failed to meet at least the "ultimate load" test, which must be
> passed before the plane can be delivered. Further, because of the known limitations
> of the design, defendants would have to re-design, fabricate, install and successfully
> test a solution, and then implement it before a full First Flight could take place.

¶75. By mid-May, they knew the plane had failed a second test, but told nobody. Plaintiffs allege that defendants failed to disclose these known risks, while they repeatedly misstated the actual status of the 787. It is this simple theory that defendants seek to confuse and complicate to avoid liability.

## A.    Plaintiffs Have Standing for All Statements

Defendants ignore large swaths of alleged false statements based on their interpretation of *Roots P'Ship v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir. 1992). Defs.' Mem. at 7. In *Roots*, the

Seventh Circuit examined a nine-month-long class period, March to December 1989, where the plaintiff's final purchase was on July 25.  965 F.2d at 1414.  The Court held that Roots was not a proper representative of the class of persons who purchased stock after July 25 because of Roots' failure to allege loss causation.  *Id.* at 1420.  As defendants note, Lead Plaintiff purchased its shares on June 5, 2009, and the Class Period ends on June 23, 2009, less than three weeks later.  Defs.' Mem. at 7.  Unlike the facts in *Roots*, the misleading statements and omissions here, premised on the failed April and May 2009 stress tests, are essentially identical during a short Class Period.  Further, plaintiffs' losses in this case were caused by the same June 23 disclosure that caused the losses suffered by purchasers of Boeing stock post-June 5.  ¶151.  According to defendants' cramped interpretation of *Roots*, however, "'there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since on each day the mix of information available to the public would vary.'"  *Danis v. USN Commc'ns, Inc.*, 189 F.R.D. 391, 399 (N.D. Ill. 1999).  Here, the mix of information defendants failed to disclose did not change.  Accordingly, the Court should reject defendants' argument.

To the extent the Court requires further representation, the Local 295/Local 851 IBT Employer Group Welfare Fund, with the Lead Plaintiff's consent, seeks to serve as a representative plaintiff.  As noted in the certification attached as Ex. A, the Fund purchased 200 shares of Boeing stock on June 17, 2009 – the date of defendants' last false and misleading statement in this action.  ¶96.  Lead Plaintiff asks to amend the Complaint to add the IBT Employer Funds as a representative, or, at the Court's request, they will serve as a class representative in the upcoming motion for class certification.

**B.** **The Complaint Sufficiently Pleads Defendants' False and Misleading Statements and Why Each Statement Was False and Misleading When Made**

Plaintiffs must plead falsity in compliance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") §21D(b)(1) and Fed. R. Civ. P. 9(b). To do so, it must "'specify each statement alleged to have been misleading,'" identify the "who, what, when, where, and how," and list "'the reason or reasons why the statement is misleading.'" *See Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 971 (N.D. Ill. 2006) (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The Complaint meets this requirement. ¶¶73-96.

**1.** **When Defendants Chose to Speak, They Assumed a Duty to Speak Fully**

Defendants were under no duty to make statements about the 787 and its April 21 wing load stress test; rather, they chose to issue a press release on May 3 stating that "*[a]ll the necessary structural tests required prior to first flight are now complete*," the "*final test occurred April 21*," and the "'*initial results are positive*.'"[2] ¶¶73-74. Once defendants choose to speak on a subject, they are under a duty to speak fully and truthfully regarding all material facts concerning that subject. *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991). However, far from "complete,"

---

[2]      Defendants ask the Court to ignore the May 3 statement because it was made before the NYSE opened (Defs.' Mem. at 7), but courts in the Seventh Circuit have long recognized that statements like this are actionable. *See In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862, at *29-*30 (N.D. Ill. Feb. 7, 2003) (citing *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331-32 (7th Cir. 1995)); *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 282 (7th Cir. 1996)). Other courts agree. *See, e.g.*, *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966-67 (N.D. Cal. 2005) ("The Court rejects the argument that Plaintiff cannot maintain an action on the basis of statements made before the proposed class period" because the analysis that "'liability cannot attach to statements made either before or after the class period'" does not apply where plaintiff "asserts a causal connection between the [pre-class period] misstatements and the [securities'] value."). *Cf.* Defs.' Mem. at 10 (relying on law outside of this jurisdiction and the factually unique case of *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 855 (N.D. Ill 2009) (where pre-Class Period statement fell on a Tuesday, and the plaintiffs did not allege how it artificially inflated the stock price during the class period)). If the Court requires, plaintiffs will amend the Complaint to start the Class Period one day earlier.

