UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:09-cv-07143 |
| | ) | Judge Suzanne B. Conlon |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE BOEING COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT TO CONVERT
DEFENDANTS' MOTION TO DISMISS TO SUMMARY JUDGMENT AND FOR LIMITED
DISCOVERY AND FOR LEAVE TO AMEND THE OPERATIVE PLEADING

Lead Plaintiff, City of Livonia Employees' Retirement System ("plaintiff"), moves this Court

to Convert Defendants' Motion to Dismiss to Summary Judgment and for Limited Discovery and for

Leave to Amend the Operative Pleading (the "Motion").[1]  In support of the Motion, plaintiff submits

an affidavit pursuant to Rule 37.2 of the Local General Rules of this Court, which is attached hereto

as Exhibit B.

## I.   INTRODUCTION

The Amended Class Action Complaint for Violation of the Federal Securities Laws ("AC")

alleges that by May 3, 2009, defendants at The Boeing Company ("Boeing" or the "Company")

knew that their newest and fastest-selling airplane, the 787, had failed a key wing stress test.  ¶75.[2]

The AC alleges that because of the test failure, and the remediation and re-testing the failure

mandated, defendants knew that the scope of the 787 program's First Flight and its delivery schedule

were at severe risk.  *Id.*  But on May 3, defendants told investors that "[a]ll the necessary structural

tests required prior to first flight are now complete," that "[t]he final test occurred April 21," and that

while the final results were not complete, "'the initial results are positive.'"  ¶¶73-74.

In mid-May, defendants re-tested the 787's wings, which failed again, this time also suffering

from structural "delamination," putting the First Flight and delivery schedules at even further risk .

¶¶77, 119-123.  Defendants, however, remained silent about these material, non-public, adverse

facts.  Instead, up through June 23, defendants made more than a dozen additional statements

affirming the health of the 787 program, and re-affirming the First Flight and first quarter 2010

---

[1]      For the Court's convenience, the proposed Second Amended Complaint ("SAC") is attached hereto as Ex. A, and the additional allegations therein are highlighted in yellow.  The additional allegations are contained on p.1 and in ¶¶33, 139-142.

[2]      Unless otherwise noted, all "¶_" or "¶¶__" references are to the AC.  *See* Dkt. No. 23.  Unless otherwise noted, all emphasis is added and all internal citations are omitted.

- 1 -

delivery schedule for the airplane, while knowing that their "final" test was not final, and that subsequent tests failed. ¶¶70-99. This includes statements at a key trade show – the June 15-18 Paris Air Show – where, as defendants' chief salesperson said, "'[t]he highest priority [was] keeping the 3,500 planes we have on backlog.'" ¶88.

Just five days after the Paris Air Show closed, defendants stunned investors. They cancelled the First Flight (which was just a week away) and, on a conference call, said they could not estimate when it, or the first delivery, would be rescheduled. Securities analysts bashed the Company, pointing to, among other things, "the Wall of Worry" about Boeing (¶112) and raising "the question of controls and credibility." ¶114. The Company's stock price dropped more than 12% over two days. ¶115. This suit followed.

## II.   PROCEDURAL HISTORY

On March 25, 2010, defendants filed their motion to dismiss the AC ("Defs.' Motion"), primarily challenging the pleading's allegations concerning falsity and scienter. *See* Dkt. No. 35. On April 22, 2010, plaintiff filed its opposition to Defs.' Motion. *See* Dkt. No. 41. Thereafter, on May 10, 2010, defendants filed their reply brief ("Reply"). *See* Dkt. No. 44. Defendants' reply addressed plaintiff's arguments in opposition to Defs.' Motion in part, but went beyond what is allowed by the law at this stage in the proceedings.

Defendants have inappropriately infused facts into their reply brief. By way of example, defendants state:

- "No reasonable person would think that a 'full analysis' of test results on a complex, cutting-edge aircraft structure *invariably* takes only 10 days. [Boeing] [e]ngineers collect enormous amounts of data during such tests, and the analysis period depends on the nature of the test and the complexity of what is found." Reply at 8 (emphasis in original). In other words, defendants assert as fact that the negative results of the failed April 21, 2009 and May 17, 2009 wing tests were neither compiled for, nor communicated to, defendants McNerney and Carson within 10 days.

- 2 -

- 522960_1"Boeing announced on May 3 only that the 'structural tests *required prior to first flight* are complete.' . . . All that meant was that Boeing had finished tests that it had planned to complete before first flight." Reply at 9 (emphasis in original). In other words, defendants seek to excuse their Class Period statements by glossing them with *post hoc* perspective.

- "The precise testing contours from before first flight through ultimate certification, calibrated to the specific aircraft, are detailed in a Certification Plan, to which [Boeing] and the FAA [agreed] make clear that . . . testing continues well past tests performed for first flight." Reply at 9. Here, defendants reference an array of federal regulations and imply that the May 2009 test had nothing to do with readying the 787 for first flight (*i.e.*, plaintiff "offers *no* facts alleging that the [May] test . . . was not related to *certification*."). *Id.* (first emphasis in original).

  But this purported fact is contradicted by Pat Shenahan's, 787 Vice President and General Manager, June 23, 2009 admission: "*Our preliminary analysis of [the May test] results indicated we could proceed with first flight*." ¶102.

- "Other testing for certification would go on, and Plaintiff offers *no* facts alleging that the test conducted later in May was a retest (*it was not*) . . . ." Reply at 9 (first emphasis in original). Here, defendants argue as fact, without support, that the May 2009 test was not a re-test of the failed April 2009 limit load test and had nothing to do with first flight.

As demonstrated below, not only is this type of fact-based argument improper on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), but also plaintiff should be allowed limited discovery to test the veracity of defendants' fact-based arguments if the Court considers them.

## III. ARGUMENT

### A. Because Defendants Improperly Infuse Assertions of Fact in Support of Their Motion to Dismiss, It Should Be Converted to a Motion for Summary Judgment and Plaintiff Is Entitled to Limited Discovery

The Court, in deciding defendants' motion to dismiss, may only consider the allegations in the complaint, as well as take notice of items in the public record. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000). But here, defendants urge the Court take notice of unsupported assertions of fact that were not available to the public during the Class Period. Specifically, defendants represent that when they said all "structural tests required prior to first flight are complete," *they really meant*

that all tests they "planned to complete" were complete.  Reply at 9.  Further, defendants assert that

the May 17, 2009 test "*was not*," a re-test or in any way related to First Flight.  *Id.*  Defendants, until

they filed their Reply, never made the public aware of these purported facts.  Under these

circumstances, the Court would be well within its discretion to convert defendants' motion to

dismiss to summary judgment.  *See Rizzo v. Sheahan*, No. 91 C 3002, 1992 U.S. District LEXIS

10347, at *11-*12 (N.D. Ill. July 14, 1992) ("the proper vehicle to bring this issue before the Court is

a motion for summary judgment, after the parties have had sufficient time to conduct appropriate

discovery").

Because defendants' improper assertions of fact go to the core of the 787 testing process, the

Court should allow plaintiff the opportunity to conduct appropriate, limited discovery.  As such,

plaintiff requests the Court's leave to seek the following documents as kept in the ordinary course of

Boeing's and the Wing-Body Integration Team's business: (a) the 787's "Certification Plan"; (b) the

complete contents of Boeing's April 21, 2007 Wing Test File (*see* Ex. A, ¶¶139-142); (c) the

complete contents of Boeing's May 17, 2009 Wing Test File (*see id.*); (d) all Class Period

communications concerning the final results of the April 21 and May 17, 2009 Wing Tests; and

(e) the documents referenced in defendants' Rule 26(a)(1) initial disclosures, which are attached

hereto as Ex. C.  Since defendants have placed specific assertions of fact into the record, plaintiff

should now be afforded the opportunity to test their veracity.  *See, e.g.*, *Chicago Bd. of Educ. v.

Substance, Inc.*, 354 F.3d 624, 627 (7th Cir. 2003) ("[t]o convert [a] motion to dismiss into a motion

for summary judgment, the judge would have had to notify [the parties] of his intention and give

[them] an opportunity to present evidence that would create a triable issue").

### B.   The Court Should Grant Plaintiff Leave to Amend the Operative Complaint Because Justice so Requires

In their Reply, defendants misstate the relevant level of detail a plaintiff must plead in order to raise a strong inference scienter.  Reply at 1-2.  The current complaint adequately pleads plaintiff's case.  However, plaintiff will meet even defendants' improperly raised burden with the proposed amendment.  The majority of the new information in the SAC provides further incriminating detail to the allegations regarding defendants' Class Period false statements made with actual knowledge or reckless disregard for the truth.  The SAC contains additional details regarding plaintiff's confidential source, including detailed information about the contents of Boeing's test files for the 787 wing structure. Ex. A, ¶¶139-142.  Further, the SAC includes the proposed plaintiff representative, Local 295/Local 851 IBT Employer Group Welfare Fund ("IBT Fund"),[3] which acquired Boeing stock during the Class Period and was damaged by defendants' alleged fraud.  Ex. A, ¶¶139-142.  Allowing amendment would neither impact any dates in the current Scheduling Order, nor would it pose any undue prejudice to defendants.

### C.   Standard for Granting Leave to Amend

The question of whether a district court should grant leave to file an amended complaint is governed by Fed. R. Civ. P. 15(a). That subsection provides in pertinent part:

> (a) **Amendments Before Trial** [a] party may amend its pleading once as a matter of course within . . . 21 days after serving it; or . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b) . . . . ***In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires***.

---

[3]     While plaintiff believes that it could move to join the IBT Fund pursuant to Fed. R. Civ. P. 19(a) or IBT Fund could move to intervene pursuant to Fed. R. Civ. P. 24, plaintiff respectfully submits that amending the operative pleading pursuant to Fed. R. Civ. P. 15 would pose less of a burden on the Court and parties.

- 5 -

Because Rule 15(a) itself provides that leave shall be "freely" given to accomplish justice, it

is well-settled that Rule 15(a) should be applied liberally to permit amendment, so that cases may be

decided on their merits:

> Although permission to amend a pleading is not automatic, court approval to amend
> should be given "freely . . . when justice so requires." Denial of leave to amend is
> disfavored; and a district judge should grant leave absent a substantial reason to
> deny. A liberal, pro-amendment ethos dominates the intent and judicial construction
> of Rule 15(a)(2). . . . In exercising its discretion, the court should be guided by the
> underlying purpose of allowing amendments to facilitate a decision on the merits.
> The policy in favor of allowing amendments is extremely liberal. Because the text of
> Rule 15(a)(2) unequivocally requires the court to grant leave to amend liberally.

3 James Wm. Moore, et al., *Moore's Federal Practice - Civil* §15.14(1) (3d ed. 2009). Because

defendants will be unable to show any prejudice with regard to plaintiff's proposed amendment, the

Court should grant plaintiff leave to file the SAC. *See Peregrine Options v. Farley Inc.*, No. 90 C

285, 1994 U.S. District LEXIS 3961, at *5-*8 (N.D. Ill. Mar. 31, 1994).

### D.    Justice Requires that Leave to File the Proposed Complaint Be Granted

Here, the SAC clearly demonstrates that amendment is in the interests of justice. As

discussed above, the SAC includes more detailed facts regarding defendants' scienter, which more

than adequately meet the pleading standards for securities fraud. Plaintiff has not been dilatory in

seeking amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (a court can only deny leave to

amend if there is undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice or the

amendment is futile). The briefing on defendants' motion to dismiss was concluded only a few days

ago and the Court has not yet ruled on the motion.

Plaintiff has not shown any bad faith in seeking amendment. Plaintiff seeks leave to amend

promptly. The amendment provides further factual support for and expands upon the allegations

already made in the AC, and seeks to protect the putative class's interests. Ex. A, ¶¶139-142. This

case is in its earliest stages and allowing amendment would present no prejudice to defendants. If

- 6 -

amendment is permitted, defendants will have ample time to augment any planned discovery requests in consideration of the new facts alleged in the AC. Further, defendants do not face any radical change in the theory of plaintiff's case. Requiring defendants to answer for the full effect of their wrongs does not amount to the undue prejudice necessary to defeat a motion for leave to amend.

The proposed amendment is not futile, as the SAC adds even greater detail concerning defendants' knowledge that their Class Period statements were false and misleading at the time they were made. The SAC introduces specific detail of the nature and content of Boeing's Wing Test files and the fact that the final results of the failed Wing Tests in April and May 2009 were immediately brought to the attention of defendants McNerney and Carson. Ex. A, ¶¶139-142.

Finally, the propriety of the amendment is further established when the possibility of some minor delay is weighed against the underlying purpose of allowing amendments to facilitate a decision on the merits. *See Foman*, 371 U.S. at 181. Amendment for the purpose of adding the new information is necessary so that the controversy between the parties can be adjudicated in full.[4]

---

[4] The final *Foman* factor, namely, that of whether there has been a "repeated failure to cure deficiencies by amendments previously allowed," cannot support denial of leave to amend here, as the Court has not yet tested the sufficiency of the operative pleading. 371 U.S. at 182.

## IV.     CONCLUSION

For the above stated reasons, the Court should grant Plaintiff's Motion to Convert Defendants' Motion to Dismiss to Summary Judgment and grant Plaintiff's Motion for Leave to Amend the Operative Pleading.

