IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.:  09 C 7143 |
| v. | ) ) ) | Suzanne B. Conlon, Judge |
| THE BOEING COMPANY, W. JAMES MCNERNEY, JR., and SCOTT E. CARSON, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

City of Livonia Employees' Retirement System ("City of Livonia") brings this putative

class action securities fraud case against The Boeing Company ("Boeing"), its chairman,

president and chief executive officer W. James McNerney, Jr., and its former executive vice

president, president, and chief executive officer of the commercial airplanes segment Scott E.

Carson (collectively "defendants") under sections 10(b) and 20(a) of the Securities Exchange Act

of 1934 ("Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  City of

Livonia alleges defendants intentionally deceived investors about the test and delivery schedule

for its new 787 Dreamliner airplane.  It seeks to hold Boeing, McNerney, and Carson liable under

section 10(b) of the Act and Rule 10b-5 (Count I), and to impose joint and several liability

against them under section 20(a) of the Act as persons controlling another liable under the Act

(Count II).  Defendants move to dismiss the amended complaint for failure to state a claim.  For

the reasons set forth below, the motion is granted.

## BACKGROUND

Boeing builds airplanes. The 787 Dreamliner is Boeing's cutting-edge commercial passenger airplane; its development and production schedule was announced to the world in 2003. Am. Compl. ¶ 6, 35, 43. Customer orders rolled in. By the end of 2008, the 787 was Boeing's fastest-selling airplane ever, with almost 900 orders from more than 55 customers. *Id.* ¶ 7.

As part of the Federal Aviation Administration ("FAA") certification process, after an airplane passes a series of tests, it may fly for the first time. *Id.* Certification for first flight requires subjection of the airplane wings to a "load limit" test, which simulates 100% of the anticipated in-service load. *Id.* ¶ 50. During first flight, the airplane is tested to determine its readiness for the final airworthiness certification testing phase. *Id.* ¶¶ 7, 40, 69. The plane may be delivered to customers when it achieves airworthiness certification. *Id.* FAA certification for customer delivery requires that the wings pass an "ultimate load" test at 150% of the anticipated in-service load. *Id.* ¶ 50.

Boeing initially set August 2007 as the 787's first flight, and May 2008 as the customer delivery date. *Id.* ¶ 43. This was an aggressive schedule. *Id.* ¶ 7. The post-first flight testing for the 787's predecessor took almost a year. *Id.* ¶¶ 7, 41. Boeing reduced the schedule to nine months for the 787 by distributing the tests among a fleet of six airplanes and two test airframes. *Id.* In 2007 and 2008, problems with the 787's composite technology and construction, a strike, and a vendor quality issue caused Boeing to postpone its anticipated first flight and delivery dates five times for a total 20-month delay by the end of 2008. *Id.* ¶¶ 8-9, 43, 51. With the fifth delay in December 2008, Boeing announced the 787's first flight was scheduled for the second quarter

2

of 2009 (ending June 30, 2009), and the plane would finish the certification process and be ready for customer delivery by the end of the first quarter of 2010. *Id.* ¶¶ 10, 51, 54. Boeing's reputation and relations with suppliers and customers were strained. *Id.* ¶¶ 8-9. By May 2009, customers cancelled 50 orders for the 787. *Id.* ¶ 11.

On April 21, 2009, Boeing conducted a wing load stress test on the 787. *Id.* ¶ 61. The 787 "failed to meet at least the 'ultimate load' test." *Id.* ¶ 75. The design limitations required redesign, fabrication, installation, and successful testing of a solution before first flight. *Id.* Pre-May 3, 2009 internal e-mails revealed defendants' knowledge of the ramifications from the poor results of the wing stress test, and the risk to the first flight and delivery schedule. *Id.* Boeing issued a press release on May 3, 2009, stating that the 787's wings were "'subjected to their limit load – the highest loads expected to be seen in service,'" and although all of the test data had not been analyzed, "'the initial results are positive.'" *Id.* ¶¶ 2, 12-13, 73-75, 140. Boeing represented that all of the necessary structural tests required prior to first flight were complete, and that the airplane was on schedule for first flight. *Id.* ¶ 74. Boeing's stock price rose by 2.4% the next day. *Id.* ¶ 75.

On May 17, 2009, Boeing conducted another wing load stress test on the 787. *Id.* ¶¶ 3, 13, 77. The 787 again failed the ultimate load test. *Id.* In addition, defendants learned the 787 wings suffered "delamination" (separation of composite materials) from the stress test. *Id.* By the end of May 2009, defendants were "scrambling" to design a solution that would allow the 787 to perform first flight. *Id.* ¶ 13.

