**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br>v. )<br><br>THE BOEING COMPANY, W. JAMES McNERNEY, JR. and SCOTT E. CARSON, )<br><br>Defendants. ) | Case No. 1:09-cv-07143<br><br>Judge Suzanne B. Conlon<br><br><u>DEMAND FOR JURY TRIAL</u> |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

Mark Filip
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Tel.  (312) 862-2000
Fax  (312) 862-2200
mark.filip@kirkland.com

Craig S. Primis, P.C. *(Admitted Pro Hac Vice)*
John A. Eisenberg
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200
craig.primis@kirkland.com
john.eisenberg@kirkland.com

*Attorneys for Defendants The Boeing
Company, W. James McNerney, Jr. and
Scott E. Carson*

July 2, 2010

## INTRODUCTION

The Court dismissed the First Amended Complaint because it failed to meet the heightened pleading standards of the PSLRA.  Those standards are designed to curb "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (citation omitted).  Before a securities plaintiff may be permitted the considerable leverage of discovery and the prospect of class action damages, the PSLRA's pleading standards must be met; if not, the complaint must be dismissed.  As the Court found when it granted Boeing's earlier motion to dismiss, among many flaws in the First Amended Complaint, there was no cogent, compelling inference of intent to defraud (scienter), and the complaint's core allegations were "murky" at best.  May 26 Dismissal Order ("*Order*") at 9-10 (Conlon, J.).  The Second Amended Complaint fares no better and, in some ways, fares worse.  It should be dismissed.

Aside from technical corrections to extend the class period and add a new plaintiff that purchased Boeing stock later, the Second Amended Complaint adds only four new paragraphs, SAC ¶¶ 139-42, that expand on the "confidential source" allegations.  While superficially more detailed, the new allegations cannot survive scrutiny.  Critical aspects of particularity are lacking. New internal contradictions are introduced that make the new complaint even murkier than the last.  Core problems for the PSLRA's required "strong inference" of scienter remain, especially the lack of any compelling motive for why Boeing would attempt the purported scheme to defraud.  And the Seventh Circuit's decision in *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), remains as insurmountable as the Court previously recognized it was, in dismissing the earlier complaint.

If anything, the new allegations make the theory of scienter *less* compelling.  Plaintiffs now allege that Boeing's most senior executives purportedly knew in May 2009 (from

"communications" reported by a single, still unidentified "confidential source") that first flight *could not occur* in June 2009, but that Boeing's leaders fraudulently kept insisting otherwise, knowing that they would soon be publicly contradicted.  In attempting to boost the confidential source allegations, Plaintiffs have actually moved their theory of scienter from merely implausible and unsupported to absurd.

The ultimate test for scienter is a straightforward comparison of narratives.  Only if a reasonable person would deem Plaintiffs' inference of scienter "cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged" can a securities complaint survive.  *Tellabs*, 551 U.S. at 324.  Simply put, if Plaintiffs' theory of scienter is not as compelling as the non-fraudulent explanation for Boeing's conduct, the complaint must be dismissed.  As the Court noted with the earlier complaint, the "more cogent inference" is that "Boeing detected problems during the wing stress testing and spent time investigating and analyzing the problem and trying to find a solution that would allow adherence to the first flight and delivery schedule."  *Order* at 11.  That remains the case.  The Second Amended Complaint should be dismissed.

## <u>ARGUMENT</u>

The Second Amended Complaint corrects certain clear flaws regarding the class period and the original Plaintiff's attempt to challenge statements made after it purchased Boeing stock.  Otherwise, the only new allegations concern the purported "confidential source" who now allegedly says, among other things, that by May 26, 2009, an alleged conclusion by the Boeing "Wing Integration Team" that first flight could not occur in June 2009 was "clearly communicated" to Boeing's senior leaders.  SAC ¶ 142.

This motion will first explain why the new confidential source allegations offer far less than initially meets the eye and still do not overcome *Higginbotham* and other cases.  Defendants

will then explain why the Plaintiffs' overarching theory of scienter still suffers from the same flaws the Court identified with the earlier complaint—in particular, the absence of any plausible motive to defraud—and why it is, in many respects, now less plausible as alleged than before.