- 9 -

"final" or "positive," re-design and re-test of the wings were required because the 787 had failed the April 21 stress test. ¶¶75, 100-107.  Plaintiffs need plead no more to establish falsity. *Takara Trust*, 429 F. Supp. 2d at 971.

Defendants do not dispute that the 787 wings failed the  April 21, 2009 wing load stress test. Rather, they challenge whether plaintiffs sufficiently plead facts demonstrating that defendants' May 3 statements were false as of that date.  Their challenge is an empty one.[3]  By May 3, 2009, defendants knew the results of the April 21 wing stress test because, as Boeing has admitted, the timing for a "full analysis" of this type of wing test takes 10 days.  ¶¶133-134.[4]  Not coincidently, defendants announced the April 21, 2009 test results 12 days after the test – when the final results were known.  ¶104.  Finally, plaintiffs' investigation has confirmed that defendants received the failed results via e-mail by May 3, 2009.  ¶75.  At this procedural juncture, no more is required. *Corus*, 2010 U.S. Dist. LEXIS 33579, at *17-*18 (rejecting defendant's argument concerning the alleged timing of its knowledge because "plaintiff is not required to prove the truth of his allegations, and it would be inappropriate to weigh the parties' factual bases for their respective positions") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

Throughout the balance of the Class Period, defendants repeatedly chose to make more qualitative statements about the 787.  For example, defendants affirmed the 787's First Flight and

---

[3]      Contrary to defendants' mischaracterization of the Complaint, ¶75 of the Complaint alleges that "Boeing employees and defendants knew about the poor results of this April 21 test, the need for re-design and re-testing, and the risk to the First Flight and delivery schedule via internal e-mails sent before May 3, 2009." *Compare* ¶75 *with* Defs.' Mem. at 10 (arguing that ¶75 states that "first flight would be delayed").

[4]      Recent announcements by Boeing further discredit defendants' attempt to challenge this 10-day analysis period.  *Compare* Ex. B  (http://boeing.mediaroom.com/index.php?s=43&item=1138) (Boeing's announcement on 3/28/10 that it "today completed the ultimate-load wing up-bending test on the 787 Dreamliner") *with* Ex. C  (http://boeing.mediaroom.com/index.php?s=43&item=1151)  (Boeing's announcement ***10 days later***, on 4/7/10, that "all test requirements were successfully met during the 787 Dreamliner's ultimate load wing and fuselage bending test").

delivery schedules.  *See* ¶¶71, 79, 85, 91, 93-94, 96.  Defendants also chose to repeatedly tout their

successes on the road to achieving on-time delivery of the 787.  *See* ¶¶72-74, 78, 80-82, 85, 90, 93-

94, 96.  Each time defendants did so, they had an affirmative duty to disclose material non-public

information – the failed results of the April 21 and then May 17 wing tests that posed a severe risk to

on-time delivery.  *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2010 U.S. Dist. LEXIS 31463, at

*4, *53-*57 (N.D. Ill. Mar. 31, 2010) ("'[I]ncomplete disclosures, or half-truths'" concerning the

launch of a company's "lead product in development" "'implicate a duty to disclose whatever

additional information is necessary to rectify the misleading statements.'") (quoting *Schlifke v.

Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989)).[5]

Defendants argue in the alternative that they are not liable because the May re-test may have

been a "potentially different" or even an optional test, thus making their May 3 statements literally

true.  Defs.' Mem. at 11.  This argument is contradicted by defendants' June 23 admissions.