DATED:  May 20, 2010                                    Respectfully submitted,

PLAINTIFF


By:  s/Marvin A. Miller
MARVIN A. MILLER

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

THOMAS E. EGLER
TRIG R. SMITH
SHANNON M. MATERA
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

RANDI D. BANDMAN
ROBBINS GELLER RUDMAN
  & DOWD LLP
52 Duane Street, 7th Floor
New York, NY  10007
Telephone:  212/693-1058
212/693-7423 (fax)

Lead Counsel for Plaintiff

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES OF BERNARD M.
   GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

522960_1

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:09-cv-07143 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| vs. | ) ) | |
| THE BOEING COMPANY, et al., | ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

Lead Plaintiff, City of Livonia Employees' Retirement System, and representative plaintiff, Local 295/Local 851 IBT Employer Group Welfare Fund, by their attorneys, alleges the following based on the investigation of counsel which included a review of United States Securities and Exchange Commission ("SEC") filings by The Boeing Company ("Boeing" or the "Company"), press releases issued by Boeing, public statements issued by defendants, securities analysts' reports about the Company, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of all persons who acquired the common stock of Boeing during the period between May 4, 2009 and June 22, 2009 (the "Class Period"), alleging that defendants committed violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated by the SEC, 17 C.F.R. §240.10b-5, during the Class Period.

2.      On April 21, 2009, directly before the Class Period opened, defendants performed a stress test on the wings of an unfinished version of Boeing's newest jet airliner, the 787-Dreamliner series, which was set to fly for the first time by June 30, 2009.  The wing stress test failed.  Because of the failure, defendants were forced to design, fabricate, install and re-test the airplane wings.  On May 3, 2009, however, having already seen negative results from the test, defendants stated in a press release that "the initial results are positive."  Further, although they knew the airplane design would require further testing because of the re-work being performed, defendants stated that  "all structural tests required on the static airframe are complete."

3.      In mid-May, defendants conducted a second stress test on the re-designed airplane wings.  The second wing stress test failed as well.  Again, they would be forced back to the drawing

board, but this time the airplane had suffered from an additional failure: "delamination" that, if not solved, would substantially increase the maintenance costs for customers once the planes were ultimately delivered. During the Class Period in this action, defendants misrepresented the results of the first test, and never even mentioned the second one until June 23, 2009.

4.      The two failed stress tests took place within two months of scheduled "First Flight" and the "Paris Air Show," where Boeing typically focuses on selling airplanes and wooing new customers. From January to April 2009 alone, however, Boeing customers had already cancelled 32 orders for 787s. By May, the cancellations jumped to 57, more than five percent of the total 787 backlog earned since 2003. Due to the economy, defendants were not looking to book new orders at the 2009 Air Show. Rather, as their top salesman said, their "highest priority [was] keeping the 3,500 planes [they had] on backlog," and not lose orders to cancellations or competitors at the show. This especially applied to the new 787, which had already suffered from previous delays. Although defendants knew before and during the Air Show that the wing stress test failures would likely delay or impair First Flight and stall delivery of the new 787, they said nothing about it. Rather, they said that the airplane "definitely will fly" by the end of June, among other things.

5.      Boeing lost no 787 orders at the Air Show. On June 23, two days after the Air Show ended, and a week before the First Flight deadline, however, defendants finally exposed the bad news: The 787 had failed the April 21 wing stress test. Further, the 787 had undergone an additional wing stress test in May and that it had failed that test as well. The highly-anticipated First Flight was cancelled. The 787 delivery schedule would not only be delayed, but Boeing executives *could not even estimate how long that delay would last*. In the 22 days before the end of the Class Period, defendants had made almost a dozen public statements about the 787. Yet none of them mentioned the May wing tests, or their April and May test failures. In response to the news of the First Flight cancellation and the undetermined delivery delay, the Company's stock dropped by more

- 2 -

than 10 percent over two days, and investors who bought during the Class Period suffered an even higher percentage loss.  This action followed.

6.      This case primarily concerns Boeing's newest jet airliner, the 787-series "Dreamliner" airplane.  Introduced to much fanfare in 2003, and then rolled out to the tarmac in Everett, Washington in July 2007, defendants have portrayed the airplane as representing the future of the Company's Commercial Airplane division.  The airplane features advanced carbon-fiber based composites for many of its components.  Further, Boeing introduced a remote construction and assembly process that relied heavily on outside vendors, and was to require very little assembly time for Boeing to build the plane.  These new technologies and systems brought benefits, but also created major challenges for the Company and the Individual Defendants.  The challenges were increased by the detailed and rigorous Federal Aviation Administration ("FAA") certification process in the United States, which seeks to guarantee safety for commercial airline passengers as much as possible.

7.      As part of the intensive FAA certification process, an airplane must pass a series of tests before it can even achieve "First Flight," *i.e.*, legally take off for the first time.  First Flight, in turn, triggers another series of intensive tests to ensure quality and safety in the aircraft's design and construction.  For Boeing's previous new airplane, the 777 series, the tests after First Flight took almost a year, using multiple airplanes to achieve "Airworthiness" Certification.  For the 787, Boeing sought to reduce the time needed, spreading out the certification tests over a fleet of six airplanes and two test "airframes."   Even with the expanded fleet, Boeing representatives said it would have to work the certification process 24 hours a day to get it done in the nine-month certification window.  This left Boeing with almost no margin for error.  Notwithstanding these materials, construction and certification challenges, the 787 became Boeing's fastest-selling airplane ever, with almost 900 orders from more than 55 customers by the end of 2008.

- 3 -

8.    Before the Class Period, however, defendants had repeatedly delayed delivery of those orders because of problems with the 787 composite technology and other construction issues throughout the design and certification process.  From mid-2007 to mid-2008, the 787's delivery had been delayed four times.  The delays began to affect the Company's finances, as per-day contractual penalties for late delivery began to increase.  Further, the delay in final, post-certification delivery of the models was straining Boeing's relationship with the suppliers they relied heavily upon, who could not start building and delivering their parts in earnest until the plane was certified by the FAA, as well as the customers who were not receiving the planes they had ordered and continually saw their delivery schedules pushed back.

9.    Starting in May 2008, due to the strain the delays put on the Company's reputation with its customers, the industry and investors, the Company sought to re-make its public image, with executives pledging more transparency in communication with the public about the 787's status.  At its 2008 annual investor conference, for example, the Company gave reporters and investors access to its 787 final assembly and testing center in Everett, Washington, and executives assured investors that they were in constant communication with employees about the airplane's development status.

10.    Defendants delayed the 787 for a fifth time in December 2008, after an unforeseen strike and another vendor quality issue, stating that Boeing would conduct the 787's First Flight in 2Q2009 (ending June 30, 2009) and would finish the certification process and be ready for customer delivery by the end of 1Q2010.

11.    Soon after the December 2008 delay, however, 787 customers began cancelling orders.  Although Boeing had almost nine hundred 787 orders at the end of 2008, by early May 2009, customers had cancelled more than 50 planes.  Thus, in four months, Boeing had lost over 5 percent of a backlog it had taken six years to build.

- 4 -

12.     In order to fight the rising tide of cancellations, throughout the first five months of 2009, defendants repeatedly affirmed their First Flight and delivery schedule, and also made regular, detailed, public statements about the testing and certification process, going as far as to create publicly-accessible web sites with photos, videos and "blogs" to discuss internal events.   In a Sunday, May 3, 2009 press release, defendants told the public, that on April 21, the 787's wings had undergone a test where they were "subjected to their limit load – the highest loads expected to be seen in service," and although the Company had not analyzed all of the data on the test, "'***the initial results [were] positive***.'"   Defendants also stated that "***All the necessary structural tests required prior to first flight are now complete***."

13.     Unbeknownst to investors, however, by May 3, 2009, defendants knew of grave problems in the final results of the April 21, 2009 wing stress test and knew they would need to design, fabricate, and install a fix to perform a re-test before First Flight.   The test results showed that the 787 airplane design would not pass the second of two important wing stress thresholds – "ultimate load" – and therefore could not be FAA certified for delivery in its current state.   By mid-May, defendants had scrambled to design and install a fix for the problem, and, again, unbeknownst to the public, conducted a second stress test on the wings on or about May 17, 2009.   The 787 design failed this test as well, before the "ultimate load" level.   Defendants knew from that point forward that the plane design could not be Airworthiness Certified by the FAA for delivery without major modification.   Further, none of the 787s would be allowed to carry out a full-fledged First Flight because of the newly-discovered design limitation.   In the second test, the wings suffered "delamination" when the composite materials began to separate.   By the end of May, defendants were scrambling to design a solution that would allow the 787 to perform a full First Flight, but were unable to finalize a new design that could be fabricated, applied and tested again in time for First Flight by the end of June.

- 5 -

14.     Defendants' statements about First Flight and delivery came to a fever pitch as June 2009 approached.  Not only was June 30 the final day of 2Q09, the final scheduled 787 First Flight date, but the Paris Air Show was set to take place between June 15 and June 19, 2009.  The Paris Air Show, which occurs every other year, brings together civil and military aircraft builders, suppliers and customers from around the globe.  In years past, Boeing and its rivals had sought to impress customers by out-performing each other in orders and new technology announcements at the show.  Typically, a large percentage of annual orders for commercial aircraft are announced at the show.  In 2009, however, the poor economy cast a pall over the proceedings.  As Randy Tinseth ("Tinseth"), Boeing's vice president of marketing stated, the 2009 Paris Air Show, for Boeing, was "'***more about keeping backlog in place than selling new airplanes***' . . . '***The highest priority is keeping the 3,500 planes we have on backlog***.'"  Having already lost more than 50 orders for 787 planes and many orders of other models to cancellations in the first five months of 2009, Boeing could not afford to lose more.

15.     In support of the "priority" of keeping orders previously taken, defendant Scott Carson (CEO of Boeing's Commercial Airplane Division) and other Boeing executives made repeated statements about the 787 and its schedule at the Air Show.  In a June *Bloomberg* television interview, Carson went as far as to say that the 787 "'definitely will fly' this month."  Similarly, Pat Shanahan ("Shanahan") and Carson made press presentations and other statements at the show repeatedly touting the First Flight and delivery schedule.  As a result of these efforts, Boeing left the Paris Air Show with no cancellations.

16.     ***But just five days after the Paris Air Show presentations, on June 23, Boeing issued a press release cancelling First Flight and obliterating the delivery schedule***.  Further, defendants were unable to even estimate when either First Flight or delivery would occur.  Defendants admitted the problems occurred because the 787 failed a wing stress test performed in ***May 2009*** and they ***had***

- 6 -

***not yet developed a solution***.  In a subsequent conference call that day, defendant Carson stated that

the Company had "discovered in a test condition ***several weeks ago*** an anomaly that we saw."

Carson stated that defendants first believed they could install a temporary fix on the plane and get it

in the air for a shorter-than-planned First Flight.  Ultimately, he said, the "flight envelope" became

so small so as to be useless.  Carson avoided addressing the effect of the test failure on the already-

compressed Airworthiness Certification schedule, other than to say they could not say when it would

occur.

17.   On the June 23, 2009 conference call, Boeing executives tried to downplay the

problem, stating it was small and simple.  But as the call progressed, Scott Fancher ("Fancher"), the

787 Program's Vice President and General Manager, admitted that "this is an area where we have

got wing, body coming together, multiple materials, and the observed data from the static test did not

match our model.  So you've got a relatively complex area of the airplane."  Indeed, multiple parts

inside the 787's wing mis-performed and failed during the undisclosed additional wing stress test in

late May.  The problem involved 34 "stringers" on the plane that connected the wing to the fuselage

(*see* figure below).

- 7 -



Source: *Seattle Times*, July 30, 2009.

18.     Boeing executives ultimately admitted that they did not yet know how to fix the problem.  Defendants also admitted that the problem involved "delamination," where layers of composite materials and metals separate under stress – a problem that Boeing had been concerned about, but had not previously encountered on the 787.  Delamination of composites in prototypes is of grave concern because if it is possible it necessitates far greater maintenance and inspection costs in delivered models.

19.     Even with these admissions, defendants never discussed why they conducted the May test after having stated on May 3, 2009 that all "necessary structural tests required prior to first flight" were completed.  They also never disclosed the grave problems in the final results of the April 21, 2009 stress test, even though they stated that "the initial results [were] positive."

20.     Even with the limited admissions, however, after the June 23, 2009 conference call, a slew of angry financial analysts downgraded Boeing's stock and others slammed defendants for their lack of candor, especially after giving such positive statements at the Paris Air Show.  As stated by

- 8 -

one analyst: "We believe that had management been more up-front about this situation, perhaps the modest level of credibility on this topic it had started to re-establish over the past several months could have been sustained." Over the following two days, Boeing lost more than $5 per share, more than 10 percent of its stock market value.

21.     After the initial bad news, things got worse. Subsequent media reports disclosed that the problem was "more complex than originally described by the company," and that **_Boeing had contacted its parts vendors about the test failures long before it told investors_**. Ultimately, Boeing could not announce a new First Flight and delivery schedule until August 27, 2009, setting First Flight for six months after the earlier date, in 4Q09, and postponing delivery **_nine months_**, to 4Q10. On the same day, Boeing also announced that beyond the growing penalties for late deliveries, the Company **_had declared three of the six-plane test fleet to be un-sellable_**, with "no commercial market value beyond the development effort" because of the extensive re-work and modifications performed on them including the wings and wing box. The Company took a $2.5 **_billion_** charge in 3Q09 for the cost of the planes and for additional research and development costs.

22.     Four days later, on August 31, 2009, defendants announced the surprise retirement of defendant Carson at age 63. He was replaced by an executive from Boeing's "Integrated Defense Systems," outside of the Commercial Airplane group. On November 30, 2009, Boeing announced that it had tested the wings again. On December 10, 2009, defendants announced the new design had passed the "load level" test. They did not even try to perform an "ultimate load" test on the new design. The First Flight of the 787 ultimately occurred on December 15, 2009 – almost six months after defendant Carson had said that the plane would "definitely" fly within two weeks. First delivery continues to be scheduled for 4Q10, a delay of nine months after the date maintained until June 23, 2009.