Nevertheless, Boeing did not mention the wing stress tests or the results in a series of statements during May and June 2009. *Id.* ¶¶ 77-78. On May 21, 2009, Boeing issued a press

3

release regarding its steady progress toward the 787's first flight. *Id.* ¶ 78. McNerney reportedly stated on May 27, 2009 that he "'think[s] the airplane will fly in June'" and expects delivery of the 787 in the first quarter of 2010 but "'there is always the chance that the schedule could be disrupted by a mechanical issue coming to light during the test flight.'" *Id.* ¶ 79. On May 30, 2009, Boeing's vice president for commercial airplanes marketing announced the "'intermediate gauntlet,'" or simulated in-flight conditions, on the 787 had begun. *Id.* ¶¶ 80-81.

A June 1, 2009 *Bloomberg* report stated that Boeing began a flight simulation test on the 787 and quoted a Boeing e-mail that the test "'is expected to take about seven days, but it's more important to get the testing done correctly than to meet a schedule.'" *Id.* ¶ 82. Boeing's stock price rose after the announcement. *Id.* A June 4, 2009 Boeing press release announced its presentation schedule at the upcoming 2009 Paris air show, including a presentation on the 787. *Id.* ¶ 84. Boeing's stock continued to climb. *Id.* Boeing's June 8, 2009 press release discussed the intermediate gauntlet testing and reported it "'will continue to take a hard look at the results, make adjustments and finish up our testing so we can get to first flight.'" *Id.* ¶ 85.

The air show opened on June 15, 2009. *Id.* ¶ 87. The show is an international trade fair for aircraft manufacturers, suppliers, and buyers. *Id.* In light of the international economic turmoil, Boeing's stated priority at the 2009 air show was to maintain the backlog of orders rather than sell new airplanes. *Id.* ¶ 88. As the show began, Boeing issued a press release, reporting that fuel testing on the 787 began, and "'[m]omentum continues to build with each milestone achieved.'" *Id.* ¶ 90. On June 16, 2009, Carson stated the 787 "'definitely will fly'" this month, and that he "'personally believe[d] the airplane could fly today.'" *Id.* ¶ 94. The next day, Boeing announced that final assembly began on the 787, and deliveries were scheduled to

begin in the first quarter of 2010. *Id.* ¶ 96.  No 787 orders were cancelled during the air show.
*Id.* ¶¶ 15, 98.

On June 23, 2009, five days after the air show ended, Boeing issued a press release
canceling the first flight and stating it could not estimate the date for first flight or delivery. *Id.*
¶¶ 16, 100.  During a conference call with analysts that day, Carson stated that Boeing had
"'discovered in a test condition several weeks ago an anomaly that we saw.'" *Id.* ¶ 104.  He
discussed the initial belief that Boeing had a solution allowing progression toward first flight, but
detailed analysis completed "'late last week'" resulted in the decision to postpone first flight. *Id.*
¶¶ 101, 104.  Boeing revealed the problem concerned the "critical point at which the wing is
attached to the rest of the body of the airplane." *Id.* ¶ 103.  Boeing elaborated that "'[l]ate last
month,'" excessive stress "'in an area of the side-of-body structure'" was identified during
testing; preliminary analysis indicated first flight could proceed, but after further testing and
analysis completed "'late last week'" Boeing decided to postpone first flight to conduct structural
reinforcement and necessary modifications. *Id.* ¶ 102.  Boeing's stock plummeted 12% over the
next two days. *Id.* ¶ 115.  City of Livonia seeks to represent a class of all person who acquired
Boeing common stock from May 4, 2009 to June 22, 2009. *Id.* ¶ 1.

## DISCUSSION

City of Livonia sues defendants for securities fraud under sections 10(b)[1] and 20(a)[2] of

the Act and Rule 10b-5[3] promulgated thereunder.  It must establish defendants made a material

misstatement or omission with scienter in connection with the purchase or sale of securities, on

which it relied, and which caused economic loss.  *Stoneridge Inv. Partners, LLC v. Scientific-*

*Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  The required scienter is an intent to deceive,

demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk

that the statement is false.  *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

Defendants move to dismiss the amended complaint for failure to state a claim under Fed.

R. Civ. P. 12(b)(6).  Generally, in ruling on a Rule 12(b)(6) motion, all well-pleaded allegations

are accepted as true, and all reasonable inferences are drawn in plaintiff's favor.  *Tamayo v.*

*Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).  Factual allegations must be sufficient to state

a claim to relief that is plausible on its face, rather than merely speculative, and must provide fair

notice of the nature and basis of the claim.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-

56, 570 (2007).

---

[1] Section 10(b) of the Act forbids the use or employ, in connection with the purchase or sale of securities, of any manipulative or deceptive device or contrivance in contravention of rules and regulations the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for investors' protection.  15 U.S.C. § 78j(b).