I.      **Plaintiffs' New Confidential Source Allegations Do Not Give Rise To A Strong Inference Of Scienter.**

Regarding the new confidential source allegations, the question presented is simply whether they are sufficient to convert Plaintiffs' claims from ones that have already failed as a matter of law to ones that meet the PSLRA's demanding requirements. The answer to that question is "no." Carefully scrutinized, the new allegations continue to conceal far more than is revealed; the new complaint's story is no more compelling than before and indeed, less so.

A.      **The Confidential Source Is Still Unidentified, Uncorroborated, And Unreliable, And Under *Higginbotham* Must Be Steeply Discounted.**

The new complaint builds upon the same confidential source allegation the Court found lacking in the First Amended Complaint, namely that Boeing management learned about the April 21 test results and the risk to first flight "via internal emails sent before May 3, 2009." SAC ¶ 77 (same allegation as FAC ¶ 75). Plaintiffs now claim that the allegation is based on information from a "confidential source," described for the first time as a former Boeing Senior Structural Analyst and Chief Engineer. SAC ¶ 139.

Although superficially that allegation looks like an improvement over the absence of ***any*** supporting allegations in the First Amended Complaint, a closer inspection reveals that the new version offers more words, but no more creditable substance. First, the threshold discount for anonymity still applies. For reasons never provided, Plaintiffs ***still*** do not identify the source by name. Allegations attributed to an anonymous source must be "steeply discounted," *Makor Issues & Rights v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (citing *Higginbotham*, 495

F.3d at 756-57), because anonymity prevents the Court from fully considering plausible opposing inferences, as required by the Supreme Court. *See Higginbotham*, 495 F.3d at 757. This is because it "is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Order* at 9 (quoting *Higginbotham*, 495 F.3d at 757). The new allegations do nothing to diminish the steep discount that still applies to the words of this confidential source.

Moreover, Plaintiffs' confidential source still stands alone. The new complaint is a far cry from the sufficient complaint in *Tellabs*, which boasted 26 confidential sources "corroborated by multiple sources," and the information attributed to those sources was "set forth in convincing detail." 513 F.3d at 712. Here there is just one uncorroborated and unidentified source, and the information attributed to him is described superficially, not in convincing detail. The Seventh Circuit affirmed dismissal in *Higginbotham*, where scienter was based on vague allegations of internal reporting just like those alleged here, even though that plaintiff identified *five* confidential sources in support of those allegations, 495 F.3d at 756-58.[1] Plaintiffs here offer *no* other source—confidential or otherwise—to corroborate the new allegations.

Further, in assessing a confidential source allegation, the Court should also discount for other matters that are concealed, aside from the source's name. *See Higginbotham*, 495 F.3d at 757. Here, much critical information is still concealed. For example, the new complaint does not say *when* the confidential source worked on the 787 program; whether he was in management, held a lower level staff position, or was a salaried employee during the time in question; or even whether he was at Boeing at all during that time. Alleging the source was a

---

[1] The *Higginbotham* complaint is available on-line for comparison. *See* No. 104CV04909, 2005 WL 6189808, ¶¶ 8, 73 (N.D. Ill. Sept. 28, 2005).

"former" employee during an unspecified time period says nothing as to first-hand knowledge during the relevant time period.

Those are important missing facts.  Confidential sources deserve some weight only when the complaint explains by pleading detailed, particularized facts how the person was in a position to know.  Here, the complaint does not reveal whether the source was in a position to know what senior executives actually heard or understood about this testing, or when they learned it.  The Second Amended Complaint does not even allege that the confidential source saw the purported communications in question.  *See* SAC ¶¶ 140-42.  It alleges only that he had "access" to and "first-hand" knowledge of the "stress test files" generally, without saying ***when***, *id.* ¶ 139, and notably ***does not allege*** that the source actually saw or read any of the purported communications to senior management.  The lack of such critical details about the communications on which the complaint relies weighs against an inference of scienter.

This Court has already taken issue with Plaintiffs' "fail[ure] to identify who authored the alleged e-mails."  *Order* at 8-9.  That deficiency remains.  Despite the source's asserted "first-hand knowledge," Plaintiffs still do not say who authored the emails, who all received them and in what context, the exact date on which they were sent, the information on which they were based, or the precise contents of ***any*** of the alleged emails.  *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147-48 (3d Cir. 2004) (rejecting allegations based on internal reports where plaintiffs "fail to identify who authored the report, when it was authored, who reviewed the report, and what data its conclusions were based on").  In this regard, these confidential source allegations are indistinguishable from the ones *Higginbotham* rejected.  There the confidential sources vaguely alleged that management had been informed of the alleged fraud—just as in this case, the source alleges that management was informed about the

testing; the fact that Plaintiffs here rely on unspecified emails does not suffice to credit the allegation.   As the Seventh Circuit noted in *Higginbotham*, in discussing the allegations and affirming the dismissal there, "even by plaintiffs' lights the evidence is slim."  495 F.3d at 758.