Boeing's 787 Vice-President and General Manager explained that "further testing" occurred in May

because the earlier wing load stress test produced ***failed*** results.[6]  ¶102.  In June, both Carson and

Shanahan admitted that Boeing's May wing load stress test was part of "***planned*** 787 static testing"

---

[5]      *See also Levie v. Sears Roebuck & Co.*, No. 04 C 7643, 2006 U.S. Dist. LEXIS 12725, at *13-*16 (N.D. Ill. Mar. 22, 2006) (finding a "duty to disclose" contemporaneous merger negotiations with Kmart arose because defendants chose to make statements about the company's other business dealings with Kmart); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (A defendant must "'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak'. . . .  With regard to future events . . . a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths.").

[6]      Defendants try to downplay the failed results of the 787 stress tests by reiterating that the tests produced an "'anomaly'" and an "'identified stress'" (*i.e.*, delamination) that they did not fully understand. Defs.' Mem. at 13.  However, courts in this district have found similar arguments unavailing.  *See, e.g.*, *NeoPharm*, 2010 U.S. Dist. LEXIS 31463, at *57 ("why the clinical trials had failed, however, is irrelevant . . . investors were most concerned with information concerning [a product's] time-to-market because it was a direct indicator of . . . ***future earnings***") (emphasis in original).

- 11 -

on the "static test airplane" – the same static testing that was supposedly "complete" by May 3. *Compare* ¶¶73-74 *with* ¶¶101-102.

> **2.    Defendants Impermissibly Contort the Actual Facts Alleged in an Attempt to Meet Their Case Law of Choice**

Because the facts alleged do not fit defendants' case law of choice, defendants simply ignore facts in order to make the cases of *Higginbotham*, *Pugh*, and *Anderson* seem relevant.  Defs.' Mem. at 14 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007); *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008); and *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd*, *Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)).  Defendants fail.

In all three cases, defendants chose to remain silent during the investigation and/or never made any qualitative statements about the issue they were investigating. *See, e.g.*, *Anderson*, 140 F. Supp. 2d at 907 (noting that defendants there "[said] little, if anything" about the issue of investigation).  Here, the Complaint alleges that W. James McNerney, Jr. ("McNerney") and Carson made false statements regarding status of the 787 after receiving the final results of the "investigations" and the final results contradicted their public statements.  ¶¶140, 143-144.  Further, when each of the test's results were final (*i.e.*, before May 2, 2009 and May 28, 2009, respectively), defendants' "investigations" were complete. *But see* Defs.' Mem. at 18.  To that end, the cases upon which defendants rely for their purported "investigation" defense are distinguishable.  In *Pugh*, the defendants were not alleged to have participated in the fraud and initiated an investigation after becoming aware of accusations of fraud.  521 F.3d at 695.  Here, defendants are alleged to have directly participated in the alleged fraud after completion of the investigations – and spoke about them.  Likewise, *Higginbotham* is of no avail.  As the Seventh Circuit noted, "[t]aking the time necessary to get things right is both proper and lawful.  [However] *[m]anagers cannot tell lies* . . . ."  495 F.3d at 761.

### 3.    Defendants' Class Period Statements Affirming On-Schedule First Flight and Delivery Are Not Puffery

On May 21, 2009, defendants claimed "steady progress" toward First Flight and announced that Boeing was moving forward to conduct the next phase of testing – gauntlet tests.[7]  ¶78.  They hid the fact of the May 17 re-test and, therefore, their statements were misleading.  However, "even where a statement is not actionable when considered individually, it can be actionable if it 'reinforce[s] factual misstatements and therefore contribute[s] to ongoing deception.'"  *Corus*, 2010 U.S. Dist. LEXIS 33579, at *37 (quoting *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003)); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) ("defendants continually skewed the mix of information by omitting the known severe risks").  Defendants' statements reiterating that the 787 was on-schedule were false and misleading because defendants omitted the known severe risks to that schedule.[8]

By the end of May, defendants were scrambling to design a solution that would allow the 787 to perform a full First Flight and, consequently, allow on-time delivery.  Nonetheless, on May 27,