- 9 -

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the claims asserted in this complaint pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

24.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).   Defendants maintain their principal executive office at 100 North Riverside Plaza, Chicago, Illinois 60606-1596.   Certain acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

25.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate wire and telephone communications.

**CLASS ACTION ALLEGATIONS**

26.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of all persons who acquired the common stock of Boeing during the Class Period ("the Class").   Excluded from the Class are defendants, members of their immediate families, and officers and directors of Boeing and their immediate families.

27.     The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.   More than 200 million shares of Boeing common stock (ticker symbol "BA") were traded on the New York Stock Exchange ("NYSE") during the Class Period.

28.     Plaintiffs' claims are typical of the claims of the members of the Class.   Plaintiffs and each member of the Class purchased the Company's common stock during the Class Period and sustained injury as a result.

- 10 -

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation an impossible hurdle for members of the Class to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of the case as a class action.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

Whether defendants' acts and omissions as alleged in the complaint violated the Exchange Act; and

Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## THE PARTIES

### Plaintiffs

32.     City of Livonia Employees' Retirement System acquired the common stock of Boeing during the Class Period and was damaged as the result of defendants' wrongdoing alleged in this complaint, as set forth in the certification attached to the original complaint in this action.  On January 15, 2010, this Court appointed the City of Livonia Employees' Retirement System as Lead Plaintiff in this action, pursuant to 15 U.S.C. §78u-4(a)(3)(B)(v).

33.     Representative plaintiff Local 295/Local 851 IBT Employer Group Welfare Fund, acquired the common stock of Boeing during the Class Period and was damaged as the result of

- 11 -

defendants' wrongdoing alleged in this complaint, as set forth in the certification attached hereto as Exhibit A.

**Defendants**

34.     Boeing is one of the largest and most successful companies in America. It has been listed as one of the 30 stocks on the Dow Jones Industrial Average since 1987, and is a component of the "S&P 500" index. Boeing has organized its business in five principal segments, including the Commercial Airplanes segment. The Commercial Airplanes segment is involved in developing, producing and marketing commercial jet aircraft to the commercial airline industry worldwide. Boeing's newest commercial airplane in development is the 787 Dreamliner ("787"). Boeing's principal competitor is Airbus SAS, which was also developing a new airplane, the A350, that would compete with the 787, and had other competitive products.

35.     W. James McNerney, Jr. ("McNerney") was, at all relevant times, the Company's Chairman, President and Chief Executive Officer.

36.     Scott E. Carson ("Carson") was, at all relevant times, the Company's Executive Vice President, President and Chief Executive Officer of Boeing's Commercial Airplanes segment and Member of the Executive Council. The Company announced Mr. Carson's retirement on August 30, 2009 at the age of 63 .

**FACTUAL ALLEGATIONS**

37.     The 787 is Boeing's principal next generation commercial airplane and has been eagerly awaited by the commercial airline market and the financial market since it was first announced in 2003. Since its unveiling, Boeing has made numerous announcements concerning the many orders it has received from commercial airlines worldwide, the positive results of the testing process for the 787 and also the timetable for the First Flight, FAA Airworthiness Certification and first commercial delivery of the 787.

523320_1

38.     The 787 is Boeing's first all-new commercial aircraft since the introduction of the 777 in the 1990s.  Its most notable advance is the large amount of "composites," or non-metallic carbon-fiber compounds, used in its construction.  According to Boeing, while the 777 was made of 50 percent aluminum and 12 percent composites, the 787 is 50 percent composites and 20 percent aluminum.  The composites, among other things, substantially reduce the airplane's weight, which allows Boeing to predict that it will be 20 percent more fuel efficient than similarly-sized aircraft, and produce far fewer emissions.  New manufacturing techniques and planning also allowed the plane assemblers to deal with far fewer parts, creating a potential final assembly time of just three days per plane.

39.     At the same time, Boeing, for the first time, hired outside companies to produce large portions of the airplane.  Vendors across the United States and around the world have been contracted to build various parts, including Mitsubishi Heavy Industries ("MHI" or "Mitsubishi") of Japan manufacturing the mostly-composite wings, and Fuji Industries producing the "center wing box" where the wings attached, as well as part of the wing's trailing edge.

40.     In the wing manufacturing process, the composites are formed in a mold and then baked at extreme temperatures in an autoclave oven, where they harden permanently.  For the 787, two parts of each wing, the wing skin and a series of 17 "stringers" are baked and bonded together during the production process.  The stringers run from the fuselage connection to the wing tip to give the wing strength.  At the base of the wing, where it joins the plane body, the stringers are connected to the center wing box using a "stringer cap."  While the wing and the center wing box are both built in Japan, they are assembled in the United States.  After construction, the center wing box is flown in a specially-made 747 aircraft from Japan to Charleston, South Carolina, to be integrated into the plane's fuselage.  Once assembled, the fuselage is then flown to Everett, Washington, for final

- 13 -

assembly.  The wing structures built by Mitsubishi, are flown directly from Japan to Everett to be attached to the fuselage.

41.    This far-flung assembly process can create headaches where additional work (or re-work) is required on a part after it has left its original location.  Such "travelled work" is substantially more expensive and time consuming for the manufacturer, and can cause severe disruption to the assembly schedule.

42.    Since 2007, Boeing has been preparing to deliver the 787 to customers.  Before it could do so, however, the design of the plane must be certified by the FAA.  While various parts of certification for delivery take place throughout the design and build process, the final FAA "Airworthiness Certification" testing takes place only after an airplane achieves First Flight.  The "First Flight" of an airplane style therefore represents the kick-off of an intense series of tests designed to push the airplane's design to its limits.

43.    The post-First Flight tests, however, are time consuming.  Boeing's prior 777 airplane took almost a year to get from First Flight to certification for delivery.  In order to reduce the time required to pass the tests for the 787, Boeing had built six separate airplanes as part of its pre-delivery certification efforts.  The six test models were (and are) referred to as planes "ZA001" through "ZA006," and were designed to fly once certified.  Along with the six flight test airplanes, Boeing has built at least two separate 787 "airframes" that would never fly: referred to as ZY997 and ZY998.  Although not all of the airplanes shared the same interiors and the airplanes differed in other manners, ZY997 and ZY998, as well as the ZA001-006, all were built and maintained to the same mechanical levels and tolerances, in order to ensure that tests run on one of the airplanes would end up with the same results as all of the others.

44.     Prior to the Class Period, Boeing had announced that it planned to sell the ZA001-006 airplanes to customers as part of the first "program" of 787 planes it was building, but not the ZY997 and ZY998.

**Background and Pre-Class Period Statements**

45.     Boeing executives first announced the 787 production schedule in January 2003, setting First Flight in August 2007, and first delivery after final certification in May 2008.  From that point forward, Boeing built a "backlog," or order book, of more than 850 planes from more than 50 airlines across the globe.  The largest initial order was from All Nippon Airlines ("ANA") for up to 50 planes.  Since the original delivery date was set, however, the First Flight and delivery dates had been pushed back at least five times publicly for a total of 20 months delay by December 2008.  All told, the 787 has now taken longer to develop than any plane in Boeing's history.

46.     The first four "First Flight" and delivery delays were announced between August 2007 and April 2008.  After the April 2008 delay, defendant Carson apologized, stating that "'[w]e deeply regret the disruption and disappointment these changes will cause for our customers, and we will work closely with each of them to minimize the impact.'"  After these delays, the 787 was set for First Flight in 4Q08 and delivery in 3Q09.

47.     At its May 21, 2008 Investors Conference, defendant McNerney said the Company was making "significant progress" in resolving the prior issues, and that it had "'a five year lead'" over Airbus's proposed new plane, the A350.  According to the *Wall Street Journal*, McNerney stated that "'The good news is that we're five years ahead of the other guys,' he said, not identifying Airbus directly.  'And if we weren't, we'd have some risk of order cancellations.'"

48.     At the conference, in response to industry and investor frustration over communication issues, Boeing also pledged to be more open and transparent with regard to any issues that would affect the delivery of the 787.  On May 23, 2008, the magazine *Flight*

- 15 -

*International*, reported that "Boeing appears to have shifted gears on its marketing strategy for the 787, breaking with a strictly closed-door policy and giving reporters and investors unprecedented access to the Dreamliner's final assembly centre in Everett, Washington."  The magazine noted that "This new openness follows Boeing's year-long struggles with supply chain and design issues that caused a [then] 15-month delay for first delivery and a two-year slowdown on the production ramp-up."  At that time, Boeing was going out of its way to keep investors and analysts up-to-date on issues.  According to *Flight International*:

> Boeing's immediate focus is completing structural and systems work required to enter the flight test phase.  Pat Shanahan, 787 vice-president and general manager, has provided a new level of granularity on Boeing's preparations.  Minutes before making a presentation to investors on 21 May, he reported receiving an email from his staff informing him that windshield birdstrike testing had been completed earlier that morning.  Ten per cent of the programme's structural test remains unfinished, he added.

49.     Analysts reacted positively:

> "Boeing lost a lot of credibility, not just because of the delays, but because they failed to communicate," says Richard Aboulafia, vice-president analysis at Teal Group.  "Being transparent is in itself a great step, partly because they're putting a lot of their faces and names behind their guidance."

50.     Furthering its open communications agenda, on November 15, 2008, Boeing announced that it had "completed destructive testing today on a full-scale composite wing box of the 787 Dreamliner, the first all-composite wing box ever built for a Boeing commercial airplane.  This test is part of the certification process for the all-new jetliner."  As the news release explained, "[t]he wing box is a cantilevered beam that carries the wing to the fuselage and supports leading – and trailing – edge devices, control surfaces, engines and landing gear."  This test is referred to internally as the "ultimate load" test, bending the wings to 150 percent of any load they would encounter in service.

523320_1

51.     The November test was not performed on any of the test airplanes, but on a stand-alone wing and wing box structure.  Boeing chose to disclose this information, and make further positive statements:

> "Successful completion of the wing box destruction test marks a major step forward in highlighting the innovation on the 787," said Mark Jenks, vice president of 787 Development.  "In addition to determining the strength of the structure, the test helps us verify the analytical methods we have used to calculate the loads the structure will have to carry."

52.     In order for a plane to be certified for First Flight, the actual airplane wings must be subjected to a "Load Limit" test, which simulates 100 percent of the load they would encounter in service.  Before being certified by the FAA for delivery, the wings must pass an "ultimate load" test at 150 percent of that same load.  This November 2008 test, where the Company bent the wing beyond 150 percent until it failed, is referred to as "critical load."  Three days after this critical load simulation, Boeing posted a video of Jenks and the test being performed on a public web site at: http://787milestones.tpninteractive.com.  As of the date of filing this document, the web video is still available there and at the Boeing website:  http://787flighttest.com/wing-break/.

53.     On December 11, 2008, after an almost two-month long machinist's strike that started in September 2008, and the embarrassing revelation of the installation of the wrong type of fasteners onto the planes by a subcontractor, Boeing announced yet another delay of at least three months or more, moving "first flight into the second quarter of 2009 and first delivery into the first quarter of 2010."

54.     As the press release announcing the delay stated:

> "Our industry team has made progress with structural testing, systems hardware qualification, and production, but we must adjust our schedule for these two unexpected disruptions," said Boeing Commercial Airplanes President and CEO Scott Carson.

Prior to the strike that halted much of the company's commercial airplane work from early September into November, the 787 was to make its first flight late in the fourth quarter of 2008. First delivery was slated for the third quarter of 2009.

"*We're laser focused on what needs to be done to prepare for first flight,*" *said Pat Shanahan, 787 program vice president. "We will overcome this set of circumstances as we have others in the past, and we understand clearly what needs to be done moving forward*."

Included in the preparations for first flight, Shanahan said, are finalizing and incorporating remaining engineering changes and completing systems testing, qualifications and certification.

55.     On the same day, Boeing announced it was taking day-to-day management responsibilities away from Shanahan, putting him in charge of overseeing both the 787 and the 747-8, another airliner Boeing was developing.  Shanahan's replacement was Fancher, who until then was serving as vice president and general manager of Boeing Missile Defense Systems.

56.     As 2009 opened, Boeing employees repeatedly reiterated the then-current schedule of First Flight by the end of 2Q09 and first delivery in 1Q10.  Boeing, and its employees, also made an affirmative effort to discuss the issues surrounding the schedule, and give the public repeated updates on the process leading up to First Flight and delivery.

57.     On January 28, 2009, a press release announcing Boeing's year end 2008 results stated that "[a]s announced in December, the company expects first flight of the 787 to occur in the second quarter of 2009 and deliveries to begin in the first quarter of 2010."  The Company also announced that as of January 2009, it had "won 895 net orders from 58 customers to date."  The Company also detailed the 787's progress in 4Q08:

The 787 Dreamliner made progress during the quarter despite the labor strike. Key milestones included FAA approval of the scheduled maintenance program that defines the tasks and service intervals operators will use to maintain the 787, and a successful wing-box destruction test, a key step toward validating the structural integrity of the airplane.  Also during the quarter, the company discovered a requirement to replace certain fasteners, and has now largely finished replacing them on the first two flight test airplanes.

- 18 -

58.     At the same time, however, 787 customers began cancelling orders.  On January 30,

2009, *Air Transport World Daily News* reported that part of the 895 net orders for 787s that Boeing

reported on January 28 included the cancellation of 15 orders, worth $2.4 billion list price.  The

airplanes had been ordered in 2007 by S7, a Russian airline.

59.     A week later, on February 6, 2009, *Air Transport World Daily News* reported more

bad news:  "LCAL, the Dubai-based lessor established in 2004 to buy and lease 787s, cut its

Dreamliner order from 21 aircraft to five, dealing another blow to Boeing's troubled next-generation

aircraft program."  The article added that, "[t]he manufacturer, which reported just eight total

commercial aircraft cancellations all of last year, already has lost 31 787s in the first weeks of 2009."