[2] Section 20(a) of the Act imposes joint and several liability on any person who controls another person liable under the Act.  15 U.S.C. § 78t(a).

[3] Rule 10b-5(b) forbids a person from making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  17 C.F.R. § 240.10b-5(b).

Allegations of fraud like City of Livonia's securities fraud claim, however, are subject to
the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re
Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996). City of Livonia
must plead the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). It must
identify the person who made the misrepresentation; the time, place, and content of the
misrepresentation; and the method by which the misrepresentation was communicated. *Vicom,
Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also Borsellino v.
Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud must be pled with
particularity by providing the who, what, when, where, and how).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b),
further raises the pleading standard for securities fraud claims. City of Livonia must specify each
statement alleged to have been misleading and the reasons why the statement is misleading. 15
U.S.C. § 78u-4(b)(1)(B). With respect to each statement or omission, City of Livonia must state
with particularity facts giving rise to a strong inference that defendants acted with the required
scienter. *Id.* § 78u-4(b)(2). A complaint will survive a motion to dismiss only if a reasonable
person would deem the inference of scienter cogent and at least as compelling as an opposing
inference that could be drawn from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights,
Ltd.*, 551 U.S. 308, 324 (2007).

The amended complaint alleges that beginning with the May 3, 2009 press release and
continuing through statements at the air show, defendants misled investors about the risks to the
first flight and delivery schedules caused by the wing stress tests. Am. Compl. ¶¶ 2, 12-13, 73-
75, 77-82, 84-85, 87-88, 94, 96, 140. The May 3, 2009 press release is not actionable because it
was issued before the start of the May 4, 2009 to June 22, 2009 class period. *Desai v. General*

7

*Growth Props., Inc.*, 654 F. Supp. 2d 836, 855 (N.D. Ill. 2009) (Shadur, J.).  City of Livonia

defined its class period; the court may not amend the class period on its behalf. *Id.*

In addition, City of Livonia lacks standing to challenge statements made after June 5,

2009 – the date it purchased Boeing stock.  Am. Compl. ¶ 31.[4]  "[P]ost-purchase statements

cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the

price at which plaintiff actually purchased." *Roots P'Ship v. Lands' End, Inc.*, 965 F.2d 1411,

1420 (7th Cir. 1992); *see also Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL

3380653, at *4 n.1 (N.D. Ill. Oct. 19, 2009) (Coar, J.) (collecting cases).

In its opposition, City of Livonia requests leave to amend the class period to include May

3, 2009, and add another class representative (who purchased Boeing stock on June 17, 2009).

The request is denied.  City of Livonia had ample opportunity to seek leave to amend its

complaint for the second time or proffer putative class representatives.  A plaintiff is not entitled

to "'leisurely repeated bites at the apple, forcing a district judge to decide whether each

successive complaint was adequate under the PSLRA.'" *Pugh v. Tribune Co.*, 521 F.3d 686, 698

(7th Cir. 2008) (citation omitted).  In addition, for the reasons discussed below, the amended

complaint fails to allege defendants acted with the required scienter.

The amended complaint alleges that before May 3, 2009 defendants knew from internal e-

mails the ramifications from the poor results of the April 21, 2009 wing stress test and the risk to

the first flight and delivery schedule. *Id.* ¶ 75.  City of Livonia fails to identify who authored the

---

[4] The PSLRA requires City of Livonia to attach to its complaint a sworn certification setting forth all of its transactions in Boeing's stock during the class period. 15 U.S.C. § 78u-4(a)(2)(A)(iv). City of Livonia attached the certification to its initial complaint, but not to its amended complaint; the amended complaint refers to the certification attached to the initial complaint. Am. Compl. ¶ 31. City of Livonia does not dispute its only transaction in Boeing stock during the class period was on June 5, 2009.

alleged e-mails.  Allegations from confidential sources must be discounted (usually steeply)
because it "is hard to see how information from anonymous sources could be deemed
'compelling' or how we could take account of plausible opposing inferences.  Perhaps these
confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."
*Higginbotham*, 495 F.3d at 757.  Confidential sources deserve weight only if the plaintiff pleads
with particularity facts showing how the source was in a position to know the information and
why the source should be credited.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702,
712 (7th Cir. 2008).