>   **B.**      **The Story Told In The New Confidential Source Allegations Suffers Similar Defects As Before And Introduces New Problems For The Complaint.**

The substance of the four new paragraphs divides up as follows.  Two paragraphs attempt to establish the *bona fides* of the confidential source, SAC ¶¶ 139-40; paragraph 141 says that the April 2009 wing testing revealed a "risk" to first flight; and paragraph 142 then says that the May 17, 2009 testing led to a clear communication to management that first flight could not occur in June.   The problems with the source's *bona fides* have been addressed above.   As explained below, paragraph 141 adds nothing over what the Court has already rejected.   As for paragraph 142—which is entirely new—it contradicts other allegations in the complaint and compounds what this Court found "murky" about the Plaintiff's story the first time around.

Paragraph 141 says that the defendants became aware "within a few days" of the April 21, 2009 test that the allegedly poor results "and necessary re-testing placed the plane's scheduled June 30, 2009 First Flight at risk."  SAC ¶ 141.  That is the same allegation this Court found to be insufficient in its previous order granting Boeing's motion to dismiss.  Fundamental to the Court's initial ruling was the observation that "the amended complaint alleges only that the confidential e-mails demonstrate defendants knew of a 'risk' to the first flight and delivery schedule."  *Order* at 11.  The Court found this insufficient to establish scienter because under Seventh Circuit law, "taking the time to investigate is lawful and proper."  *Id.* (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008), and *Higginbotham*, 495 F.3d at 761).  That same reasoning applies to paragraph 141.

Paragraph 142, directed toward the May 2009 testing, also fails to support a compelling

inference of scienter, but for different reasons.  For starters, Plaintiffs now contend that "internal electronic communications, dated around May 26, 2009 . . . clearly communicated [to Messrs. McNerney and Carson] the Wing Integration Team's conclusion that Boeing would be unable to conduct a June 30, 2009 First Flight."  SAC ¶ 142.  That is an escalation of the prior allegation, which claimed only knowledge of a "risk" of delay.  *See Order* at 11.  The new allegation is thus at odds with other allegations in the complaint.

Second, paragraph 142 alleges for the first time that "the 787 ***passed*** the limit load test on May 17, 2009."  SAC ¶ 142 (emphasis added).  Limit load is the highest load any 787 might experience in service (as opposed to "ultimate load," which is 150% of "limit load" and need only be passed before certification for delivery, not flight testing).  *See* SAC ¶ 52.  As the Court noted in its order dismissing the First Amended Complaint—and as Plaintiffs specifically allege—the 787 was required only to pass the limit load test, not the ultimate load test, prior to first flight.  *See Order* at 2, 10; SAC ¶ 52.  Accordingly, if, as Plaintiffs allege, the plane passed "limit load," then there would be no problem for first flight, and no reason to communicate that "Boeing would be unable to conduct a June 30, 2009 First Flight."  SAC ¶ 142.  The allegation in paragraph 142 makes no sense and confirms the patent insufficiency of the new allegation.

The new complaint also does not resolve the overall "murkiness" the Court identified regarding wing stress testing.  Plaintiffs continue to assert that testing in April and May 2009 was for "ultimate load" and that the plane "failed" that test, even though that is a test that must be passed only for certification for delivery to customers.  SAC ¶¶ 13, 52, 77, 91, 142.  Indeed, Plaintiffs now link the alleged failure of "ultimate load" to a supposed management conclusion that a June 2009 first flight ***could not occur***.  SAC ¶ 142.  Yet Plaintiffs acknowledge the obvious contradiction that Boeing began flying the 787 in December 2009 without having done

"ultimate load" testing on the new wing structure.   SAC ¶¶ 22, 136.   Plaintiffs also offer

contradictory allegations on what the April test actually was—was it a limit load test as alleged

in one of the new confidential source allegations, SAC ¶ 141, or was it an ultimate load test as

alleged in Paragraph 13 of the First Amended Complaint, now repleaded verbatim?   And