---

[7]    Additional misleading statements of timely progress to achieve delivery tied to successful completion of the 787's milestones are alleged throughout the Complaint.  *See* ¶85 (completing "intermediate gauntlet phase. . . so we can get to first flight"); ¶90 ("The second Boeing 787 Dreamliner has moved to the flight line to begin fuel testing. . . .  'Momentum continues to build with each milestone achieved'"); ¶¶93-94 ("'I personally believe the [787] could fly today,' . . . the 787 cleared the intermediate gauntlet testing"); ¶94 ("A flight-readiness review will be conducted on June 20, followed by a 'final gauntlet' trial of the power system, flight controls and avionics and a high-speed taxi test . . . .  'Then we'll go flying'"); ¶94 ("Boeing has already done extra ground testing during the delays in order to minimize the time until the plane's service entry"); ¶96 ("[F]inal assembly had begun . . . '[d]eliveries are scheduled to begin in the first quarter of 2010.' . . .  'This is a great day for the 787 team.'").

[8]    There is no analogy between *Eisenstadt* and the facts here.  Defs.' Mem. at 12 (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997)).  First, *Eisenstadt* "is not a case about predictions."  113 F.3d at 746.  *Eisenstadt* is about an auction of a company wherein the defendants "never even predicted that there would be a purchaser."  *Id.*  In that context, the Seventh Circuit found that investors will not "pay more for a stock" merely due to "**general** expressions of satisfaction" with the progress of an auction.  *Id.* at 745 (emphasis in original).  Here, in contrast, each of defendants' statements of on-schedule progress toward First Flight was paired with specific milestones, and understood by investors as assurance that there were no known **realized** risks to meeting the then-current delivery schedule of 1Q2010.

- 13 -

McNerney chose to state in an investor conference "'I think *the airplane will fly in June*. We will embark on a flight test program *as we described it*.'" McNerney further chose to report that "he *expects the first 787 deliveries in the first quarter of 2010*" and the *only remaining risk* to on-time delivery was the potential for "a mechanical issue coming to light *during the test flight*." ¶79.[9]

Then, on May 30 and June 1, 4, and 8, Boeing chose to generate further investor excitement over the 787's readiness for on-time delivery by announcing the progress of "around the clock" simulations of " in-flight conditions" that would further support defendants' "*gaining confidence*" in the "*full robustness*" of the 787. ¶¶80-82, 84-85. Again, defendants never disclosed the wing re-test in mid-May that compromised the robustness of the 787's flight envelope.

By the Paris Air Show, defendants' misleading statements came to a fever pitch as Boeing's "highest priority" was stemming the flow of 787 cancellations. *See, e.g.*, ¶¶91, 93-94 (Carson stating that Boeing is "'*absolutely committed*'" to a First Flight of the 787 "*within the next two weeks [by June 30, 2009]*," the Dreamliner "'*definitely will fly' this month*," and he "'*personally believe[d] the [787] could fly today*.'"). These statements were false and misleading because by the time of the 2009 Paris Air Show, defendants knew the fact that additional stress testing had been performed on the 787 wings, the reason for the testing, and the negative results of those tests. Unbeknownst to investors, with less than two weeks to its ostensible First Flight, the 787 test plane had *twice* failed to withstand the "ultimate load," and at least once suffered delamination, and defendants would need to design, fabricate, install and test yet another solution to the wing problem before a full First Flight and customer delivery could occur.

---

[9] Shockingly, defendants try to use this statement, that the *only potential risk* to an on-time delivery for the 787 was a then-unknown problem that might arise during the test flight, as a warning that the test flight itself was compromised. Defs.' Mem. at 4.

### 4.    Defendants' Statements Are Not Protected by Safe Harbor

Defendants argue that Boeing's May 3 statement that the 787 "will fly later this quarter,"
McNerney's May 27 statement that "'I think the airplane will fly in June," Boeing's marketing
chief's June 16 statement that the new "787 would fly before the end of June," and Carson's June 16
statement "I personally believe the airplane could fly today" are forward looking statements that fall
under the PSLRA's safe harbor.  Defs.' Mem. at 11, 14 and 16 n.3.  They are wrong.