60.     In Boeing's SEC Form 10-K for 2008, issued February 9, 2009, signed by, *inter alia*,

defendant McNerney, Boeing reiterated the schedule for the 787 announced on December 11, 2008,

and described the 787 program as follows:

> We are in the final stages of assembly of the initial airplanes and planning for flight
> test. . . .  First flight of the 787-8 airplane has moved from the second quarter of 2008
> into the second quarter of 2009.  Delivery of the first 787 moved from early 2009
> into the first quarter of 2010.  Delivery schedules for 787 derivative airplanes may
> also be impacted.  The revised schedule reflects the cumulative impacts of disruption
> caused by the recent IAM strike, the requirement to replace certain fasteners in early
> production airplanes, as well as the impact from the challenges mentioned above.
> We continue to work with our customers and suppliers to assess the specific impacts
> of schedule changes, including delivery delays and supplier assertions associated
> with such changes.  A number of our customers have contractual remedies that may
> be implicated by our revised plan for the 787.  We continue to address customer
> claims and requests for other contractual relief as they arise.

61.     The cancellations, however, continued.  On February 20, 2009, *Air Transport World*

*Daily News* reported that "Boeing received a cancellation of an order for one 787 during the week

ended Feb. 17, according to the manufacturer's Orders and Deliveries website."

- 19 -

62.     On March 19, 2009, Boeing issued a press release discussing that the sixth and final "Boeing 787 Dreamliner designated for flight test is now undergoing final assembly in Everett, Wash."

63.     On Tuesday, April 21, 2009, Boeing conducted a series of tests on the ZY997 airframe, including the "load limit" test at which the wings were bent to simulate the highest loads expected to be seen in service.  On May 3, 2009, Boeing would falsely claim this test was successful and publicly brag about the results.

64.     On April 22, 2009, Boeing issued a news release reporting its 1Q09 earnings.  One of the headlines read that "2009 earnings outlook reduced to reflect changes in commercial market."

65.     The release continued:

> "The expanded global economic downturn is presenting unprecedented challenges in our commercial airplane markets," said Boeing Chairman, President, and Chief Executive Officer Jim McNerney.  "We believe we are better positioned than most companies to withstand the ongoing pressures of this economy, and we are not hesitating to take necessary actions to preserve our financial strength and maintain our ability to invest and grow for the long term.  Performance across the overwhelming majority of our programs remains solid, and we are making progress toward our milestones on the 787 and other important programs."

The release noted that the Company had decreased 2010 production rates for its 777 aircraft, and was forced to postpone planned increases in production volume on its twin-aisle 747 and 767 aircraft. Boeing also announced that the first "program" of its newly designed (but not yet delivered) generation of 747s (the "747-8") had fallen further into a "loss position."  This recognition that it would lose more money on the new 747-8 program forced the Company to take a charge of $347 million in one quarter – before it had even delivered one of the new planes.

66.     Boeing, however, portrayed the progress on the 787 in a somewhat brighter manner:

> Progress on the new 787 Dreamliner continues on the revised schedule announced in December.  The company expects the first flight to occur in the second quarter of 2009 with deliveries to begin in the first quarter of 2010.  Recent milestones include completion of build-verification tests on Airplane 1, clearance of

- 20 -

all systems hardware and Rolls-Royce engines for first flight, completion of power-on for Airplane 2, and the beginning of final assembly for the sixth and final flight test airplane.  The program saw orders for 32 airplanes cancelled by mutual agreement with customers during the quarter.  Total firm orders are now 886 airplanes from 57 customers.

67.    Boeing also filed its 10-Q for 1Q09 on April 22, 2009 with the SEC.  In the 10-Q, Boeing reiterated the schedule for the 787 announced on December 11, 2008, and described the 787 program schedule as follows:

> The schedule reflects the cumulative impacts of disruption caused by the 2008 IAM strike, the requirement to replace certain fasteners in early production airplanes, as well as the impact from the challenges mentioned above.  We continue to work with our customers and suppliers to assess the specific impacts of schedule changes, including delivery delays and supplier assertions associated with such changes.  ***A number of our customers have contractual remedies that may be implicated by our revised plan for the 787.***  We continue to address customer claims and requests for other contractual relief as they arise.

68.    On April 29, 2009, Boeing stepped up its publicity campaign on the 787, hosting a conference for media at the Bomarc building at its Everett facility.  Among the presenters were Mike Delaney, then the Chief Product Engineer for the 787 program, Barbara Cosgrove, the Vice President for Flight Test Operations and Frank Rasor, the 787 Test Program Manager, as well as representatives from the Federal Aviation Administration, which oversaw the Boeing certification process.

69.    At the conference, the various Boeing executives and government regulators spoke to journalists and analysts about Boeing's certification schedule:  nine months from "First Flight" to certification.  The Boeing executives made it clear that the Company had set an aggressive flight test and certification schedule for the 787 – cutting as much as 20 percent of the scheduled time from the schedule met by Boeing's prior new plane, the 777.  However, because of prior delays, the nine-month schedule was two months longer than the original 787 plan set in 2008.

- 21 -

70.     Media reports regarding the April 29, 2009 media presentation noted that in order to meet the flight certification schedule, Boeing planned to work essentially around the clock, with the six separate 787 flight test airplanes either in the air testing for certification, or on the ground being tested or maintained.

71.     The FAA Airworthiness Certification process, however, could not begin until First Flight, which, according to news reports, was scheduled to last between three and five and a half hours.  Once the First Flight had taken place for ZA001 and the subsequent planes (002-006), each airplane would be used for testing in a different manner.  For example, it was reported that ZA003 would be used to test interiors, and ZA004 would be used for "flight loads surveys" to determine how differing arrangements of people or cargo affect the airplane's flight.

**Class Period Misrepresentations: "Keeping Backlog" at the Paris Air Show**

72.     As the date for the First Flight of the 787 approached, defendants made a series of misleading statements to the market concerning the results of the testing process for the 787 and Boeing's ability to meet the schedule for the First Flight and the delivery of the 787.  Defendants made these false and misleading statements in an effort to: (a) forestall further cancellations of orders for the 787, particularly as the orders for its competition were gaining ground; (b) conceal from the market the material fact, known to defendants, that the 787 had a structural problem in its design that would prevent the First Flight of the 787 by June 30, 2009, and delivery in the first quarter of 2010; and (c) enable Boeing to make a positive presentation concerning the test results for the 787 and the schedule for the First Flight and delivery of the 787 at the Paris Air Show, scheduled for June 15-19, 2009, at which Boeing hoped to preserve existing orders for the 787 and beat out the showing made by Airbus.

73.     On Sunday, May 3, 2009, Boeing issued a press release discussing the current status of the 787 program, stating:

- 22 -

The Boeing 787 Dreamliner that will fly later this quarter has moved to the flight line.  Fuel testing – the first in the next phase of extensive checks the airplane must undergo – will begin in the next few days.

The Vice President and General Manager of the 787 program, Fancher, stated: "'We are making great progress, and moving ever-closer to first flight.'"

74.     Boeing also stated in the press release:

In recent weeks, the 787 (designated ZA001) completed a rigorous series of tests including build verification tests, structures and systems integration tests, landing gear swings and factory gauntlet, which is the full simulation of the first flight using the actual airplane.  With Chief Pilot Mike Carriker at the controls, the simulation tested all flight controls, hardware and software.  The simulation also included manual and automatic landings and an extensive suite of subsequent ground tests.

Fancher stated: "'These results give us confidence in our ability to move into further gauntlet testing using either ground power or the airplane's engines or auxiliary power unit.  This is a significant milestone on the path to first flight.'"

75.     Boeing continued in the press release:

All structural tests required on the static airframe prior to first flight also are complete.  ***The final test occurred April 21 when the wing and trailing edges were subjected to their limit load – the highest loads expected to be seen in service***.  The load is about the same as the airplane experiencing 2.5 times the force of gravity.

Fancher stated: "'We continue to analyze the data, but the initial results are positive.'"

76.     Boeing ended the press release by stating:

***All the necessary structural tests required prior to first flight are now complete***.

Now on the flight line, [the 787] will undergo additional airplane power and systems tests as well as engine runs.  After completing final systems checks and high-speed taxi tests, the airplane will be ready for first flight, which is on schedule for later this quarter.

77.     In stark contrast to any "initial results," the final results of this April 21, 2009 wing load stress test were a disaster: the 787 design had failed to meet at least the "ultimate load" test, which must be passed before the plane can be delivered.  Further, because of the known limitations

- 23 -

of the design, defendants would have to re-design, fabricate, install and successfully test a solution, and then implement it before a full First Flight could take place.  Boeing employees and defendants knew about the poor results of this April 21 test, the need for re-design and re-testing, and the risk to the First Flight and delivery schedule via internal e-mails sent before May 3, 2009.  Because of Boeing's misleading press release, the price of Boeing common stock rose immediately by 2.4% to close at $41.77 on May 4, 2009, and continued to rise, closing at $44.20 on May 6, 2009.

78.     Soon after the positive May 3, 2009 statement, more reports of bad news came in.  On Friday, May 8, 2009, *Air Transport World Daily News* reported that "Boeing took **cancellations for 25 787s during the week ended May 5**, according to its Orders and Deliveries website . . . . Including the eight Dreamliners [ordered] by Gulf Air last month and the 32 cancellations previously announced, the manufacturer's 787 net order book for the year to date stands at -49."  Ultimately, it would be revealed that the cancelling party for the 25 planes was The Royal Bank of Scotland's RBS Aviation Capital.  In just over four months, Boeing had lost more than five percent of their 787 backlog:  57 cancellations versus eight new orders.

79.     On or about Sunday, May 17, Boeing put the 787 ZY997 airframe through another wing load stress test.  Soon thereafter, defendants would learn that the airframe would fail this test before ultimate load, just as it had in April.  Defendants also would learn that composite parts inside the wing suffered from "delamination" due to the stress test.  The fact of this May test occurring, the reason it was performed, and the results of this test were hidden by defendants until June 23, 2009, after the Paris Air Show.

80.     Boeing, however, continued making positive statements about the 787 to the market. On May 21, 2009, Boeing issued a press release, which stated:

> Boeing continued to make steady progress toward the first flight of the 787 Dreamliner, completing the first engine runs on the all-new airplane.  The occasion marks the first all-electric start of a commercial jetliner engine on a twin-aisle

- 24 -

commercial jetliner; the engines had been started electronically in test facilities earlier.

Fancher stated: "'We were very pleased with the performance on the engines during this test.'. . . 'We will now get ready for our intermediate and final gauntlet tests.'"

81.     On May 27, 2009, at a Sanford Bernstein & Co. "Strategic Decisions Conference," McNerney reportedly stated, as quoted in the media, that "'I think the airplane will fly in June.  We will embark on a flight test program as we described it.'"  McNerney is further reported to have said that "he expects the first 787 deliveries in the first quarter of 2010.  But he said that there is always the chance that the schedule could be disrupted by a mechanical issue coming to light *during the test flight*."

82.     On Saturday, May 30, 2009, without mentioning the April or May wing tests or their results, Tinseth, Vice President, Marketing for Boeing Commercial Airplanes, announced that "The 787 team in Everett has begun what we call the 'intermediate gauntlet' on Dreamliner #1" (787 plane ZA001).  Tinseth noted that "This means that over the next week or so, the team will really put ZA001 through its paces, simulating in-flight conditions ranging from long-duration standard flights to single and multiple systems failures."

83.     That same day, Guy Norris of *Aviation Week and Space Technology* reported that the "Intermediate gauntlet tests" were "happening around the clock" over the weekend.  Fancher, General Manager and Vice President of the 787 program, had described the tests as follows at Boeing's April Investor Conference:

> "Here we will operate the aircraft on engines seven days, 24/7 with aircrew on the flight deck simulating ground and flight environments, not just nominal flight profiles but a wide range of off-nominals as well, demonstrating the full robustness and gaining confidence in the robustness of the aircraft."

84.     On June 1, 2009, *Bloomberg* reported that Boeing began a flight simulation test on the 787, quoting a Boeing e-mail which stated that the test "'is expected to take about seven days,

- 25 -

but it's more important to get the testing done correctly than to meet a schedule.'" The news story also referred to defendant McNerney's statement that the 787 is "Priority No. 1" for Boeing. Boeing's stock price rose to $47.70 with the announcement of the commencement of the flight simulation test.

85.     At no time while making the statements listed in ¶¶80-83 did Boeing or the Individual Defendants note the fact that additional stress testing was being performed on the 787 airframe wings, the reason for the testing, or the negative results of those tests. Rather, investors had last heard on May 3, 2009 that "[a]ll the necessary structural tests required prior to first flight are now complete."

86.     On June 4, 2009, Boeing issued a press release announcing its presentation schedule at the upcoming Paris Air Show. Boeing announced that Carson would make a presentation on June 15 at 9:30 and Shanahan, Boeing Commercial Airplanes Vice President and General Manager of Airplane Programs, would make a presentation on June 16 at 1:00 concerning the 787. As in Boeing's earlier press releases, defendants did not disclose the fact that additional stress testing had been performed on the 787 wings, the reason for the testing, or the negative results of those tests. The next day, Boeing's stock price continued its climb, rising 4% to close at $52.65.

87.     On June 8, 2009, as the date for the Paris Air Show drew close, Boeing issued another press release, stating:

> Boeing has completed the intermediate gauntlet phase of testing on the first 787 Dreamliner.
>
> During the testing, pilots and engineers simulated multiple scenarios using all airplane systems as if the aircraft were in flight, including power, avionics and flight controls. Test scenarios ranged from standard flights to single and multiple systems failures during flights.
>
> Intermediate gauntlet testing included about one week's worth of operations on the airplane and hundreds of discrete test conditions.