        The amended complaint fails to plead any particularized facts about the confidential
sources.  In a footnote in its response, City of Livonia suggests providing the information to the
court *in camera*.  "There is no 'informer's privilege' in civil litigation."  *Higginbotham*, 495 F.3d
at 757.  Boeing is entitled to learn the information in discovery.  This does not mean that the
sources *must* be revealed in the complaint, but anonymity conceals information essential to the
determination of whether a strong inference of scienter has been pled.  *Id.*  The court must
evaluate the allegations pled, and disregard information concealed.  *Id.*  The amended complaint
alleges no information about confidential sources; the court cannot credit the information.  City
of Livonia alleges its investigation confirmed defendants' knowledge of the final April 21, 2009
wing stress testing via e-mail by May 3, 2009.  Am. Compl. ¶ 144.  It pleads no particularized
supporting facts.  A reasonable person would not deem the inference of defendants' scienter
cogent.

        The amended complaint alleges that on November 30, 2009, as Boeing was continuing
with the requisite testing for first flight, it issued a press release, stating that it had conducted a
load limit test on the solution for the 787, and expected a full analysis of the test results in

approximately 10 days.  *Id.* ¶ 133.  Boeing announced the successful test results 10 days later.  *Id.* ¶ 134.  From this, City of Livonia concludes defendants must have known about the final results of the April 21, 2009 and May 17, 2009 wing stress tests 10 days after those tests were performed.  *Id.* ¶ 143.  No reasonable person would infer that full analysis of wing stress test results on a complex, cutting-edge airplane invariably take 10 days.

The amended complaint's allegations about the wing stress test results are murky.  It alleges the 787 "failed to meet at least the 'ultimate load' test" on April 21, 2009, and again failed the "ultimate load" test on May 17, 2009.  Am. Compl. ¶¶ 75, 77.  What does that mean?  The 787 was required to pass the *load limit test* (100% of the anticipated load), not the ultimate load test (150% of the anticipated load), to achieve first flight.  *Id.* ¶ 50.  The amended complaint fails to allege the distinction between and significance of failing to pass the ultimate load test at a point when the 787 was still preparing for first flight.  The court cannot infer that defendants knew or recklessly disregarded the impact of the failed wing stress tests on the first flight and delivery schedule without particularized facts about the testing.

The amended complaint alleges defendants delayed disclosure of the test results until after the air show to stave off cancellations of existing orders.  *Id.* ¶ 138.  The theory is neither compelling nor cogent.  Boeing announced the delay to first flight and delivery five days after the air show.  *Id.* ¶¶ 16, 100.  A rational person would not presume that sophisticated purchasers of a costly aircraft would cancel orders at the air show, but not the next week after the announcement.  In addition, the amended complaint asserts that Carson's unscheduled, early retirement (*id.* ¶¶ 34, 126-27) supports a strong inference of scienter.  It fails to explain its speculative theory, or point to any particularized facts to support any inference.

The more cogent inference from the amended complaint is that Boeing detected problems during the wing stress testing and spent time investigating and analyzing the problem and trying to find a solution that would allow adherence to the first flight and delivery schedule. Indeed, the amended complaint alleges only that the confidential e-mails demonstrate defendants knew of a "risk" to the first flight and delivery schedule (*id.* ¶ 75), and that by the end of May 2009, "defendants were scrambling to design a solution that would allow the 787 to perform a full First Flight, but were unable to finalize a new design that could be fabricated, applied and tested again in time for First Flight by the end of June" (*id.* ¶ 13). Fraud cannot be inferred from subsequent investigation and testing. "Knowing enough to launch an investigation . . . is a very great distance from convincing proof of intent to deceive." *Higginbotham*, 495 F.3d at 758. Prudent managers investigate rather than jump to conclusions; taking the time to investigate is lawful and proper. *Pugh*, 521 F.3d at 695; *Higginbotham*, 495 F.3d at 761. The amended complaint fails to plead defendants intentionally deceived investors about the test and delivery schedule for the 787.

In addition, City of Livonia fails to plead a strong inference of scienter with respect to each defendant, as required by the PSLRA. *Pugh*, 521 F.3d at 693. The amended complaint repeatedly refers to "defendants" generally, and fails to provide individualized factual allegations regarding each defendant's state of mind. This impermissible group pleading fails to meet the heightened PSLRA pleading requirements. *Id.*

The amended complaint fails to plead the requisite scienter under the PSLRA for its securities fraud claim. Accordingly, it fails to state a claim for defendants' derivative liability as control persons under section 20(a) of the Act. *Id.* at 698.

## CONCLUSION

Defendants' motion to dismiss the amended complaint is granted. Count I for primary liability under section 10(b) of the Act and Rule 10b-5 is dismissed because the amended complaint fails to allege defendants made material misstatements or omissions about the 787's flight and delivery schedule with the intent to deceive investors. Count II for defendants' derivative liability as control persons under section 20(a) of the Act is dismissed because the amended complaint fails to plead a primary violation of the securities laws.

ENTER:

Suzanne B. Conlon
United States District Judge

May 26, 2010

12