Plaintiffs now say the plane "failed" "limit load" in April, SAC ¶ 141, but "passed" "limit load"

in May.   SAC ¶ 142.   The Court correctly faulted the various testing allegations as "murky" in

dismissing the earlier complaint, *Order* at 10, and they are even murkier now.   This is especially

true now that Paragraph 142 alleges both that the plane "passed" the "limit load" test in May and

that the plane could not fly in June.   Taking a step back, the Plaintiffs' confusion, apparent

contradictions, and vague allegations collectively show that they simply do not know what they

are talking about, do not have a coherent theory of fraud, and are just guessing.   This is the type

of abusive tactic the PSLRA's heightened pleading standards are designed to stop.

In any event, if Plaintiffs' version of events were credited, Boeing's entire course of

conduct following the purported May 17, 2009 test, as alleged in the Second Amended

Complaint, would make absolutely no sense.   While the new complaint alleges that late May

emails "clearly communicated [to Boeing executives] that Boeing would be unable to conduct a

June 30, 2009 First Flight," SAC ¶ 142, the complaint elsewhere alleges that "[b]y the end of

May, defendants were scrambling to design a solution that would allow the 787 to perform a full

First Flight."   SAC ¶ 13, *quoted in Order* at 11.   Why the scramble in late May to design a fix for

first flight if everyone up to the highest levels of the company already knew first flight would be

delayed?   If Mr. McNerney and Mr. Carson ***knew*** postponement of first flight was already a

certainty in late May, why would they continue to make optimistic statements that first flight was

still on track?   And why, as Plaintiffs allege, would Boeing conduct further extensive engine and

gauntlet testing through June to prepare for first flight?  SAC ¶¶ 80, 82-84, 87.  Unlike a financial fraud, where numbers can be manipulated and hidden for a long time, here the plane would either fly by June 30 or it would remain on the ground; there is no way to hide it or postpone the disclosure, especially given the FAA's close supervision of the whole process.  And the Court has already rejected the only motive Plaintiffs have alleged, that this was all a ruse to avoid cancellations during the Paris Air Show.  *Order* at 10.  The new complaint adds nothing that should result in the Court's now accepting the Plaintiffs' unchanged theory of motive.

The PSLRA requires inferences of scienter to be strong, cogent, and compelling.  The few additional details Plaintiffs have attributed to the confidential source are not the "particularized facts about the testing" this Court said were necessary to "infer that defendants knew or recklessly disregarded the impact of the failed wing stress tests on the first flight." *Id.* Instead, they either repeat allegations already addressed and rejected by the Court, contradict allegations elsewhere in the Second Amended Complaint, or make conclusory new allegations that are not supported by the sort of particularized pleading required by the PSLRA or even basic plausibility.  While Plaintiffs' new allegations may have been sufficient to justify an amendment to their pleading under the liberal rules for granting leave to amend, upon closer scrutiny they simply do not establish a compelling or cogent theory of scienter or fraud.

## II.     The Far More Compelling Inference Is That Boeing Undertook A Reasonable Investigation, Made No Fraudulent Statements, And Had No Intent To Defraud.

In isolation, the four new paragraphs expanding on the confidential source allegations are not compelling.  But they are even less so as part of Plaintiffs' overarching theory of fraud.  As stated at the outset, the ultimate inquiry on scienter is a simple comparison:  the plaintiffs' narrative must be cogent and at least as compelling as the defendants' opposing narrative.  If plaintiffs' narrative does not match up, the complaint must be dismissed.  Many of the problems

that justified dismissal of the old complaint remain, and the new allegations actually make Plaintiffs' scienter theory *less* plausible.  Nor have Plaintiffs offered the particularized factual allegations with respect to any of Boeing's public statements about the 787 that are necessary under the PSLRA to substantiate Plaintiffs' claim of fraud.  15 U.S.C. § 78u-4(b)(1) (2010).

> **A.    Plaintiffs Still Have No Compelling Theory Of Motive And Cannot Refute The Clear Inference That Boeing Simply Investigated A Potential Problem.**

In its order granting Boeing's first motion to dismiss, the Court rejected the First Amended Complaint's theory of motive as "neither compelling nor cogent."  *Order* at 10.  That theory, simply put, is that "defendants delayed disclosure of the test results until after the air show to stave off cancellations of existing orders."  *Id.* (citing FAC ¶ 138).