In this circuit, "forward-looking statements made ***after*** the issuance of those cautionary
statements are sheltered by the safe harbor – that is, ***so long as the cautionary statements remain
'meaningful*.'"  *Desai*, 654 F. Supp. 2d at 845.  Here, defendants' pre-Class Period "cautionary"
statements became not meaningful because the facts changed, but defendants never updated the
"cautionary" statements.[10]  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) (holding
that if a risk to projections materializes without any corresponding change to defendants' public
statements, then defendants "omitted important variables from the cautionary language and so made
projections more certain than its internal estimates at the time warranted").  *See also Makor Issues &
Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598-99 (7th Cir. 2006) ("*Tellabs I*") (holding that since
defendant knew about specific "troubles" when making its projections, then even the warnings that
"[w]ithout doubt" "encompass[ed]" the company's "troubles," "were not particularized enough for it
to claim shelter under the PSLRA's safe harbor provision").

### C.    The Complaint Pleads a Strong Inference of Defendants' Scienter

The PSLRA requires plaintiffs to plead facts giving rise to a "strong inference" of scienter.
15 U.S.C. §78u-4(b)(2).  A strong inference can be established with allegations of fact demonstrating

---

[10]    Each time the 787 test failed, defendants knew Boeing would have to find the time in the already compressed 24/7 certification schedule to re-design, fabricate, install and successfully test a solution, and then implement it in order to attain a full First Flight and delivery.

518726_1

that a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*"), *dismissed in part*, 2008 U.S. Dist. LEXIS 41539 (N.D. Ill. 2008). Recklessness is defined as:

> "[A]n extreme departure from the standards of ordinary care . . . which prevents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977); *see also Tellabs II*, 513 F.3d at 704. Allegations of motive and opportunity to commit fraud may support a strong inference. *See Tellabs I*, 437 F.3d at 601. The Court must consider the totality of the facts alleged to determine whether they give rise to "'an inference of scienter *at least as likely as* any plausible opposing inference.'" *Tellabs II*, 513 F.3d at 705 (emphasis in original) (quoting *Tellabs*, 551 U.S. at 328). This Complaint raises a strong inference of defendants' scienter.

### 1.   Defendants Knew or Recklessly Disregarded that the 787 Wing Failed the April 21, 2009 and May 17, 2009 Stress Tests

The Boeing 787 Dreamliner is the most important aircraft Boeing has designed in its recent history. ¶¶35-36. Throughout the Class Period, defendants confirmed to analysts and investors that they were fully aware of – *indeed, "underst[ood] clearly" and were* "*laser focused*" *on* – all aspects of the 787's testing processes because the program was "*Priority No. 1*." ¶¶12, 49, 52, 54, 58, 71-74, 80-81, 85, 90-96, 137. Most of the false statements in this case are attributable to McNerney, the Chairman and CEO of Boeing, and Carson, the then-CEO of Boeing's Commercial Airplanes segment. ¶¶33-34, 71-74, 79, 85, 90-91, 93-96, 139, 142. For executives like McNerney and Carson, therefore, the Seventh Circuit instructs that a skeptical eye must be cast on arguments that they were not intimately familiar with the status of the all-important 787:

> Because the alternative hypotheses – either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements – are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent.

- 16 -

> . . . Is it conceivable that [McNerney and Carson] [were] unaware of the
> problems of [their] company's . . . major product[] and merely repeating lies fed to
> [them] by other executives of the company?   It is conceivable, yes, but it is
> exceedingly unlikely.

*Tellabs II* at 711.  The Complaint's allegations of scienter are congruent with the Seventh Circuit's

theory of top management's scienter.  Further, when the Complaint's allegations are considered in

their entirety (*id.* at 705), the pleading gives rise to a strong inference of scienter.