- 26 -

Fancher stated: "'The team has done an incredible job supporting an exhaustive test regimen' . . . 'I couldn't be more proud.  We will continue to take a hard look at the results, make adjustments and finish up our testing so we can get to first flight.'"

88.     As in Boeing's earlier press releases, defendants did not disclose the fact that additional stress testing had been performed on the 787 wings, the reason for the testing, or the negative results of those tests.

89.     The 2009 Paris Air Show opened on June 15.  The Paris Air Show is an international trade fair for the aerospace business, held at Le Bourget Airport near Paris, France, every other year. The show had been presented for a century in 2009.  The Air Show brings a global collection of aircraft manufacturers, suppliers and buyers to one place, showing off the newest wares, giving demonstration flights and wooing potential customers.

90.     Due to the worldwide economic turmoil, the 2009 Air Show opened on a muted note. As reported by the *London Daily Telegraph*:

> Plane manufacturers are facing very lean times in the year ahead, with Boeing cutting its forecast for plane orders for the next 20 years.  Even the more resilient defence sector is pausing for breath, as Governments make budget cuts after a decade of rapid growth boosted by wars in Iraq and Afghanistan.
>
> Signals ahead of this year's event have borne this out. British engine-maker Rolls Royce and defence giant BAE will not be taking stands to display their wares as in previous years, although they will keep their chalets for hosting clients.
>
> \*        \*        \*
>
> And getting together with customers will be more important than ever, with Boeing saying its focus this year is on hanging onto the orders it already has rather than trying to make new sales.
>
> ***"It's more about keeping backlog in place than selling new airplanes,"*** *Randy Tinseth, Boeing's vice president of marketing said.  **"The highest priority is keeping the 3,500 planes we have on backlog**.***"*

91.     This "priority" was especially important with regard to the 787, which had already seen its backlog drop by 57 planes in 2009.  By the time the 2009 Paris Air Show began, however,

- 27 -

defendants knew the fact that additional stress testing had been performed on the 787 wings, the reason for the testing, and the negative results of those tests.  Unbeknownst to investors, the 787 airframe had failed the "ultimate load" test, and defendants would need to design, fabricate, install and test yet another solution to the wing problem before an effective First Flight could occur, and before first delivery.

92.     On June 15, 2009, as the Paris Air Show began , Boeing issued another press release, stating:

> The second Boeing 787 Dreamliner has moved to the flight line to begin fuel testing. This is the second of six 787s being used in the all-new airplane's flight-test program.
>
> *       *       *
>
> Each of the six flight-test airplanes will be used for a specific set of tests during the flight-test program.  This airplane, designated ZA002, will focus on systems performance.  Like its predecessor, ZA001, this airplane has successfully completed a rigorous series of tests while still in the factory.  Fuel testing began immediately upon the airplane entering the fuel dock.
>
> ZA002 features the livery of the Dreamliner's launch customer, ANA (All Nippon Airways) of Japan.

Fancher stated: "'ANA will be the first to fly the 787 Dreamliner in commercial service' . . . 'We are honored to fly in ANA livery throughout the flight-test program as a tribute to our partnership in bringing this all-new airplane to market.'"  The press release stated that Boeing had 865 orders for the 787 from 56 airlines.  The press release was reprinted on June 16, 2009, and Fancher was quoted in the press release, stating: "'Momentum continues to build with each milestone achieved.'"

93.     Carson used his presentation at the Paris Air Show on June 15, 2009, to state, as reported by *Bloomberg*, that Boeing is "'absolutely committed'" to a First Flight of the 787 "within the next two weeks [by June 30, 2009]."  Carson's statement was misleading because he knew and failed to disclose that 787 airframe wing tests had failed and that at best the "flight envelope" of the

- 28 -

First Flight would be reduced or the First Flight of the 787 would be delayed beyond June 30, 2009.

Further, because of the unknown time schedule for a design that would survive "ultimate load"

testing and the already crammed test schedule, the delivery of aircraft would be delayed past

1Q2010.

94.    On Tuesday, June 16, 2009, *Flight Global's Flight Daily News* reported that another

one of Boeing's 787 Dreamliner customers was tired of the delays and was considering cancelling.

As they reported:

> Qatar Airways chief executive Akbar Al Baker has warned Boeing that the airline could "walk away" from its 60-order 787 contract if the airframer does not quickly resolve major issues over delivery delays.

> "We at Qatar Airways have some serious issues with Boeing and if they do not play ball with us they will be in for a very, very serious surprise if we do not settle the issues on the 787," says Al Baker.

> The Doha-based carrier is a major Boeing customer, with an orderbook for over 92 aircraft including 32 777s and 60 787s.  However, the Dreamliner programme delays have pushed back the airline's deliveries by around 18 months, with its first aircraft is not now due to arrive until late 2011.

95.    As reported by *Reuters* on June 16, 2009, Boeing, through its commercial planes

marketing chief, Tinseth, reiterated at the Paris Air Show that the new 787 would fly before the end

of June.  The *Bloomberg* news service also reported in a televised interview of defendant Carson

from the Paris Air Show on June 16, 2009, that Carson had stated: "'I personally believe the [787]

could fly today,'" and that the 787 cleared the intermediate gauntlet testing that simulates flight

conditions and multiple systems failures "'in a much better condition than we'd anticipated.'"

96.    A *Bloomberg* news article entitled "Boeing Says Delayed 787 Is Capable of Flying

Today" summarized the repeated, positive and absolute statements defendants made on June 16:

> June 16 (Bloomberg) – Boeing Co. said its delayed 787 Dreamliner would probably be capable of flying right now after sailing through some of the last remaining ground tests.

- 29 -

"*I personally believe the airplane could fly today*," Scott Carson, head of Boeing's commercial-airplanes unit, said in a Bloomberg Television interview.  The plane cleared testing that simulates flight conditions and multiple systems failures "in a much better condition than we'd anticipated," he said.

Testing aside, the executive said Boeing remains "very disappointed" that the Dreamliner is running two years late following development and production glitches that have ceded ground to European rival Airbus SAS.  Even after its maiden flight the plane faces an ambitious certification process to meet a target of service entry some time in the first quarter.

*Carson, who spoke at the Paris Air Show, said Chicago-based Boeing didn't want to rush the testing process just for the event, which is the world's largest aerospace exposition, and that the Dreamliner "definitely will fly" this month*.

"A lot of people have said, 'Why aren't you flying it at the air show?'" Carson said.  *"But the worst thing any manufacturer could do is use an event to drive you into flying an airplane without having done all the special checks.  We don't want to take shortcuts."*

Investor confidence in Boeing, which has lost half its value since the first 787 delay in 2007, won't be restored until the plane takes to the skies, said Bill Alderman of Alderman & Co. Capital, a broker specializing in the aerospace industry.

Emotional Day

The Dreamliner's first flight "will be an emotionally intense day for everyone," Pat Shanahan, Boeing's head of airplane programs, said in a briefing at the Paris show.

*A flight-readiness review will be conducted on June 20, followed by a "final gauntlet" trial of the power system, flight controls and avionics and a high-speed taxi test where the wheels may briefly lift off the runway*.

*"Then we'll go flying," Shanahan said*.

Flight tests for the plane, which uses an all-composite design to help cut fuel consumption by 20 percent compared with existing models, according to Boeing, will not take much longer than that for the 777, which entered service in 1995 and is made largely of the traditional aluminum, Carson said.

"We're going through a detailed engineering review with the pilots, with the design team, to make absolutely sure the airplane is the way we want it to fly," he said.  "We believe we can get this done in the nine months we've got."

February Debut

- 30 -

***Boeing has already done extra ground testing during the delays in order to minimize the time until the plane's service entry***.  The initial customer, Japan's All Nippon Airways Co., says it has been told it will get the first in February.

While the Dreamliner is the company's fastest-selling model with 865 orders, delays to the plane have allowed Airbus to close the gap, racking up 483 orders for the competing A350, which will enter service three years later in 2013.

The U.S. company is also working with its suppliers on the Dreamliner to help them through the recession, and problems have been resolved "for the most part," Carson said.

The manufacturing process counts on vendors from Italy to Japan to gather parts and build large sections of the aircraft, which Boeing machinists will assemble in just three days.

"Cash is tight for everybody," he said in the interview.  "We're staying very closely engaged with them, working through the bottlenecks.  We all want to get this airplane delivered."

97.     Boeing had posted the detailed presentations that Shanahan and Carson made at the 2009 Paris Air Show at its web site: http://www.boeing.com/paris2009/index.html.  This web page was available until approximately early February 2010.  It since has been taken down from their website and is no longer publicly available.

98.     On Wednesday, June 17, 2009, Boeing announced that final assembly had begun on the first 787 destined for delivery to launch customer ANA and that "[d]eliveries are scheduled to begin in the first quarter of 2010."  Fancher is quoted, stating: "'This is a great day for the 787 team.'"

99.     The statements in the press releases and presentations quoted in ¶¶92-93 and ¶¶95-98 were misleading because defendants knew, and failed to disclose, the fact that additional stress testing was being performed on the 787 wings, the reason for the testing, or the negative results of those tests.  The press releases and presentations also were misleading because defendants knew that despite the purported successful completion of the intermediate gauntlet phase of testing touted by

- 31 -

defendants, the structural wing defect would cause an undeterminable delay in the schedule for the First Flight of the 787 beyond June 2009 and delivery of the 787 beyond the first quarter of 2010.

100.     Defendants, however, achieved their "priority," and the Paris Air Show ended without a single 787 cancellation being announced.

101.     Beyond customers, however, financial analysts also heard and appreciated the various statements at the Air Show.  For example, a June 17, 2009 report from Macquarie research stated that:  "While Boeing did not record any new orders, *the biggest news of the day may have been Boeing's statement that the 787 Dreamliner is ready for first flight*" along with news that Boeing was unsure about whether demand for its 737 series would rise or fall.

**Boeing Belatedly Discloses the Truth, and Defendants
Admit They Knew the Material Facts They Did Not Disclose**

102.     Suddenly, without any warning, Boeing announced on Tuesday, June 23, 2009, that the "first flight of the 787 Dreamliner will be postponed due to a need to reinforce an area within the side-of-body section of the aircraft. . . .  First flight and first delivery will be rescheduled following the final determination of the required modification and testing plan.  It will be several weeks before the new schedule is available."  Carson stated that "'[s]tructural modifications like these are not uncommon in the development of new airplanes, and this is not an issue related to our choice of materials or the assembly and installation work of our team.'"

103.     Boeing also held a conference call with analysts on June 23, 2009, to explain this dramatic disclosure.  On the call, analysts peppered Carson and Fancher and Shanahan with questions, including, *inter alia*, the nature of the structural defect, the timing of the disclosure and the impact on the First Flight and delivery schedules for the 787.  Carson stated:

> As our release stated this morning, based on our analysis of results from tests on the static test airplane, we have determined that we need to make a modification to reinforce a limited area of structure at the side-of-body section of the airplane before we begin our flight test program.  Following detailed analysis which was

- 32 -

completed late last week, we decided to postpone first flight until the modification is made and our team is satisfied that we are ready for fully productive flight testing.

104.    Shanahan elaborated, stating as follows:

Late last month during planned 787 static testing, our team was conducting a series of tests that involved bending the wings of our full-scale test airplane.  These tests are part of the normal test process on the path to achieve certification.  During one test, the team identified stress in an area of the side-of-body structure that was in excess of expectations.  Our preliminary analysis of these results indicated that we could proceed with first flight.

After further testing and analysis which we finished late last week, our team concluded that a productive flight test program could not take place without structural reinforcement in limited areas with the side-of-body join.  We decided at that point that we should postpone first flight and make the needed modifications before beginning the flight test program.

I want to be very clear here, this is a structural reinforcement issue . . . .

105.    Upon questioning by analysts, Fancher admitted that the problem concerned the critical point at which the wing is attached to the rest of the body of the airplane.

106.    Carson admitted that they knew of the structural defect back in May 2009 but had decided not to say anything when they learned of it or even at the Paris Air Show during their public and private presentations.  In response to a direct question about when defendants knew of the structural defect, Carson wiggled around the answer, as follows:

[W]e discovered in a test condition several weeks ago an anomaly that we saw.  We believed that we had a solution that would allow us to move to the flight test program.  We retested and followed that retest with additional analysis late last week.  As we looked at that analysis we concluded that to fly the airplane would have such a limited envelope on it that it wasn't productive for us to do that.  And we chose to delay the flight and incorporate the change so we have a vigorous flight test envelope to work with.

107.    Upon questioning by analysts as to management's credibility, one analyst asked point blank why, if management knew of this structural problem in May, they waited until after the Paris Air Show, when the world's attention was on Boeing, to make the disclosure.  Carson replied:

When we were at Paris last week we had been through the preliminary analysis of the data and were of a mind that the airplane could enter flight test with a credible flight

- 33 -

test envelope as we worked relatively minor modifications.  The work done by the team through the week last week narrowed the envelope to the point where on Friday we determined that to fly would be such a small envelope for us that it would be an interesting exercise in having the airplane in the air but not particularly useful in terms of preparing the airplane for certification.

So at that point is when we made the call to delay the process, identify the fix, test the fix, install the fix, and then enter a flight test program that is fully robust.

108.    The analysts clearly were not satisfied with the explanations they were hearing, and one analyst queried why, if the fix was so "small and simple," it would take so long to sort out. Fancher attempted a response, stating:

As far as the schedule to get through this, as I mentioned earlier, this is an area where we have got wing, body coming together, multiple materials, and the observed data from the static test did not match our model.  So you've got a relatively complex area of the airplane, divergence of observables from analysis, and we want to make sure that we are able to anchor those observables to the analysis and make sure we've got that rock solid before we proceed with cutting chips and getting parts to the airplane.