The Second Amended Complaint reiterates the exact same theory of motive the Court already rejected, *see* SAC ¶ 144, and it is no more compelling or cogent this time around.  Even if everything attributed to the confidential source were believed, those allegations do not provide a compelling reason why Boeing executives would hide the delay of first flight during the air show, only to disclose it five days later.  As the Court explained, "[a] rational person would not presume that sophisticated purchasers of a costly aircraft would cancel orders at the air show, but not the next week after the announcement."  *Order* at 10.  The new allegations neither change nor supplement the original theory of motive already rejected by the Court.

The new allegations also do not overcome Boeing's entitlement to investigate a problem.  As the Court earlier found, even accepting that defendants knew of a risk to first flight in April or late May, "taking the time to investigate is lawful and proper," and "[f]raud cannot be inferred from subsequent investigation and testing."  *Order* at 11 (citing *Pugh* and *Higginbotham*).  The Seventh Circuit addressed almost the exact same situation in *Higginbotham* and rejected any inference of scienter or fraud:

> The most one can say is that, sometime during May 2004, Baxter learned enough to lead a reasonable person to conduct an investigation.  That is exactly what Baxter did during the next two months, demonstrating a pursuit of truth rather than reckless indifference to the truth.  Knowing enough to launch an investigation . . . is a very great distance from convincing proof of intent to deceive.

495 F.3d at 758.  Even if this Court were to credit what the purported confidential source says was communicated—and, as discussed above, it should not—the most that can be said about Boeing's position in May and June 2009 is that it was investigating the issue.

Boeing's subsequent investigation and testing demonstrate an effort to determine *whether* there was an issue or risk; the decision to investigate further cannot produce a compelling inference that Boeing had already concluded that flight would be delayed.  It shows the opposite.  Boeing continued wing testing into June, SAC ¶ 104, and only after that analysis was completed did Boeing—on its own initiative—explain its conclusions to the public.  "Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention."  *Higginbotham*, 495 F.3d at 760-61.  That is all that Boeing did here, and dismissal is justified under the PSLRA, just as it was in *Higginbotham*.[2]

---

[2] The Second Amended Complaint also fails to plead scienter adequately with respect to Mr. McNerney and Mr. Carson.  As with the First Amended Complaint, the new complaint engages in "impermissible group pleading."  *Order* at 11 (citing *Pugh*, 521 F.3d at 693).  It "repeatedly refers to 'defendants' generally, and fails to provide individualized factual allegations regarding each defendant's state of mind."  *Id.*  Plaintiffs also continue to allege that Messrs. McNerney and Carson's liability "arises from the fact that each of them was a high-level executive at the Company responsible for the 787 program," SAC ¶ 171, which is insufficiently detailed to establish scienter under the PSLRA.  Although Plaintiffs now allege that certain internal electronic communications informed Messrs. McNerney and Carson of the April and May wing test results, *see* SAC ¶¶ 141-42, Plaintiffs do not cite the contents of a single specific email that McNerney or Carson allegedly received, let alone the date, sender, or recipients.  That cannot establish the *individualized* strong inference of scienter that is necessary for *each* defendant.  Because Plaintiffs have not amended their complaint to address the Court's group pleading holding, the claims against Mr. McNerney and Mr. Carson should once again be dismissed.  *Accord Order* at 11.

### B.   If Boeing's Leaders Knew In Late May That There Could Be No First Flight In June, Management's Actions And Statements In June Were Utterly Irrational.

The Second Amended Complaint depicts a completely pointless "scheme to defraud," one that cannot reasonably be attributed to rational business leaders.   The story set out by Plaintiffs inaccurately portrays the statements alleged to be fraudulent and the context in which those statements were made.   It then asks the Court to believe that Boeing's executives embarked on a wholly irrational course of conduct, fraudulently claiming the plane would fly while knowing they would be contradicted days or weeks later when the whole world would learn that it could not.   No particularized allegations support this unlikely theory of fraud, and Boeing's own statements alone cannot sustain it.