**Within 10 days of the April 21 and May 17, 2009 stress tests, defendants Carson and**

**McNerney were informed via email of each test's final results**.  ¶¶75, 77, 140, 144.  And these are

facts defendants received **before** issuing their false and misleading statements.  The April 21 stress

test was an abysmal failure as the wings failed before "ultimate load."  ¶¶13, 75.  Accordingly, the

wing structure would require redesign of critical components and installation of the fix to obtain

FAA flight certification.  ¶¶13, 75.  In early May, after receiving the final results of the failed

April 21 test, defendants hurried to design and install the fix and conducted a secret second stress

test on or about May 17, 2009.  *Id*.  Like the April 21 test, the May 17 test was a failure because the

wing did not meet the "ultimate load" threshold.  *Id*.  Defendants knew of or recklessly disregarded

these facts within ten days of the April 21 and May 17, 2009 tests (¶¶75, 77, 140, 144), but failed to

disclose them publicly during the Class Period.  These facts must be accepted as true, and the

Complaint need not allege more.  *Tellabs II*, 513 F.3d at 704.

## 2. Defendants' Motivation to Conceal 787 Wing Test Failures from Investors and Customers Supports a Strong Inference of Scienter

Not only does the Complaint sufficiently allege evidence/facts showing defendants' knowing

or reckless conduct, it presents additional, cogent theories of motive that pass muster under the

PSLRA.  First, on June 23, 2009, defendants admitted they knew about the original test failure, and

subsequent re-testing before the Paris Air Show.  ¶¶101-106.  Next, between January 30, 2009 and

February 20, 2009, Boeing announced over 32 cancellations of its 787 jetliner due to various development delays. ¶¶56-59, 64. During the week of May 5, 2009, Boeing announced another 25 costly cancellations for the jet. ¶76. Quite naturally, therefore, defendants stated that the "***highest priority***" of attending the June 2009 Paris Air Show was to stem the tide of cancellations, "keeping the 3,500 [787s] we have on [the order] backlog." ¶88. Defendants do not dispute that a real risk of additional cancellations existed if Boeing had disclosed the failed April and May 2009 wing tests prior to the Paris Air Show.[11] Thus, defendants' motivation to conceal the failed April 21, 2009 and May 17, 2009 stress tests from customers to avoid billions of dollars in lost revenue is unassailable.

For instance, in *Roth v. Aon Corp.*, insurance giant Aon kept quiet regarding contingent commission arrangements it had with competing insurance companies, which posed real financial risks to Aon's retail customers and investors. *See* No. 04 C 6835, 2008 U.S. Dist LEXIS 18471, at *17-*18 (N.D. Ill. Mar. 7, 2008). Judge Norgle concluded that these types of allegations are relevant to the scienter inquiry. *Id.* at *19. Here, defendants had the same motive to remain quiet about known risks concerning the 787 delivery schedule as a result of the failed April and May 2009 stress tests. Again, defendants hid these risks from customers during the Paris Air Show to avoid further cancellations of the 787, which would have resulted in a material erosion in Boeing's stock price.[12]

---

[11]    Defendants, however, contend that this theory of motive is "nonsensical." Defs.' Mem. at 18-19. Yet the Seventh Circuit has already rejected this very argument: "[D]efendants argue that they could have no motive to paint the prospects for the [product] in rosy hues because within months they acknowledged their mistakes and disclosed" the truth. *Tellabs II*, 513 F.3d at 710. "The argument confuses expected with realized benefits. [Defendants] may have thought that there was a chance that the situation regarding the [product] would right itself. If so, the benefits of concealment may have exceeded the costs. . . . Prompt disclosure of the truth would have caused Tellab's stock price to plummet, as it did when the truth [later] came out . . . . The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id.*

[12]    Defendants wrongly contend that this theory of motivation is "counterintuitive" because it implies that customers would have "shyly refrained" from cancelling orders after the Paris Air Show. Defs.' Mem. at

- 18 -

The Complaint contains another cogent theory of motive to defraud.  Shortly after the known

test failures were disclosed to the public, Carson, who repeatedly promised investors that the 787

would fly by the end of June 2009, was asked to take an unscheduled retirement three years early.

¶¶34, 126-127.  This fact only adds to the strong inference of scienter raised in the Complaint.  *See,*

*e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002) (allegations of a defendant setting

false performance expectations concerning a key product, where his job might be in jeopardy if those

expectations do not materialize, are relevant).  Accordingly, the Complaint conveys multiple cogent

and plausible theories of motivation that directly support a strong inference of scienter.  Defendants

fail to argue more cogent inferences, let alone equally cogent alternatives.  *Cf. Tellabs*, 551 U.S. at

323-24.  Thus, the Court should deny defendants' motion in its entirety.