109.    In direct response to a question concerning Boeing's ability to meet the delivery schedule for the first quarter 2010, Carson admitted that "we don't have a reset on the schedule."

110.    In the aftermath of the belated disclosure and the answers received on the conference call, security analysts commented on defendants' lack of timely candor concerning their knowledge of the structural problem with the 787.  JPMorgan Chase aerospace analyst Joseph Nadol stated in his research report that multiple members of Boeing management had assured him in private conversations only the week before that the 787 would meet its First Flight deadline and that:

The structural issue that has caused the latest delay cropped up several weeks ago, but there was not a hint of concern about it as management continually highlighted the impending first flight, including last week at the Paris Air Show both in public and in private.  Management acknowledged on the conference call that it discovered this issue last month but noted it only determined last Friday [June 19] that it would cause a delay to first flight.  We believe that had management been more up-front about this situation, perhaps the modest level of credibility on this topic it had started to reestablish over the past several months could have been sustained.

- 34 -

111.    In immediate response to Boeing's belated June 23, 2009 disclosure of the structural

defect in the 787, and its effect on the First Flight and delivery schedules, the market price of

Boeing's common stock dropped 6.5% to close at $43.87 per share, on huge volume of 27.3 million

shares traded.  The next day, Boeing's common stock price dropped another 6% to close at $41.32

per share, on huge volume of 21.3 million shares.

112.    On June 24, 2009, Morgan Stanley's analyst, Heidi Wood, who had followed the

Company very closely, downgraded Boeing's stock, showing her conclusions in a detailed research

report.  Wood pointed out that whatever the complexity of the required fix, the Company's reliance

on "predictive models" in the certification process may have been called into question by the FAA

because of the results of the undisclosed May stress tests, which contradicted the models.  If the

FAA required more testing due to the failed models, it would "at a minimum . . . slow down the

certification process."

113.    Wood further was concerned about "the revelation that the composite material

delaminated under stress."  As she stated:

> Up until now, the 787 problems have been largely confined to more plebian issues
> like insufficient fasteners and there's been little reason to question the robustness of
> the composite advancements the company has made over the last decade or so.  But
> under rigorous stress tests, the fibers embedded in the resin matrix apparently
> separated, requiring a design fix in some 36 places along the side body of the aircraft.
> Why would it make sense to believe this is the only time a design flaw will be
> revealed?  Our conclusion is the risk of further negative developments and risk of
> rising costs ahead is higher than originally anticipated.  With so many important tests
> yet to occur, including 9-12 months of flight testing, odds of further negative
> developments is too high for us to be comfortable with [our prior rating].

114.    As Wood noted in an exhibit to her report, "Yesterdays' News Added More Bricks to

the Wall of Worry" at Boeing.

115.    Similarly, a report for securities analysts, Myles Walton and Ed Keller, at

Oppenheimer Research also downgraded Boeing stock, and noted that "[w]hile weeks/months aren't

- 35 -

critical to the 25yr project, the erosion of management credibility leaves no confidence this will be the last hiccup . . . ."  Further:

> The issue appears to be delamination in the composite material resulting in a need for brackets to address the local stressed conditions.  We expect the involvement of composites in the failure (and lack of predictability in the company's models) to be a particular source of negative attention over the coming months.

116.    As the note concluded, the effect of defendants' announcement was "Raining on Your Own Parade."  The analysts noted, among other things, that "The fact that the emergent failure was known for a few weeks but only recently understood as a show stopper to the first flight raises the question of controls and credibility."

117.    *The Wall Street Journal*, on June 25, 2009, reported on the dramatic disclosures, stating that "Boeing said its engineers and senior executives alike had known since May of the structural problem that will keep the jet grounded, possibly for months.  [Boeing] said it decided late Friday to scrub the first flight, which was to take place by June 30[, 2009]," and that "[w]ithout any revised timetable for test flights or deliveries, investors have been left with few clues as to when the company's marquee product might get back on track.  The uncertainty has contributed to a 12% drop in Boeing's share price over the past two days."

**THE AFTERMATH**

118.    After Boeing's belated June 23, 2009 disclosure of the structural defect in the 787 Dreamliner and its negative effect on the First Flight and delivery schedule, the media turned to Boeing's partners, customers and insiders to fill in the details that defendants would not.

119.    The *Seattle Times*, on June 25, 2009, reported that Boeing admitted its sole responsibility for the structural defect that failed to properly integrate the body of the 787 Dreamliner with its wings.  The article quoted Boeing spokeswoman, Yvonne Leach, as saying, *inter*

- 36 -

*alia*: "'Boeing is responsible for the overall design and the integration of the sections and takes responsibility for both.'"

120.   This June 25, 2009 *Seattle Times* article also reported on important information from "one of Boeing's key Japanese partners," MHI.  While Carson had already admitted two days earlier that the structural defect was significant enough to prevent Boeing from providing a re-set on the First Flight and delivery schedule, MHI further explained that "[t]he structural flaw that has grounded Boeing's 787 Dreamliner will likely add months of delay to the new jet program."  This corroborated the fact that the structural defect was not as small and simple as defendants had attempted to portray it on June 23, 2009.

121.   In addition, through this June 25, 2009 *Seattle Times* article, MHI further detailed how Boeing handled the structural problem that it found in May 2009 but did not disclose to the public.  After the May 2009 test uncovered the structural problem that failed to properly integrate the body of the 787 Dreamliner with its wings, Boeing not only shared its concerns with MHI, but also asked MHI to help develop a solution to the structural problem (that Boeing found but did not disclose to the public).  The *Seattle Times* reported, in relevant part:

> **The structural flaw that has grounded Boeing's 787 Dreamliner will likely add months of delay to the new jet program**, an executive with one of Boeing's key Japanese partners said Wednesday.
>
> Kiyotaka Ichimaru, an executive at the aerospace division of Mitsubishi Heavy Industries (MHI), which makes the 787's carbon-fiber composite plastic wings in Japan, also said **the problem announced Tuesday stems from Boeing's engineering design, not MHI's – an assessment confirmed by Boeing**.
>
> Ichimaru said MHI engineers are drawing upon the experience of similar problems on the Mitsubishi F-2 jet-fighter program in working with Boeing to fix the problem: a need for reinforcement of the structure where the Dreamliner's wing is joined to the load-bearing box at the center of the fuselage.

*       *       *

- 37 -

> *MHI learned of the concerns at Boeing after a test inside the Everett factory in late May that entails bending the wings of a 787.*

Last month's test

> This test produced delamination of the composite material – separation of the carbon-fiber layers – in small areas where the MHI wings join the structural box embedded in the center fuselage made by Fuji Heavy Industries (FHI) of Japan.

> \*        \*        \*

> *"This trouble is in the Boeing design," Ichimaru said. "That is admitted by Boeing."*

> *Boeing spokeswoman Yvonne Leach agreed* that MHI had no responsibility for the design problem. And though FHI did contribute to the design, she said, *it's Boeing that is responsible for the interfaces between the sections made by different partners*.

> "It's our engineers that designed this interface," Leach said. *"Boeing is responsible for the overall design and the integration of the sections and takes responsibility for both."*

> The company offered no new details about the structural problem Wednesday.

> *Ichimaru said MHI is helping Boeing work on the problem because it has experience with a similar issue on its F-2 fighter program.*

122.    On Friday, June 26, 2009, Qantas Air Lines, the largest airline customer for the 787, cancelled 15 of its 65 orders and deferred 15 more for four years.  As reported by *Air Transport World Daily News*, Qantas "will not get its first 787 until 2013.  Originally it was due to receive one per month for 65 months beginning in August 2008."  The article reported that, "[b]ased on list prices," the orders were worth at least $3 billion.

123.    A July 22, 2009 article from the *Seattle Times* further confirmed that the 787 Dreamliner's structural defect was not as small and simple as defendants had attempted to portray it on June 23, 2009.  The *Seattle Times* reported the following important details explaining why Boeing's re-set on the First Flight and delivery schedule would be at least four to six months:

- 38 -

*The structural flaw that delayed the first flight of the 787 Dreamliner is more complex than originally described by the company, and the plane's inaugural takeoff is likely at least four to six months away*, say two engineers with knowledge of Boeing's problem.

"It's got to take at least three to four months just to get something installed on an airplane," said a structures engineer who has been briefed on the issue. "It's definitely a costly fix to go and do this work."

A second engineer, who is familiar with the details of Boeing's construction method, said the fix must first be made on the nonflying test airplane in the Everett factory. Assuming that's successful, it will take another month or two to install the fix on the first airplane to fly.

*Both engineers said the issue requires a thorough redesign of the plane's wing-to-body join, and the necessary parts will be very difficult to install on the test airplanes that have already been built*.

*The engineers' accounts differ from Boeing's description June 23 when it acknowledged a problem and again postponed the first flight of the much-delayed plane*.

*Dreamliner program chief Scott Fancher said then that the fix would be "a simple modification" requiring only "a handful of parts*." But almost a month later, heading into today's quarterly earnings report, Boeing has neither set a new schedule nor outlined its planned fix of the problem.

- 39 -



Source: *Seattle Times*, July 22, 2009.

124.   On July 30, 2009, *The Seattle Times* reported that the damage to the wings caused by the structural defect in May 2009 happened when the stress placed on the wings was "well below" the ultimate load that the wings must bear for FAA Airworthiness Certification.

125.   This *Seattle Times* article also reported that the 787 Dreamliner's structural defect was not as small and simple as defendants had attempted to portray it on June 23, 2009.  The article reported that the damage was extensive because both the outside and inside of the wing join were damaged, which only "adds to the complexity of any fix and the time and cost involved in implementing it."  In sum, the article reported:

> ***The wing damage that grounded Boeing's new composite 787 Dreamliner occurred under less stress than previously reported – and is more extensive***.
>
> An engineer familiar with the details said the damage happened when the stress on the wings was well below the load the wings must bear to be federally certified to carry passengers.

- 40 -

In addition, information obtained independently and confirmed by a second engineer familiar with the problem shows *the damage occurred on both sides of the wing-body join – that is, on the outer wing as well as inside the fuselage*.

\*     \*     \*

*The fact that there is corresponding damage on the fuselage side of the wing join adds to the complexity of any fix and the time and cost involved in implementing it*.

\*     \*     \*

Though a single fix, once designed and tested, will work on both sides of the join, mechanics performing the necessary modifications inside the airplanes already built will have to duplicate the work inside the wing and inside the fuselage.



Source: *Seattle Times*, July 30, 2009.

126. On August 27, 2009, more than two months after postponing the 787 Dreamliner's First Flight and delivery schedule, Boeing announced via a news release that it had re-set the 787

Dreamliner's First Flight to the end of 2009 and first delivery to the fourth quarter of 2010.

However, Boeing had not yet even begun to install the fix for the 787 Dreamliner's wing problem.

127.     Boeing also announced in this same release that three of the six flight-test 787s had

"no commercial market value."  As the release stated:

> . . . *the company has concluded that the initial flight-test airplanes have no commercial market value beyond the development effort due to the inordinate amount of rework and unique and extensive modifications made to those aircraft*. Therefore, costs previously recorded for the first three flight-test airplanes will be reclassified from program inventory to research and development expense, ***resulting in an estimated non-cash charge of $2.5 billion pre-tax, or $2.21 per share, against third-quarter results***.  This charge will have no impact on the company's cash outlook going forward.

128.     On August 31, 2009, four days after re-setting the 787 Dreamliner's First Flight and

delivery schedule and announcing the $2.5 billion 3Q09 charge for its useless flight-test 787

Dreamliner airplanes, *The Wall Street Journal* reported on Boeing's announcement of the surprise

retirement of defendant Carson, at the age of 63.  Carson's replacement, Jim Albaugh, came not

from Boeing Commercial Airplanes, but from Boeing's "Integrated Defense Systems."

129.     *The Wall Street Journal* reported on the surprise retirement as follows:

> Boeing Co. said Monday that Scott Carson is retiring as head of its commercial aircraft business following a three-year tenure tainted by the persistent delays of its new 787.

> The aircraft business will be run from Sept. 1 by Jim Albaugh, head of Boeing's defense unit, who will have four months to rescue the company's credibility by making good on its pledge to have the 787 – commonly known as the Dreamliner – fly for the first time by year end.

> Mr. Carson, 63 years old, was widely expected to step down next year, and he is the highest-profile executive departure following the technical and labor problems that have cost billions of dollars and left the crucial 787 project two-and-a-half years late.

> *Boeing Chairman and Chief Executive James McNerney said last week that the aircraft team was as strong as it had ever been as he announced the sixth delay to the 787.  There was no mention of Mr. Carson's imminent departure*.

- 42 -

130.    On September 27, 2009, three months after the problems were revealed to investors

and described as "minor" by defendants, *The Wall Street Journal* reported that Boeing had finally

begun to install the fix for the 787 wing problem.  *The Wall Street Journal* reported as follows:

Boeing Starts Repairs on 787

> ***Workers at Boeing Co. in Everett, Wash., have begun fixing a flaw on the
> first 787 Dreamliner test aircraft in preparation for its long-delayed first flight
> later this year***, a Boeing executive said Wednesday.

*       *       *

> The modifications are expected to take about 30 days, which means the first
> Dreamliner could fly by late October or early November [2009].

131.    Ultimately, the prediction of First Flight in October or November 2009 did not come

to fruition because fixing the 787 wing problem proved to be complex.