As an initial matter, Boeing consistently cautioned—both in general and in the context of particular statements—that the 787 program was a complex development program that entailed numerous design and other risks.   As the complaint describes, multiple series of tests proceed simultaneously, generating enormous amounts of data that must be analyzed and discussed. Further testing with additional analysis and review is often necessary.   Boeing executives therefore consistently coupled their public statements with cautionary notes, reminding everyone that the plane would only fly when ready, and that first flight would be driven by engineering judgment, not public events.   *See, e.g.*, Ex. A at 29-30 (2008 Form 10-K) (warning that "risks . . . are always inherent in the latter stages of new airplane program production" and that "technical or quality issues" may result in "schedule delays"); Ex. B (Dec. 11, 2008 press release) (warning that projected 787 flight schedules are necessarily "forward looking," and identifying various risks, including "Boeing's ability to meet development, production and certification schedules for the  . . . 787 program and the ability to meet scheduled deliveries of the 787 airplane").

Coupled with those warnings, the announcements and predictions Plaintiffs allege to be fraudulent in the Second Amended Complaint cannot sustain a claim of fraud as a matter of law. S*ee* 15 U.S.C. § 78u-5(c)(1)(A)-(B) (2010) (forward-looking statements cannot give rise to 10b-5 liability when accompanied with cautionary language).   And under Seventh Circuit law, Boeing's "cautionary language must be treated as if attached to every one of its oral and written statements."  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp.2d 836, 844, 847-48 (N.D. Ill. 2009).

The various individual statements cited in the complaint that are not irrelevant or obvious puffery also include cautions, which dispel any inference that the speaker was attempting to defraud.[3]  For example:

- *May 3 Press Release and May 27 Conference*.  On May 3, 2009, Boeing issued a press release about wing testing that said "the initial results are positive," but explicitly cautioned that "[w]e continue to analyze the data." SAC ¶ 75.  Similarly, at a May 27, 2009 conference, Mr. McNerney predicted that the plane would fly in June 2009—"I think the airplane will fly in June." *Id.* ¶ 81.  That classic forward-looking statement cannot support a claim of fraud, especially in light of Boeing's repeated warnings about risks to the schedule in SEC filings and elsewhere.

- *June 15-16 Bloomberg Articles*.  In the June 15 article (attached as Ex. C), Mr. Carson is quoted as saying that Boeing was "absolutely committed" to getting the 787 "off the ground" before the end of June 2009. SAC ¶ 93.  But Mr. Carson also explained that "the worst thing any manufacturer could do is use an event to drive you into flying an airplane without having done all the special checks.  We don't want to take shortcuts." *Id.* ¶ 96.  Mr. Carson said that Boeing was "going through

---

[3] The irrelevant statements concern testing of 787 systems unrelated to the wing, including engine testing (May 21, SAC ¶ 80), gauntlet testing (May 30, ¶ 82), and flight simulation testing (June 1, ¶ 84), as well as the presentation schedule at the Paris Air Show (June 4, ¶ 86).  Plaintiffs claim each was fraudulent because Boeing did not also disclose the wing testing.  Plaintiffs do not even allege that these statements were false, and, in any event, Boeing was well within its rights to investigate the test results on the wing and to remain silent about them until it had "a full story to reveal."  *Higginbotham*, 495 F.3d at 761.

a detailed engineering review with the pilots, with the design team, to make absolutely sure the airplane is the way we want it to fly." *Id.* And he cautioned, in a portion of his statement that the Second Amended Complaint omits, that "the Dreamliner will fly when it's ready." Ex. C (June 15, 2010 *Bloomberg* article). The Court may consider that statement even though it is not included in the complaint. *See Tellabs*, 551 U.S. at 322.

Plaintiffs nevertheless attack Mr. Carson's statements in the June 16 article where he is reported to have said, "I personally believe the airplane could fly today," and that the plane had "cleared testing that simulates flight conditions and multiple systems failures 'in much better condition than we'd anticipated.'" SAC ¶¶ 95-96. Mr. Carson is also alleged to have said words to the effect that the Dreamliner "definitely will fly" in June 2009. *Id.* ¶ 96. Those statements merely express Mr. Carson's confidence and optimism; the most compelling inference is that Mr. Carson ***believed them to be true***.

Moreover, it is here that Plaintiffs' new confidential source allegations actually undermine the Second Amended Complaint. If Boeing management already ***knew*** from the purported "communications" referenced in paragraph 142 that first flight in June would not occur, then there must be some "cogent" or "compelling" theory why they said otherwise. Just over a week later, Boeing informed the public that the 787 would not fly in June. Why would any member of Boeing management say something about the 787 that he or she knew would be publicly contradicted within a matter of days? There ***is*** no "cogent" or "compelling" theory. The only theory Plaintiffs have advanced is the same one offered previously: to avoid cancellation of orders for a few days during the Paris Air Show, only to have the cancellations occur days later. But the Court rejected that theory in the old complaint, and nothing in the new complaint saves it. If paragraph 142 is credited, then the subsequent actions of Boeing leaders are inexplicable.