### 3.     The Complaint's Allegations of Scienter Are Sufficiently Particularized

Defendants   wrongly   contend   that   the   Complaint   relies   upon   mere   "conjecture"   and

"unsupported ***assumptions***" to allege that defendants must have known of the failed April 21 and

May 17, 2009 tests within ten days of their completion.  Defs.' Mem. at 17 (emphasis in original).

Specifically, defendants assert that the Complaint does not sufficiently identify the source of those

allegations – *i.e.*, confidential sources.  *Id.*  Defendants are wrong and have misread the law.  *See,*

*e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("where plaintiffs rely on confidential

personal sources but also on other facts, they need not name their sources as long as the latter facts

provide an adequate basis for believing that the defendants' statements were false").

---

18.  As an initial matter, defendants fail to address the allegation that Boeing, in fact, did not lose a single
order at the Paris Air Show because defendants were falsely touting that the 787 "***definitely will fly***" by the
end of June 2009.  ¶¶5, 94.  Second, shortly after defendants disclosed the 787's structural flaws on June 23,
2009, Qantas did cancel orders for 15 787s and deferred orders for an additional 15.  ¶120.

That basis exists here – in spades.  The Complaint is replete with references to publicly available facts evidencing that defendants' Class Period statements regarding the 787 were false when made.  For instance, defendants have admitted twice that finalization of the 787's wing tests took 10 days to finalize.  *See* ¶143; n.4, *supra*.  For defendants to suggest that they were not made aware of these results immediately, given that they were "***laser focused***" on the 787 and the program was "***Priority No. 1***," is absurd.  *Tellabs II*, 513 F.3d at 711.  On June 23, 2009, moreover, defendants admitted that they knew of the 787 wing structural defects in May 2009. ¶104.  Between June 23 and June 25, various reputable news sources confirmed defendants' admissions that they knew about the "emergent failure" of the wing structure in May 2009. ¶¶105, 114-115.  On June 25, 2009, *The Wall Street Journal* added that "Boeing said its engineers and senior executives alike had known since May of the structural problem that [would] keep the jet grounded . . . for months." ¶115.  Accordingly, plaintiffs need not identify or name their confidential sources.[13]

## IV.   Conclusion

Plaintiffs respectfully request the Court deny defendants' motion.

DATED:  April 22, 2010                    Respectfully submitted,

                                          PLAINTIFF


                                          By:  s/Marvin A. Miller
                                          _____
                                          MARVIN A. MILLER

---

[13]     Should the Court believe that the Complaint lacks specificity as to the source of information from which plaintiffs have alleged that defendants received the final results of the failed April 21, 2009 and May 17, 2009 stress tests within 10 days via email, plaintiffs will share that information with the Court *in camera.*  Plaintiffs offer to share this information to address any concern the Court may have, as well as for the purpose of allowing plaintiffs to seek leave to make a minor amendment to the operative pleading.

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

THOMAS E. EGLER
TRIG R. SMITH
SHANNON M. MATERA
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

RANDI D. BANDMAN
ROBBINS GELLER RUDMAN
   & DOWD LLP
52 Duane Street, 7th Floor
New York, NY  10007
Telephone:  212/693-1058
212/693-7423 (fax)

Lead Counsel for Plaintiff

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES OF BERNARD M.
   GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

- 21 -

MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

EXHIBIT A

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP WELFARE FUND
("Plaintiff") declares:

1.    Plaintiff has reviewed the Amended Class Action Complaint filed in this
action and adopts its allegations.

2.    Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a
class in an action filed under the federal securities laws except as detailed below
during the three years prior to the date of this Certification:

*The Eshe Fund, et al. v. Fifth Third Bancorp, et al.*, No. 1:08-cv-00421-SSB-TSH (S.D. Ohio)

6.    The Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

BOEING

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of April , 2010.

LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP WELFARE FUND

By: _Neil J. Saveste_

Its: _Administrator_

- 2 -

BOEING

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 06/17/2009 | 200 | $48.35 |

# EXHIBIT B

Case 1:09-cv-07143   Document 41   Filed 04/22/10   Page 33 of 37

## Boeing Completes Ultimate-Load Wing Test on 787



**These images are available for editorial use by news media.**

EVERETT, Wash., March 28 /PRNewswire-FirstCall/ -- Boeing (NYSE: BA) today completed the ultimate-load wing up-bending test on the 787 Dreamliner static test unit. During the testing, loads were applied to the airframe to replicate 150 percent of the most extreme forces the airplane is ever expected to experience while in service. The wings were flexed upward by approximately 25 feet (7.6 meters) during the test.

The initial results of the ultimate-load test are positive. More extensive analysis and review are required before the test can be deemed a success.

"The test program has been more robust than any conducted on a Boeing commercial jetliner," said Scott Fancher, vice president and general manager of the 787 program, Boeing Commercial Airplanes. "It has taken countless hours of hard work by the Boeing team and our partners to work through the static test program. Everyone who has been involved in this effort over the past several years should be very proud of their contributions to ensuring the safety of the 787 Dreamliner.

"We are looking forward to the technical team's report on the details of the test results," said Fancher. It will take them several weeks to work through all of the data.

During each second of the more than two-hour test, thousands of data points were collected to monitor the performance of the wing. Key data points are monitored real-time during the test, but all of the data will be evaluated in the weeks ahead.

### 787 Dreamliner Background

The 787 Dreamliner is an all-new twinjet designed to meet the needs of airlines around the world in providing nonstop service between mid-size cities with new levels of efficiency. The airplane will bring improved levels of comfort to passengers with larger windows, bigger baggage bins and advances in the cabin environment, including lower cabin altitude, higher humidity and cleaner air. Delivery of the first 787 is planned for the fourth quarter of 2010.

### # #

Contact:
Lori Gunter
787 Communications
+1 206-931-5919


SOURCE Boeing

EXHIBIT C

## Boeing Confirms Success on 787 Wing, Fuselage Ultimate Load Test

EVERETT, Wash., April 7 /PRNewswire-FirstCall/ -- Boeing (NYSE: BA) announced today that all test requirements were successfully met during the 787 Dreamliner's ultimate load wing and fuselage bending test. This follows a thorough analysis of the results from a test on the 787 static test airframe.

"Successfully completing this test is a critical step in the certification of the 787. This is further validation that the 787 performs as expected, even in the most extreme circumstances," said Scott Fancher, vice president and general manager of the 787 program for Boeing Commercial Airplanes.

On March 28, loads were applied to the test unit to replicate 150 percent of the most extreme forces the airplane is ever expected to experience while in service. The wings were flexed upward by approximately 25 feet (7.6 meters) during the test and the fuselage was pressurized to 150 percent of its maximum normal operating condition.

In evaluating the success criteria for the test, Boeing specialists have been poring over the thousands of data points collected during the test to ensure that all parts of the airplane performed as expected.

"The airframe performed as designed and retained the required structural integrity. These results continue to validate the design of the 787 as we move toward certification," explained Fancher.

Video of the static test can be found at the 787 flight test Web site at www.boeing.com and www.newairplane.com.

Contact:

Lori Gunter

787 Communications

+1 206-931-5919

SOURCE Boeing

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 22, 2010.

<u>s/ MARVIN A. MILLER</u>
MARVIN A. MILLER

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

E-mail:  mmiller@millerlawllc.com

# Mailing Information for a Case 1:09-cv-07143

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randi D Bandman**
  randib@rgrdlaw.com

- **Thomas E Egler**
  tome@rgrdlaw.com,stremblay@rgrdlaw.com

- **John A Eisenberg**
  john.eisenberg@kirkland.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Mark Robert Filip**
  mark.filip@kirkland.com,john.eisenberg@kirkland.com,sandra.gentile@kirkland.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Shannon Mckenna Matera**
  smatera@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)