132.    On November 13, 2009, *The Wall Street Journal* explained that, while Boeing had

recently fixed the structural defect in the 787 wing-to-body join, Boeing discovered an additional

wing problem involving metal bolts and cracked composite materials inside the 787 Dreamliner's

wings.

133.    This same *Wall Street Journal* article outlined the serious, long-term safety concerns

raised by cracked composite materials inside a plane's wings.  The *Wall Street Journal* reported that

such cracking raised "red flags" with Boeing engineers and caused them to issue a work order that

stated, "NO FLIGHT TEST IS ALLOWED."  Nonetheless, faced with hundreds of millions of

dollars in mounting concessions and penalties to its 787 Dreamliner customers, a Boeing

representative stated that this problem would not affect the 787's First Flight or require a repair.

134.    In pertinent part, *The Wall Street Journal* reported as follows:

> As Boeing raced to implement a remedy [to its wing structural defect] this
> summer, it discovered another issue with the composite material in the plane's wings,
> according to internal company documents and a person familiar with the matter.
> Metal bolts inside the wings of one of the six test airplanes were found to have

- 43 -

slightly damaged the surrounding material – causing so-called delamination, or cracking – the documents show.

*      *      *

The damage created by the metal bolts, called freeze plugs, was confined to a relatively small area. However, according to an internal Boeing document from October, it raised red flags among engineers, who decided the plane couldn't fly until the problem was corrected.

A work order written by one of the company's engineers, and reviewed by The Wall Street Journal, says, "**Noted conditions are structurally and functionally acceptable to Engineering for GROUND TESTING ONLY," and adds, "NO FLIGHT TEST IS ALLOWED**."

The company acknowledged Thursday that delamination occurred in the composite material surrounding bolt holes, but said it won't affect the plane's first flight or require a repair.

*      *      *

**When composites are damaged, or delaminate, Prof. Hansen says, "you had better be concerned about them propagating over time**."

*      *      *

According to a person familiar with the details, Boeing is still aiming to get the first Dreamliner airborne on Dec. 22. Workers at Boeing's massive factory in Everett, Wash., are on duty around the clock preparing the first batch of Dreamliners for test flights.

*      *      *

These delays have cost the company hundreds of millions of dollars in concessions and penalties to its customers, though the company still has orders for 840 Dreamliners.

135.    On November 30, 2009, Boeing announced that it had completed the wing test on the new solution for the 787.  The news release stated that the airframe had been "subjected to its limit load" during the test.  As stated above, the Limit Load is the highest load expected to be seen in service, and the test must be passed before the FAA allows First Flight.  The news release did not announce the results – but said that Boeing expected "a full analysis of the test results to be concluded in approximately 10 days."

- 44 -

136.     Ten days later, on December 10, 2009, the Company announced that analysis was done, and that the wings had passed the test.  The release stated that as part of a "strategy," Boeing would conduct the "ultimate load" test only after First Flight, in 2010.

137.     Boeing's 787 Dreamliner First Flight took place on December 15, 2009, and first delivery is still slated to occur in 4Q10.

## DEFENDANTS ACTED WITH SCIENTER

138.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance of such statements or documents in violation of the federal securities laws.  As set forth elsewhere herein in detail, the defendants, by virtue of their receipt of information reflecting the truth regarding the 787 program, their control over and/or receipt and/or modification of Boeing's alleged materially misleading misstatements, and their positions with the Company, were made aware of relevant confidential proprietary information concerning Boeing, and participated in the fraudulent scheme alleged herein.

139.     Plaintiffs' confidential source ("CS") is a former Boeing Senior Structural Analyst Engineer and Chief Engineer, who worked on the Mid-Body Fuselage/Wing Integration Team for the 787 program.  The CS's job responsibilities included stress and design review of the 787 wing joints, as well as performing Finite Element Modeling analyses for other engineers and designers working on the 787 wing project.  The CS reported to Larry Hall, Boeing's Vice President of the Wing-Body Integration Team.  As part of the CS's job, he had direct access to, as well as first-hand knowledge of the contents of, Boeing's 787 stress test files that memorialize the results of the failed 787 wing limit load test and subsequent re-test, which transpired on April 21, 2009 and May 17,

- 45 -

2009, respectively (individually referred to as a "Wing Test" file and collectively as the "Wing Tests" files).

140.    Based on the CS's first-hand knowledge, Boeing's Wing Tests files are an organized set of documents in Boeing's direct control that contain the Wing Tests' technical results, internal communications among the engineers who participated in conducting the Wing Tests and the internal communications of the Wing Integration Team's management concerning the results of those tests.  According to the CS, the Wing Tests files include internal, contemporaneous communications regarding the specific results of the Wing Tests, and findings of the Wing Test Integration Team, which the Wing Test Integration Team sent directly to defendants McNerney and Carson.  According to the CS, the Wing Integration Team members included Larry Hall, Terry Pham (who reported directly to Larry Hall) and Mike Denton (Vice President of Engineering for the 787 Program, who reported directly to defendant Carson).

141.    According to the first-hand knowledge of the CS, the April 21, 2009 load test file, which is in Boeing's direct control, indicates that the 787 wing structure failed at 30% below limit load.  Further, according to the CS, the April 21, 2009 Wing Test file contained copies of internal electronic communications to defendants McNerney and Carson, which were dated within a few days of April 21, 2009, informing defendants that the 787's wing had failed at limit load and, as a result of that failed test, re-testing of the 787 wing assembly would be necessary.  According to the CS, the contents of the April 21, 2009 Wing Test file, including the contemporaneous communications from the Wing Integration Team to defendants McNerney and Carson, are clear in the finding that the failed April 21, 2009 limit load test and necessary re-testing placed the plane's scheduled June 30, 2009 First Flight at risk.

142.    According to the CS, the May 17, 2009 Wing Test file (*i.e.*, the re-test) indicates that the 787 passed the limit load test on May 17, 2009, but failed the ultimate load test at about 125% of

- 46 -

limit load.  According to the CS, the fact that the 787 wing failed at 125% of limit load was generally known by the Wing Integration Team immediately upon completion of the May 17, 2009 test and was characterized by the Wing Test file documents as a "weight optimization issue." Further, according to the CS, the May 17, 2009 Wing Test file contains detailed analysis evidencing that nine days after the failed May 17, 2009 test, "delamination" of the 787 wing stringers was also identified as a serious engineering issue.  According to the CS, the May 17, 2009 Wing Test file contains copies of internal electronic communications, dated around May 26, 2009, from the Wing Integration Team to defendants McNerney and Carson, which specifically informed defendants McNerney and Carson that the 787 wing failed the ultimate load test, as well as the fact that additional re-work of the wing attachment design was required to correct the delamination problem. These late May 2009 contemporaneous communications contained in the May 17, 2009 test file, from the Wing Integration Team to defendants McNerney and Carson, clearly communicated the Wing Integration Team's conclusion that Boeing would be unable to conduct a June 30, 2009 First Flight.

143.    As noted above, defendants have admitted that they monitored and were aware of all significant business and operational developments regarding the 787.  For example, during the Class Period, defendant McNerney was quoted as stating that the 787 Program was "Priority No. 1" for Boeing.  Defendant Carson spoke repeatedly of the Program before, during, and after the Class Period, and had been Chief Executive Officer of Boeing Commercial Airplanes since 2006.

144.    Defendants had a clear motive to delay the dissemination of the bad news until after the Paris Air Show.  From January to May 2009, leading up to the Paris Air Show, customers for the 787 had cancelled 57 orders, meaning that in five months Boeing had lost more than 5 percent of the backlog developed since 2003.  Other Boeing employees publicly declared that the Company's "Highest Priority" at the Show was maintaining its backlog, including protecting the 850+ orders

- 47 -

for 787s that had previously been placed. Defendants chose to make multiple, qualitative statements regarding the 787 before and during the Paris Air Show, including defendant Carson's unqualified statement on June 16, 2009, that the airplane "definitely will fly" by the end of the month. The first public statement the Company made about the 787 after the Air Show was to announce its delays.

145. Defendants had a duty to disseminate or cause to be disseminated, accurate and truthful information with respect to Boeing's significant products, its disclosure and internal controls and its operating performance. Defendants also had a duty to correct or update promptly any previously disseminated information that was misleading to the market. As a result of the defendants' failure to do so, the price of Boeing's securities was artificially inflated during the Class Period, damaging plaintiffs and the Class.

146. Moreover, on May 3, 2009, the Company issued a false and misleading news release quoting a Boeing employee as stating that "All structural tests required on the static airframe prior to first flight also are complete. The final test occurred April 21 when the wing and trailing edges were subjected to their limit load – the highest loads expected to be seen in service." Defendants also stated that although the Company had not analyzed all of the data on the test, "the initial results [were] positive." Yet defendants knew by May 3, 2009 that the April wing stress test results were far from "positive" as they showed that the 787 airplane current design would not pass the second of two important wing stress thresholds – "ultimate load" – and therefore could not be FAA certified to be delivered in its current state. Further, defendants subsequently admitted that the April 21, 2009 test was not the "final test" on the static airframe as defendants had conducted an undisclosed wing stress test in May, that the May wing test had failed to produce results that allowed for an unrestricted First Flight, and that the 787 series would have to be re-designed in order to achieve Airworthiness Certification from the FAA. As explained herein, defendants knew within 10 days of both wing tests that the 787 required a new wing design that needed to be conceived, constructed,

- 48 -

installed and tested again, and then implemented before a full First Flight could take place, but they did not admit to any of these facts until June 23.

147.    Additionally, individuals from Boeing communicated with vendors repeatedly prior to the public disclosure of the information.  For example, as reported by the *Seattle Times* on June 25, 2009, Boeing representatives contacted MHI employees about the structural defect in the 787 aircraft long before informing the public, and sought assistance from Mitsubishi in fixing the problems.

148.    The Individual Defendants, because of their positions with Boeing, controlled the contents of the Company's authorized public statements disseminated throughout the Class Period. Each Individual Defendant was provided with, or had access to, copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their  issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts discussed above had not been disclosed to the public and that the positive representations that were being made were false and misleading.

149.    In November and December 2009, defendants noted that the results from the limit load tests require about ten days to finalize.  The final results from the April 21 limit load stress tests, therefore, were available as early as the last day of that month.  Further, beyond the fact of the undisclosed May 17 test (which was never revealed to the public before June 23), the results of the May limit load stress test were similarly available before the end of May 2009.

150.    Plaintiffs' investigation has confirmed that the final results of the April and May 2009 tests were available on or about 10 days after the tests were performed, and the Individual Defendants were made aware of the results of the April and May tests via email immediately after those results were available.  Yet defendants did not publicly disclose the final results of the April

- 49 -

2009 test, or the existence of and the results of the May 2009 test, including the discovery of delamination in the stringers, until June 23, 2009.

151.     Each of the defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Boeing's securities during the Class Period.

152.     As alleged herein, the defendants acted with scienter in that each such defendant knew or recklessly disregarded that the public documents and statements, issued or disseminated by or in the name of the Company, were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued to the investing public, and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violators of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Boeing and its 787 products and business practices, their control over and/or receipt of Boeing's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Boeing, were active and culpable participants in the fraudulent scheme alleged herein. The defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent schemes described in this complaint could not have been perpetuated without the knowledge and complicity of the Individual Defendants.

153.     Indeed, the defendants were timely provided with material adverse information about the results of the wing tests that took place in April and May 2009 which, unbeknownst to the public, had presented grave problems for the then-current schedule of the 787.  At no time before June 23, 2009 did Boeing publicly acknowledge that it had even conducted the wing test in May 2009, made necessary by the April 21, 2009 wing stress test failure.

- 50 -

154.     Defendants also were well aware that such information presented a risk that was, at least, reasonably likely to adversely affect the Company's operations and business prospects and that such risk was required to be disclosed to investors.  Nonetheless, the defendants caused Boeing to conceal and minimize such adverse information rather than disclose this adverse and material information to the marketplace.

## PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

155.     During the Class Period, defendants engaged in a scheme and course of conduct to deceive investors and the market that artificially inflated and maintained the price of Boeing's common stock and operated as a fraud or deceit on Class Period purchasers of Boeing's publicly traded securities.  Defendants achieved their scheme by misrepresenting and omitting material information about the testing results, safety, and timetable for the First Flight and commercial delivery of the 787.

156.     When defendants' Class Period misrepresentations and omissions were disclosed and the market learned that they had been less than candid about known structural problems with the 787, Boeing's stock price dropped as the prior artificial inflation was removed from the price.  As a result of their purchases of inflated Boeing securities during the Class Period, plaintiffs and other members of the Class, as defined in ¶1, suffered economic loss, *i.e.*, damages, under the federal securities laws.

157.     Defendants' false statements and omissions, identified herein at ¶¶73-76, 80-83, 86-87, 92-93, 95-98, had the intended effect and caused Boeing's securities to trade at artificially inflated levels during the Class Period.

158.     As a direct result of defendants' June 23, 2009 disclosures regarding structural defects in the side-of-body join and additional delays in the 787 flight test program, Boeing's stock price dropped immediately.  On June 23, 2009, in reaction to defendants' disclosures, Boeing's stock price

- 51 -

dropped 6.5% to close at $42.78 per share, on heavy volume.  The following day, Boeing's stock price continued to lose value as the market fully digested the impact of the negative information disclosed by defendants on June 23.  By the close of June 24, 2009, the Company's shares dropped to $40.29 per share, representing another 5.9% drop, on heavy volume.  As identified in the chart below, these drops removed the inflation from Boeing's stock price, causing real economic loss to investors who had purchased the Company's securities during the Class Period.



**Boeing Co.**
June 22, 2009 - June 26, 2009

159.    Numerous securities analysts were united in their disappointment with the delay in the 787's development schedule, as well as in their skepticism of defendants' credibility.  On June 23, 2009, Credit Suisse noted in downgrading the stock: "***Six Delays and Counting*** . . .