The more "cogent" and "compelling" theory is that Boeing—as it explained publicly— was investigating an issue as to the side-of-body, but that Boeing's leaders believed in good faith that it would not prevent first flight.  They expressed confidence about first flight in June 2009 because they believed it to be true.  Those predictions did not pan out, but that is not fraud.  *See Higginbotham*, 495 F.3d at 759-60 (rejecting claim of "fraud by hindsight").   And when the updated testing results and analysis came in a few days later, Boeing changed its view, postponed first flight, and promptly announced the change.  "Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Id.* at 761. That is the most compelling inference here, and Plaintiffs have advanced no particularized facts or plausible inferences to suggest otherwise.[4]

## **CONCLUSION**

For the reasons set forth above, Boeing and Messrs. McNerney and Carson respectfully request that this Court grant their motion to dismiss with prejudice.

Dated: July 2, 2010                                   Respectfully submitted,


                                          /s/ Mark Filip
                                          Mark Filip
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle Street
                                          Chicago, Illinois  60654
                                          Tel.  (312) 862-2000
                                          Fax  (312) 862-2200
                                          mark.filip@kirkland.com

---

[4] Count II pleads "control person" claims under Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (2010), against Mr. McNerney and Mr. Carson.  Those claims are derivative of the underlying securities fraud claim against Boeing.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 605 (7th Cir. 2006).  Because the underlying claim fails, the Section 20(a) claim must be dismissed as well.  *See id.*; *see also Pugh*, 521 F.3d at 698.

Craig S. Primis, P.C. *(Admitted Pro Hac Vice)*
John A. Eisenberg
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200
craig.primis@kirkland.com
john.eisenberg@kirkland.com

*Attorneys for Defendants The Boeing*
*Company, W. James McNerney, Jr. and*
*Scott E. Carson*

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Filip, hereby certify that on July 2, 2010, a true and correct copy of the foregoing

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED**

**COMPLAINT** was filed electronically with the Northern District of Illinois - Eastern Division.

Notice of this filing has been sent by operation of the Court's electronic filing system to all

parties indicated on the electronic filing receipt.  Parties may access this filing through the

Court's ECF system. A courtesy copy has also been sent via e-mail to the following counsel of

record, and additional counsel noted below via overnight mail with courtesy copy via email:

| | |
|---|---|
| Lori A. Fanning<br>Marvin A. Miller<br>MILLER LAW LLC<br>115 S. LaSalle Street<br>Suite 2910<br>Chicago, Illinois  60603<br>Tel. (312) 332.3400<br>Fax. (312) 676-2676<br>lfanning@millerlawllc.com<br>mmiller@millerlawllc.com | Thomas E. Egler<br>Shannon M. Matera<br>Trig R. Smith<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, California 92101-3301<br>Tel. (619) 231-1058<br>Fax. (619) 231-7423<br>tome@rgrdlaw.com<br>smatera@rgrdlaw.com<br>trigs@rgrdlaw.com |
| Deborah R. Gross<br>Robert P. Frutkin<br>LAW OFFICES OF BERNARD M.<br>GROSS, P.C.<br>Wanamaker Building<br>Suite 450<br>100 Penn Square East<br>Philadelphia, Pennsylvania  19107<br>Tel. (215) 561-3600<br>Fax. (215) 561-3000<br>debbie@bernardmgross.com<br>rpf@bernardmgross.com | Randi D. Bandman<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>52 Duane Street<br>7th Floor<br>New York, New York  10007<br>randib@rgrlaw.com |

| ADDITIONAL COUNSEL OF RECORD:<br><br>Michael J. Vanoverbeke<br>Thomas C. Michaud<br>VANOVERBEKE MICHAUD &<br> TIMMONY, P.C.<br>79 Alfred Street<br>Detroit, Michigan  48201<br>Tel. (313) 578-1200<br>Fax. (313) 578-1201<br>mvanoverbeke@vmtlaw.com<br>tmichaud@vmtlaw.com | |
|---|---|

/s/ Mark Filip_____
Mark Filip