Unfortunately, this episode will only reinforce the investment community's skepticism about the program's timeline." Also on June 23, 2009, J.P. Morgan reported:

> **Oh No, Not Again** . . .  We consider ourselves relatively steeled to disappointments on this program, but given everything we had heard recently, including in private conversations with multiple member of management just last week, we were shocked by this news.
>
>                  *   *   *
>
> **Boeing's problems disseminating information about progress on the 787 program . . . remain unresolved.  The structural issue that has caused the latest delay cropped up several weeks ago, but there was not a hint of concern about it as management continually highlighted the impending first flight, including last week at the Paris Air show both in public and in private**.

160.    On June 24, 2009, Oppenheimer downgraded Boeing and noted:

> **Boeing's slip on the 787 is all the more negative given its confidence last week on an imminent 1st flight**. . . .  [T]he erosion of management credibility leaves no confidence this will be the last hiccup and the current delay could push the program into a forward loss.

161.    On June 24, 2009, Morgan Stanley emphasized:

> **Failure of the predictive models to anticipate the stress points that suspended first flight presents real risk the FAA will now insist on more data, slowing certification, hence our assumption for 2011 for first delivery**.

162.    The decline in Boeing's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market.  The timing and magnitude of Boeing's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  In fact, on June 23 and 24, 2009, when Boeing's stock price fell by 6.0% each day as a result of defendants' fraud being revealed, the Dow Jones Industrial Transportation Average moved **up** each day on average volume.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class, therefore, was a direct result of defendants' fraudulent scheme to

- 53 -

artificially inflate Boeing's stock price and the subsequent material decline in the value of the Company's stock when defendants' prior misrepresentations and omissions were revealed.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5

163.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-162 of this complaint.

164.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other members of the Class, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase Boeing common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

165.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Boeing's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

166.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the structural problem with the 787 and its adverse impact on the First Flight and delivery schedules for the 787, as alleged herein.

- 54 -

167.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Boeing's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the 787 in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Boeing common stock during the Class Period.

168.    The false and misleading statements made by defendants are alleged in ¶¶73-76, 80-83, 86-87, 92-93, 95-98, above.

169.    The defendants had actual knowledge of the misrepresentations and omissions of material facts alleged or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though they have admitted that they knew of the facts and made a decision not to disclose them, even when they were touting the success of the testing process and assuring the markets that the tests of the 787 were all successful, that the results of the tests of the 787 were all positive, that the 787's First Flight was on schedule for June 2009, and that delivery of the 787 was on track for the first quarter of 2010.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the structural problem in the 787 and its adverse impact on the First Flight and delivery schedules of the 787 from the investing public and supporting the artificially inflated price of Boeing's common stock.  As demonstrated by defendants' misstatements and omissions of material fact throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

- 55 -

170.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The failures to disclose the issues relating to the 787 and its negative impact on the First Flight and delivery schedules are not forward-looking statements.  Rather they are current, existing facts.  To the extent any of the alleged misleading statements are considered forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying the fact that an existing structural defect in the 787 could cause a delay in the First Flight and delivery schedules of the 787.

171.    The primary liability of McNerney and Carson arises from the fact that each of them was a high-level executive at the Company responsible for the 787 program and was privy to the material facts concerning the structural defect and the impact on the First Flight and delivery timetables for the 787, and each of them made statements to the public and contributed to or reviewed Boeing's press releases, as alleged in this complaint, concerning the development, testing and soundness of the 787 and the First Flight and delivery schedules for the 787.  Each of them was aware of the Company's dissemination of information to the investing public concerning the 787 which they knew or recklessly disregarded was materially false and misleading.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, alleged above, the market price of Boeing common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Boeing's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class

- 56 -

Period, plaintiffs and the other members of the Class acquired Boeing common stock during the Class Period at artificially high prices and were damaged thereby.

173.   At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems with the 787, as alleged herein, which were not disclosed by defendants, as alleged herein, plaintiffs and other members of the Class would not have acquired their Boeing common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.  The market for Boeing's common stock was, at all times, an efficient market that promptly digested current information with respect to the Company from publicly available sources and reflected such information in the prices of the Company's stock.  Boeing's common stock was actively traded on the NYSE.  The market price of Boeing's common stock reacted promptly to the dissemination of public information regarding the Company.  Securities analysts followed Boeing and published research reports regarding Boeing that were publicly available to investors.  As a result of the misconduct alleged herein, the market for Boeing's common stock was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.  Plaintiffs and the Class justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of Boeing common stock at artificially inflated prices and the subsequent decline in the price of the common stock when the truth was disclosed.

174.   During the Class Period, the price of Boeing's common stock was artificially inflated as a direct result of defendants' misrepresentations and omissions regarding the 787.  When the truth about the 787 was finally revealed to the market on June 23, 2009, at the end of the Class Period, the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from

- 57 -

the price of the Company's stock as a direct and proximate result of the correct disclosures, causing significant damages to plaintiffs and other Class members.

175.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

176.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

177.     Plaintiffs repeat and reallege each and every allegation contained in or realleged in Count I, above, as if fully set forth herein.

178.     McNerney and Carson each acted as a controlling person of Boeing within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the 787 program, McNerney and Carson each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the 787. Boeing controlled Carson and McNerney and all of its other employees.

179.     As set forth above, Boeing, McNerney and Carson each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, defendants are each liable pursuant to §20(a) of the Exchange Act.

180.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their acquisitions of the Company's common stock during the Class Period.

- 58 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment:

A.     Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and that plaintiffs be appointed as representatives of the Class and their counsel be appointed Lead and Liaison Counsel for the Class;

B.     Awarding compensatory damages as appropriate against defendants, in favor of plaintiffs and all members of the Class, for damages sustained as a result of defendants' wrongdoing;

C.     Awarding plaintiffs and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: _____, 2010             PLAINTIFF


By: s/ _____
              MARVIN A. MILLER

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

THOMAS E. EGLER
TRIG R. SMITH
SHANNON M. MATERA
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

RANDI D. BANDMAN
ROBBINS GELLER RUDMAN
  & DOWD LLP
52 Duane Street, 7th Floor
New York, NY  10007
Telephone:  212/693-1058
212/693-7423 (fax)

Lead Counsel for Plaintiff

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES OF BERNARD M.
  GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES'<br>RETIREMENT SYSTEM, Individually and on<br>Behalf of All Others Similarly Situated, | ) ) ) | No. 1:09-cv-07143 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| vs. | ) ) | |
| THE BOEING COMPANY, et al., | ) ) | |
| Defendants. | ) ) ) | |

AFFIDAVIT OF COMPLIANCE WITH RULE 37.2 OF THE
LOCAL GENERAL RULES OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

523738_1

THOMAS E. EGLER, being duly sworn, deposes and says:

1.      I am over the age of 18 and understand the obligations of an oath.

2.      I am a partner of the firm of Robbins Geller Rudman & Dowd LLP, counsel for plaintiff in this litigation.  I am admitted to the bar of this Court *pro hac vice* and have personal knowledge of the matters set forth in this Affidavit and, if called to testify, could and would competently testify about them.  I submit this Affidavit in support of Plaintiff's Motion to Convert Defendants' Motion to Dismiss to Summary Judgment and for Limited Discovery and for Leave to Amend the Operative Pleading of the captioned securities action (the "Motion").

3.      Consultation by telephone concerning the Motion occurred on May 14, 2010 at 2:00 p.m. CDT between counsel for the parties at their respective offices.  The counsel involved in this consultation included: Craig Primis, Mark Filip, Mark Nomellini, Thomas Egler, Trig Smith, and Shannon Matera.

4.      Counsel for plaintiff provided counsel for defendants a draft of the proposed Second Amended Complaint via e-mail on May 14, 2010 at approximately 8:00 p.m. CDT.  The counsel listed on this email included: Craig Primis, Mark Filip, Mark Nomellini, Tom Egler, Trig Smith, Shannon Matera, Lori Fanning and Marvin Miller.

5.      Consultation by telephone concerning the Motion also occurred on May 19, 2010 at 11:00 a.m. CDT between counsel for the parties at their respective offices.  The counsel involved in this consultation included: Craig Primis, Mark Nomellini, Tom Egler, Trig Smith, and Shannon Matera.

6.    Pursuant to Rule 37.2 of the Local General Rules of this Court, I submit that after the above-referenced consultations and good faith attempts to resolve differences, the parties are unable to reach an accord on the Motion.

I declare under penalty of perjury under the laws of the United States of America that the information in the foregoing is true and correct. Executed this **20** day of May, 2010, at San Diego, California.



THOMAS E. EGLER

State of California

County of San Diego

Subscribed and sworn to (or affirmed) before me on this _20_ day of May, 2010, by Thomas E. Egler, proved to me on the basis of satisfactory evidence to be the person who appeared before.

NATALEE HORSTMAN
Commission # 1826720
Notary Public - California
San Diego County
My Comm. Expires Dec 13, 2012

NOTARY PUBLIC

523738_1

# EXHIBIT C

Confidential Under Protective Order

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 1:09-cv-07143 |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| v. | ) ) | DEMAND FOR JURY TRIAL |
| THE BOEING COMPANY, *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

**DEFENDANTS' RULE 26(a)(1) DISCLOSURES**

Defendants The Boeing Company, W. James McNerney, Jr., and Scott E. Carson ("Defendants") hereby make their initial disclosures to Plaintiff pursuant to Federal Rule of Civil Procedure 26(a)(1). These disclosures identify core witnesses and categories of documents in support of Defendants' defenses based on the current status of the pleadings in this matter and available information to date. Defendants expressly reserve their right to supplement these disclosures pursuant to Federal Rule of Civil Procedure 26(e).

**A.     Persons With Discoverable Information That Defendants May Use**

Defendants have identified the following current or employees of The Boeing Company ("Boeing") who may possess discoverable information that Defendants may use to support their defenses in this action. Defendants reserve the right to supplement their identification with other individuals who may have discoverable information. Defendants may also rely on individuals and documents that are identified by Plaintiff in its Rule 26 disclosures. Each of these individuals may be contacted through Mark Filip at Kirkland & Ellis LLP, 300 N. LaSalle,

Confidential Under Protective Order

Chicago, Illinois 60654 and telephone number (312) 862-2192.  Although additional persons

may have knowledge of facts relating to Defendants' defenses, the persons listed herein are those

Defendants reasonably believe to be appropriate for disclosure at this time, based upon the status

of the pleadings to date.

| NAME | TOPIC ON WHICH WITNESS IS LIKELY TO HAVE DISCOVERABLE INFORMATION. |
|---|---|
| Scott Carson | The side-of-body issue and the scheduling of the first flight. |
| Scott Fancher | The side-of-body issue and the scheduling of the first flight. |
| Jim Ogonowski | The side-of-body issue and the scheduling of the first flight. |
| Patrick Shanahan | The side-of-body issue and the scheduling of the first flight. |
| John Tracy | The side-of-body issue and the scheduling of the first flight. |

**B.     Categories Of Documents That Defendants May Use**

Defendants intend to use to support its claims certain relevant, non-privileged documents.

These documents relate to, *inter alia,* the Dreamliner 787 side-of-body issues that Boeing

addressed in the spring and early summer of 2009.

**C.     Computation of Damages**

Defendants have not asserted any claims to date.

**D.     Insurance Agreements**

Insurance agreements are available for inspection and copying, upon entry of an

appropriate protective order.

Confidential Under Protective Order

Dated: April 22, 2010                    Respectfully submitted,


                                         /s/ *Mark R. Filip*
                                         _____
                                         Mark R. Filip
                                         KIRKLAND & ELLIS LLP
                                         300 North LaSalle Street
                                         Chicago, Illinois  60654
                                         Tel.  (312) 862-2000
                                         Fax  (312) 862-2200
                                         mark.filip@kirkland.com

                                         *Attorneys for Defendants The Boeing Company,*
                                         *W. James McNerney, Jr. and Scott E. Carson*

Confidential Under Protective Order

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2010, I caused a true and complete copy of Defendants' Rule 26(a)(1) Disclosures to be served on the following counsel of record by e-mail and U.S. Mail.

| | |
|---|---|
| Lori A. Fanning<br>MILLER LAW LLC<br>115 S. LaSalle Street<br>Suite 2910<br>Chicago, Illinois 60603<br>Tel. (312) 332.3400<br>Fax. (312) 676-2676<br>lfanning@millerlawllc.com | Samuel H. Rudman<br>David A. Rosenfeld<br>COUGHLIN STOIA GELLER<br>  RUDMAN & ROBBINS LLP<br>58 South Service Road<br>Suite 200<br>Melville, New York 11747<br>Tel. (631) 367-7100<br>Fax. (631) 367-1173<br>SRudman@csgrr.com<br>DRosenfeld@csgrr.com |
| Deborah R. Gross<br>Robert P. Frutkin<br>LAW OFFICES OF BERNARD M.<br>  GROSS, P.C.<br>Wanamaker Building<br>Suite 450<br>100 Penn Square East<br>Philadelphia, Pennsylvania 19107<br>Tel. (215) 561-3600<br>Fax. (215) 561-3000<br>debbie@bernardmgross.com<br>rpf@bernardmgross.com | Michael J. Vanoverbeke<br>Thomas C. Michaud<br>VANOVERBEKE MICHAUD &<br>  TIMMONY, P.C.<br>79 Alfred Street<br>Detroit, Michigan 48201<br>Tel. (313) 578-1200<br>Fax. (313) 578-1201<br>mvanoverbeke@vmtlaw.com<br>tmichaud@vmtlaw.com |

/s/ *Mark R. Filip*
Mark R. Filip