UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:09-cv-07143 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | Judge Suzanne B. Conlon |
| vs. | ) ) | |
| THE BOEING COMPANY, et al., | ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     FACTS ...................................................................................................................2

III.    DISCUSSION ........................................................................................................6

        A.      The SAC Pleads Direct Evidence of Scienter .........................................6

        B.      When Defendants Chose to Speak, They Assumed a Duty to Speak Fully...........11

        C.      Defendants' "Beliefs" Do Not Excuse Hiding Known Risks...............................13

IV.     CONCLUSION....................................................................................................15

572592_1

## I.    INTRODUCTION

On June 22, 2010, over defendants' objection, the Court granted plaintiffs leave to file the

Second Amended Class Action Complaint for Violation of the Federal Securities Laws (Dkt. No. 63)

("SAC").  In that order, the Court considered and rejected the arguments that defendants now repeat

in their motion to dismiss.  Dkt. No. 62.  The Court explained why the SAC withstands defendants'

arguments:

> The court dismissed the [first] amended complaint because City of Livonia . . . failed
> to plead particularized facts about its alleged confidential source and the 787
> Dreamliner's wing stress tests, and failed to plead facts giving rise to a cogent
> inference that defendants acted with intent to deceive. . . .  ***The proposed second
> amended complaint addresses these deficiencies***.

Dkt. No. 62.[1]  Specific to defendants' scienter arguments, the Court held that ¶¶139-142 of the SAC

"pleads details about the confidential source and the basis for the source's knowledge, as well as the

wing stress tests.  Defendants argue the [SAC] remains deficient by failing to plead scienter.

***Reasonable inferences suggest otherwise***."  Dkt. No. 62.

Defendants' current motion does not offer anything new.  Defendants effectively concede

that they made false statements and omissions of material fact in connection with the purchase or

sale of securities.  They only contest whether the SAC adequately pleads a strong inference of

scienter with the requisite level of detail, contradicting the "reasonable inferences" this Court has

already found.  Defendants' arguments fail and the Court should deny their motion.

The SAC's documentary evidence and confidential source ("CS") allegations provide

particularized facts about each defendant's actual knowledge of the 787's multiple, undisclosed wing

stress test failures.  The SAC alleges through objectively verifiable, ***direct*** evidence that the test

---

[1]    The phrase "Class Period" refers to the period between May 3, 2009 and June 22, 2009.  ¶1.  Unless
otherwise noted, all "¶_" or "¶¶__" references are to the Complaint.  Unless otherwise noted, all emphasis is
added and all internal citations are omitted.

failures were complete and known to defendants in a matter of days (confirming plaintiffs' prior allegations). ¶¶141-142. The allegations are straightforward – defendants received e-mails from the members of the Wing Integration Team within 10 days of the failed tests communicating both the test results and their consequences. *Id.* The e-mails told defendants that the 787's wings failed substantially below the 150% ultimate load level, and below even the 100% load limit level on April 21, 2009. ¶¶141-142. Worse, in May testing, *the wings cracked (delaminated) in no less than 36 different places*. ¶¶3, 13, 18, 79, 113, 115, 121, 142, 150. Defendants knew these failures put *not only* the 787's full First Flight at risk, but also *the key financial date for Boeing – the 1Q10 first delivery date*, after which defendants would be forced to pay late penalties to customers and risked losing 787 orders on backlog. *Id.* Defendants' motion just ignores the 787's nine-month delivery date delay, and the $2.5 billion subsequent charge to earnings. ¶¶20, 125. These "smoking-gun" allegations suffice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Defendants here cannot be relieved from liability because of their now-vaunted "investigation" (*see* Defs.' Mem. (Dkt. No. 68) at 10-15) because *during the "investigation," they chose to speak*. Defendants knew about the test failures, including cracked wings, and their ramifications, yet made positive statements about the First Flight and delivery date, and never told investors about the known risks. As the Seventh Circuit has held, even if defendants "thought that there was a chance that the situation regarding [the 787] would right itself," they are not entitled to "gamble" under the securities laws, and make rosy statements. *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008).

## II.  FACTS

As the Court noted in its Opinion:

> [A]fter an airplane passes a series of tests, it may fly for the first time. Certification for first flight requires subjection of the airplane wings to a "load limit" test, which simulates 100% of the anticipated in-service load. During first flight, the airplane is

tested to determine its readiness for the final airworthiness certification testing phase. . . .   FAA certification for customer delivery requires that the wings pass an "ultimate load" test at 150% of the anticipated in-service load.

Opinion (Dkt. No. 53) at 2 .  Timely completion of the 787's *full* three to five and a half hour First Flight was important to defendants, investors and customers alike because it signaled a timely delivery date. ¶¶42, 71, 106-107.  Any additional delays of the 787's delivery date, however, would further cede ground to competitor Airbus' A350 and put billions of dollars in 787 order backlog, as well as hundreds of millions of dollars in contractual concessions and penalties, at risk.  ¶¶4, 8, 11, 14, 21, 47, 58, 72, 78, 90-91, 96, 122, 127-128, 133-134, 144.

The Court also noted that Boeing set "an aggressive schedule" for delivery of the 787. Opinion at 2.  "The post-first flight testing for the 787's predecessor took almost a year.  Boeing reduced the schedule to nine months for the 787 by distributing the tests among a fleet of six airplanes and two test airframes." *Id.* at 2.  "[I]n December 2008, Boeing announced the 787's first flight was scheduled for the second quarter of 2009 (ending June 30, 2009), and the plane would finish the certification process and be ready for customer delivery by the end of the first quarter of 2010." *Id.* at 2-3.  This was the schedule that defendants chose to guarantee throughout the Class Period.  ¶¶53-54, 56-57, 60, 66, 69, 73-74, 80-81, 93, 95-96, 169.

The Court's Opinion summarizes facts concerning the April 2009 load limit test:

The 787 "failed to meet at least the 'ultimate load' test."  The design limitations required redesign, fabrication, installation, and successful testing of a solution before first flight.  Pre-May 3, 2009 internal e-mails revealed defendants' knowledge of the ramifications from the poor results of the wing stress test, and the risk to the first flight and delivery schedule.  Boeing issued a press release on May 3, 2009, stating that the 787's wings were "'subjected to their limit load — the highest loads expected to be seen in service,'" and although all of the test data had not been analyzed, "'the initial results are positive.'"  Boeing represented that all of the necessary structural tests required prior to first flight were *[now] complete*, and that the airplane was on schedule for first flight.  Boeing's stock price rose by 2.4% the next day.

Opinion at 3.  Also on May 3, defendants told investors that "[t]he *final* test occurred April 21."
¶¶75-76.  Further, the pre-May 3 e-mails referenced above were sent by members of the Wing
Integration Team – Larry Hall, Terry Pham and Mike Denton – to defendants McNerney and Carson.
¶¶77, 140-141.

Then, "[o]n May 17, 2009, Boeing conducted another wing load stress test on the 787.  The
787 again failed [*before*] the ultimate load . . . .  In addition, defendants learned the 787 wings
suffered 'delamination' (separation of composite materials) from the stress test.  By the end of May
2009, defendants were 'scrambling' to design a solution that would allow the 787 to perform [its
full] first flight."  Opinion at 3; *see also* ¶¶13, 91, 142.  The SAC further details why the May 2009
test results were a disaster for Boeing's key revenue sensitive date – the 1Q10 first delivery deadline.
In late May, members of the Wing Integration Team sent e-mails to McNerney and Carson detailing
the second set of bad results and their ramifications.  ¶142.  Although Boeing had passed the May 17
limit load re-test by successfully bending the 787's wings beyond 100% of limit load, the test
revealed a serious wing design flaw when the wings were bent to 125% of limit load.  *See* ¶¶91, 123-
125, 142.  Indeed, *the wings cracked on both sides of the wing-body join (on the outer wing as well
as inside the fuselage) in at least 36 places* – suffering from delamination at each point where the
wing's stringers connect to the center wing box.  ¶¶17, 40, 113, 123, 125.  The wing design flaw
required "additional re-work of the wing attachment design" and resulted in the Wing Integration
Team's conclusion "that Boeing would be unable to conduct a June 30, 2009 First Flight."  ¶142.
The Court's Opinion notes:

> Boeing did not mention the wing stress tests or the results in a series of statements
> during May and June 2009.  On May 21, 2009, Boeing issued a press release
> regarding its steady progress toward the 787's first flight.  McNerney reportedly
> stated on May 27, 2009 that he "'think[s] the airplane will fly in June'" and expects
> delivery of the 787 in the first quarter of 2010 but "'there is always the chance that
> the schedule could be disrupted by a mechanical issue coming to light *during the test
> flight*.'"

- 4 -

Opinion at 3-4.  The SAC *further* alleges that on May 27, McNerney chose to state that First Flight would occur "'*as we described it*'" – *i.e.*, the full slate of tests scheduled for the full three to five and a half hours of flight tests.  ¶¶71, 81.

The Court's Opinion also sets forth the allegations surrounding the key trade show – the June 15-18 Paris Air Show – where, as defendants' chief salesperson said, "'[t]he highest priority [was] keeping the 3,500 planes we have on backlog,'" and the media reported that "getting together with customers [was] more important than ever" (¶90):

> As the show began, Boeing issued a press release, reporting that fuel testing on the 787 began, and "'[m]omentum continues to build with each milestone achieved.'" On June 16, 2009, Carson stated the 787 "'*definitely will fly*'" this month, and that he "'*personally believe[d] the airplane could fly today*.'"  The next day, *Boeing announced* that final assembly began on the 787, and *deliveries were scheduled to begin in the first quarter of 2010*.  No 787 orders were cancelled during the air show.

Opinion at 4-5.  The following Tuesday, the bad news hit:

> On June 23, 2009, five days after the air show ended, Boeing issued a press release canceling the first flight and stating *it could not estimate the date for first flight or delivery*.  During a conference call with analysts that day, Carson stated that Boeing had "'discovered in a test condition several weeks ago an anomaly that we saw.'"  He discussed the initial belief that Boeing had a solution allowing progression toward first flight, but detailed analysis completed "'late last week'" resulted in the decision to postpone first flight.  Boeing revealed the problem concerned the "critical point at which the wing is attached to the rest of the body of the airplane."  Boeing elaborated that "'[l]ate last month,'" excessive stress "'in an area of the side-of-body structure'" was identified during testing; preliminary analysis indicated first flight could proceed, but after further testing and analysis completed "'late last week'" Boeing decided to postpone first flight to conduct structural reinforcement and necessary modifications.  Boeing's stock plummeted 12% over the next two days.

Opinion at 3-5.

The SAC further alleges that in response to defendants' June 23 admissions, analysts immediately downgraded Boeing's stock and slammed defendants for their lack of candor and failure to provide even a "hint of concern" about the 787's design flaws, especially after giving such

- 5 -

positive statements at the Paris Air Show just days earlier. ¶¶20, 110, 112-116, 159. As one analyst wrote, "Management acknowledged on the conference call that it discovered this issue [*in May 2009*]. We believe that had management been more up-front about this situation, perhaps the modest level of credibility on this topic it had started to reestablish over the past several months could have been sustained." ¶¶20, 110.

Subsequent media reports disclosed that the problem was "more complex than originally described by the company," and that Boeing had contacted its parts vendors, Mitsubishi Heavy Industries ("MHI"), about the test failures long before it told investors. ¶¶21, 120-121, 123-125. Ultimately, Boeing could not re-announce the 787's First Flight and delivery schedule until August 27, 2009, this time setting delivery for the end of 2010 – *now twelve months* after the postponed First Flight date of 4Q09. ¶¶21, 126. On the same day, Boeing also announced a $2.5 billion charge against earnings, as, among other things, half of the six-plane 787 test fleet was now un-sellable, with "no commercial market value beyond the development effort" because of the wing design flaws. ¶¶21, 127. On August 31, 2009, Carson left Boeing. ¶¶22, 36, 128.

## III.   DISCUSSION

As stated by the Court, "[t]he required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." Opinion at 6. In other words, "[w]hen the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs II*, 513 F.3d at 704. The SAC shows defendants knew of grave risks to the 787's First Flight and delivery schedules, but omitted them from their affirmative, positive statements.

### A.   The SAC Pleads Direct Evidence of Scienter

E-mails sent to defendants McNerney and Carson provided them with actual knowledge of the wing stress test failures and ramifications in a matter of days of each test's completion. ¶¶141-

- 6 -

142.  By May 3, 2009, for example, defendants knew that the 787 failed its April 21 limit load test and needed to be re-tested.[2]  ¶141.  Nevertheless, defendants chose to issue a press release stating that "[a]ll the necessary structural tests required prior to first flight are now complete," the "***final test occurred April 21 when the wing and trailing edges were subjected to their limit load***."[3]  ¶¶75-76. As subsequent wing tests were required, these statements were false and misleading when made and defendants knew it.  Defendants then chose to make almost a dozen more false and misleading statements.  ¶¶73-98.

The SAC makes detailed allegations concerning defendants' actual knowledge that their statements were false and misleading.  ¶¶21, 54, 77, 84, 106, 110, 117, 120-121, 135-136, 138-154. The new allegations are attributed to a CS with direct knowledge of the 787's wing testing and direct knowledge of e-mails sent to McNerney and Carson, which communicated the final results and impact of the failed wing tests in April and May 2009.  ¶¶139-142.  With these new allegations, the SAC provides the detail sought by the Court in its May Opinion, including "individualized factual allegations regarding each defendant's state of mind."  Opinion at 9-11.

Plaintiffs have alleged ***who*** authored the emails (the "Wing Test Integration Team": Larry Hall, Terry Pham and Mike Denton), ***who*** received them (McNerney and Carson), in ***what*** context they were sent (to immediately communicate the test results; honoring defendants' promise to be "laser focused" on all aspects of the 787's testing processes (*see* ¶54)), ***when*** they were sent (within

---

[2]      The re-test occurred on May 17, and defendants have abandoned their prior improper arguments that the May 17 test was not a re-test.  Instead, defendants argue a wholly unsupported issue of fact – that the FAA somehow served as a watchdog over the accuracy of defendants' public statements.  In other contexts, Boeing has been less than forthcoming with the government, even though they were regulated by the FAA.  *See In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160 (W.D. Wash. 1998) (upholding Private Securities Litigation Reform Act of 1995 ("PSLRA") fraud claims).

[3]      Defendants' motion does not even address these statements, while attempting to excuse away other false statements they made that same day.  Defs.' Mem. at 13.

10 days of each test), the **data** on which the team's conclusions were based (the test results), and

their **contents** (failed test results and disastrous ramifications thereof).  Opinion at 8-9; ¶¶140-142.

These allegations give rise to a strong, cogent inference that defendants acted with intent to deceive

as required by the PSLRA, and meet the standard the Court set.  Thus, there is no "group pleading"

here.

Defendants argue that the SAC "says nothing" as to the CS's first-hand knowledge.  Defs.'

Mem. at 4-5.  They are wrong.  Paragraph 139 alleges the CS's position and basis for his knowledge:

> [A] former Boeing Senior Structural Analyst Engineer and Chief Engineer, who
> worked on the Mid-Body Fuselage/Wing Integration Team for the 787 program. **The
> CS's job responsibilities included stress and design review of the 787 wing
> joints** . . . .  As part of the CS's job, he had direct access to, as well as first-hand
> knowledge of the contents of, Boeing's 787 stress test files that memorialize the
> results of the failed 787 wing limit load test and subsequent re-test, which transpired
> on April 21, 2009 and May 17, 2009, respectively.

The stress test files included the contemporaneous e-mails about the failures.[4]  ¶140.  This

demonstrates that the source was "in a position to know" the facts alleged.  Opinion at 9; *Tellabs II*,

513 F.3d at 712.  *See also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (such detail provides

"documentary evidence and/or a sufficient general description of the personal sources of the

plaintiffs' beliefs").

No reasonable person would believe defendants' suggestion that McNerney and Carson, who

repeatedly touted the 787 as their "Priority No. 1," disregarded or failed to understand the e-mails

from the Wing Integration Team concerning key wing tests.  ¶¶12, 54, 56, 84, 143.  This is

---

[4]     Thus, defendants' assertion that the SAC "does not even allege that the confidential source saw the
purported communications in question" is wrong. Defs.' Mem. at 5.  Further, the e-mails themselves are in
defendants' exclusive control.  *See Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 954 (N.D. Ill. 2006)
("there is an exception to the prohibition against 'information and belief' averments where the details are
within a defendant's exclusive knowledge"); *see also Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771,
778 n.5 (7th Cir. 1994) (same).

especially true here because of the 787's importance to Boeing.  *Tellabs II*, 513 F.3d at 711 (finding it "exceedingly unlikely" that senior executives were unaware of problems with their company's major product).  Further, defendants ***chose*** to repeatedly speak about the tests, their results and the 787's schedule, so if they disregarded the internal information, they did so with scienter.

Defendants rely heavily on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007).  But *Higginbotham* does not provide them any support.  *Higginbotham* has been limited to its facts by the Seventh Circuit's subsequent decision in *Tellabs II* (left almost completely unmentioned by defendants).  *Tellabs II*, 513 F.3d at 702.  *Tellabs II* distinguished *Higginbotham*'s skeptical treatment of confidential witnesses because: (1) the *Higginbotham* fraud was committed by the defendant company's subsidiary in Brazil; (2) the subsidiary had tried to keep the fraud secret from its parent; and (3) there was "no basis" for ascribing ***any*** knowledge of fraud to the parent, aside from the few sources "described merely as three ex-employees of [the parent] and two consultants." *Tellabs II*, 513 F.3d at 711-12 (accepting scienter inferences arising from confidential-witness accounts).  Here, as in *Tellabs II*, facts attributed to a CS are cogent because he was "in a position to know at first hand the facts" alleged.  *Id.*; *see also Novak*, 216 F.3d at 314.[5]

In addition, the *Higginbotham* court noted that defendants "are entitled to learn in discovery who has relevant evidence, and to obtain that evidence" under Fed. R. Civ. P.26(a)(1)(A). *Higginbotham*, 495 F.3d at 757.  Here, on April 22, 2010, before the Court ruled on defendants' first motion to dismiss, plaintiffs listed the name of the CS in their initial disclosures.  Further, in

---

[5]     The number of CS's is not determinative, especially where, as here, plaintiffs' CS allegations of scienter are both first-hand and "of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 316, 324; *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 941 (9th Cir. 2003), *limited on other grounds*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) (reversing district court's dismissal of securities fraud case, in part, because "statements by a [single] confidential witness" with "direct knowledge" of two defendants' discussions "could demonstrate a strong inference" of scienter).

- 9 -

"situations in which statements by anonymous sources may corroborate or disambiguate evidence from disclosed sources," *Higginbotham* does not apply. 495 F.3d at 757. Here, the CS allegations corroborate and disambiguate evidence from disclosed sources – curing the various questions the Court asked in its May 26, 2010 Opinion. For example, this Court noted that the prior complaint required further detail concerning the limit load tests and how the failed results impacted the 787's full First Flight. Opinion at 10. The SAC now explains how ***the 787's wings failed below even the 100% load limit level on April 21, 2009***. ¶142. Then, in May, while the 787's wings passed the limit load, ***the wing joints cracked*** (delaminated).[6] The delamination was a "serious engineering issue" that required "additional re-work of the wing attachment design" ***before*** the 787's full First Flight (and the nine-month countdown to delivery). ¶142. These new allegations bolster the previously-noted fact that on June 23, Carson admitted that the earlier tests severely reduced the potential scope of the First Flight, making it effectively useless. ¶¶106-107. Further, public reports confirm the severity of the 787's delamination problem: defendants reached outside of Boeing – to MHI employees – for help in fixing the 787 defective wing, and did so long before informing the public. ¶¶120-121, 147. Thus, the SAC's new allegations confirm that defendants knew the delamination posed a severe risk to the full First Flight and delivery schedule; defendants would have to find the time in the 787's already compressed 24/7 schedule to re-design, fabricate, install

---

[6] These allegations are not "contradictory." Defs.' Mem. at 7-8. The SAC's new allegations confirm that the 787's wing design could not pass the ultimate load by pleading the exact percentages of limit load at which the wings failed – well-below the ultimate load – and give detailed allegations about the delamination cracking that forced a massive re-design. ¶¶91, 123-125, 142. Defendants, understandably, just ignore the delamination allegations.

- 10 -

and successfully test a solution, and then implement it before the full First Flight and delivery could take place.[7]  ¶¶13, 77, 120-121, 142-143, 146.

**B.      When Defendants Chose to Speak, They Assumed a Duty to Speak Fully**

Defendants did not have a duty to make statements about the 787 and its April 21 stress test. Rather, they **chose** to speak, and violated their duty to speak fully and truthfully regarding all material facts concerning the 787 and its testing. *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (*en banc*) ("With regard to future events . . . a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths.").

Defendants' now-proffered excuse of an ongoing investigation, again relying on *Higginbotham* (Defs.' Mem. at 10-11), fails, as *Higginbotham*, again, does not apply.  There, during the "investigation" period, **defendants did not speak**.  Rather, defendants there filed a required periodic financial report with the SEC on March 12, 2004, and then filed another form on May 10, 2004.  *Higginbotham*, 495 F. 3d at 758.  As the Seventh Circuit noted, defendants' knowledge of the fraud (which occurred at a foreign subsidiary) did "not come until [an **undetermined** date in] May at the earliest."  *Id.*  Defendants did not speak again until July 22, 2004, when they announced the fraud.  *Id.* at 760.  As the Seventh Circuit held, "Silence is not 'fraud' without a duty to disclose." *Id.*  Here, conversely, defendants affirmatively spoke **more than a dozen times** after receiving the results of the April 2009 test.  ¶¶73-98.  They **undertook the duty** to speak, and speak truthfully. The SAC sufficiently pleads with particularity that each of the failed test's results and ramifications

---

[7]      Knowledge in May 2009 of the delamination is also corroborated by defendants' own statements, including statements to analysts on a conference call on June 23, 2009.  *See* ¶¶104, 110.  Further, the need to re-test upon re-designing the 787's wings is borne out by the fact that Boeing tested the wings at limit load no less than three times – re-testing the wings at limit load each time they underwent a re-design.  ¶¶75, 79, 135.

were *final* and communicated to each defendant before they spoke.  *See* ¶¶77, 141-142.  Yet, even with this knowledge, defendants never meaningfully qualified their dozen statements.[8]

Defendants next argue that pre-Class Period non-specific warnings about *potential* problems allowed them to hide *actual* problems during the Class Period.  Defs.' Mem. at 10-14.  However, any "safe harbor" for warnings only applies "so long as the cautionary statements remain 'meaningful.'"  *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009).  Here, defendants' pre-Class Period warnings lost their meaning because the facts changed, and defendants never updated the warnings.  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) (defendants "omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted"); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598-99 (7th Cir. 2006) (since defendant knew about specific "troubles," then even the warnings that "[w]ithout doubt" "encompass[ed]" the company's "troubles," "were not particularized enough for it to claim shelter under the PSLRA's safe harbor provision").

Defendants also argue that certain portions of their May 3 and June 15-16 statements are not actionable because they contained cautions that "dispel any inference that the speaker was attempting to defraud."[9]  Defs.' Mem. at 13.  That is not the standard for determining whether such

---

[8]      Further, the investigations found to be prudent in *Higginbotham* and *Pugh* have no application here. As the Seventh Circuit explained in *Pugh*, the facts of both cases for scienter purposes were the "same." *Pugh v. Tribune Co.*, 521 F.3d 686, 694 (7th Cir. 2008).  In both cases, a *parent* company was not liable for its *subsidiary's* "elaborate" accounting manipulation scheme that was *purposely designed to keep secret from the parent*, and plaintiffs had no particularized allegations ascribing knowledge of the fraud to the parent. *Id.* at 695, 700.  Here, the 787 was Boeing's most important product.

[9]      Defendants ignore key statements made on May 3 and after June 5, 2009, including, *inter alia*: "*[a]ll the necessary structural tests required prior to first flight are now complete*," the "*final test occurred April 21*"; and *the 787 "definitely will fly*" by the end of June 2009*.  ¶¶5, 75-76, 96.  They do not claim to have made relevant cautions for these statements.  Defs.' Mem. at 10-14.

present tense statements are actionable, and defendants cite no cases to support this novel proposed

rule of law.[10]  Further, "the Supreme Court [has] observed that 'not every mixture with the true will

neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and

the other, whatever is misleading will remain materially so.'"  *United States v. Morris*, 80 F.3d 1151,

1167-68 (7th Cir. 1996) (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097-98 (1991)).

The "cautions" defendants reference, *i.e.*, "[w]e continue to analyze the data" and "the Dreamliner

will fly when it's ready," do not warn of the known test failures, the re-testing required, the wing

cracking, and severe risks to the full First Flight and delivery schedule.  Defs.' Mem. at 13-14.

Further, defendants' statements about doing "special checks" (*id*. at 13) refer only to an excuse about

why the 787 was not flying during the Paris Air Show, and is itself misleading.  ¶96.  Defendants'

statements remain actionable because they continually skewed the mix of information by omitting

the known severe risks.[11]

### C.     Defendants' "Beliefs" Do Not Excuse Hiding Known Risks

The SAC, when considered as a whole, demonstrates that defendants knew but concealed the

fact that the 787 First Flight and delivery date were at severe risk.  These allegations suffice.

*Tellabs*, 551 U.S. at 325 ("While it is true that motive can be a relevant consideration . . . the absence

---

[10]     This argument has already failed Boeing once before.  *Boeing*, 40 F. Supp. 2d at 1169 (**rejecting** Boeing's argument "that certain statements stated in the present tense can in fact be forward-looking and entitled to forward-looking statement protection").

[11]     Contrary to defendants' assertion (Defs.' Mem. at 13), the SAC includes numerous actionable misleading statements and omissions of timely progress to achieve delivery tied to successful completion of the 787's milestones are alleged throughout the SAC.  *See* ¶80 ("steady progress" toward First Flight); ¶87 (completing "intermediate gauntlet phase . . . so we can get to first flight"); ¶92 ("'Momentum continues to build with each milestone achieved.'"); ¶¶95-96 ("'I personally believe the [787] could fly today.'"); ¶96 ("A flight-readiness review will be conducted on June 20, followed by a 'final gauntlet' trial of the power system, flight controls and avionics and a high-speed taxi test . . . .  'Then we'll go flying'"); ¶96 ("Boeing has already done extra ground testing during the delays in order to minimize the time until the plane's service entry."); ¶98 ("[F]inal assembly had begun . . . '[d]eliveries are scheduled to begin in the first quarter of 2010.'. . . 'This is a great day for the 787 team.'").

- 13 -

of a motive allegation is not fatal . . . the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.").  As the Seventh Circuit held in *Tellabs II*, even where "there is no indication that [any defendant] profited from it financially," a fraud is still adequately pled where defendants "may have thought that there was a chance that the situation . . . would right itself," and chose to speak positively.  513 F.3d at 710.  As the court held:

> The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. . . .  It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Id*.  Here, defendants admit to a "'cogent' and 'compelling' theory . . . that Boeing . . . was investigating an issue as to the side-of-body, but that Boeing's leaders believed in good faith that it would not prevent first flight."  Defs.' Mem. at 15.  Whatever their hope, defendants were not entitled to make "rosy" statements without meaningful qualifications after the 787 wing test failures. *Tellabs II*, 513 F.3d at 710.  They gambled, and they lost.

As in *Tellabs II*, defendants had strong reason to hide bad news.  In early 2009, Boeing was facing a rising tide of costly cancellations (5% of the 787s on order) and contractual penalties and was ceding ground to its competitor, Airbus A350.  ¶¶56-59, 64, 76, 94.  Their "***highest priority***" of attending the June 2009 Paris Air Show was to stem the tide of cancellations, "keeping the 3,500 [787s] we have on [the order] backlog."  ¶90.  During the Paris Air Show, defendants were scrambling, ***including reaching outside of Boeing to MHI for help***, to design a solution to the 787's wing problem that would allow the 787 to perform its full First Flight and start the countdown to

- 14 -

delivery. ¶¶120-121.[12] Even with this knowledge, defendants gambled that their problems would

sort themselves out, and chose to make rosy statements instead of qualifying them. Ultimately,

defendants lost the gamble, having to admit the test failures and the fact that they could not estimate

when the full First Flight or delivery would be rescheduled. ¶¶102-109. The wing failures cost the

Company $2.5 billion in charges. ¶¶20, 125. Thus, the SAC's allegations considered in their

entirety give rise to a strong inference of scienter. *Tellabs II*, 513 F.3d at 710.[13]

## IV.    CONCLUSION

Plaintiffs respectfully request the Court deny defendants' motion in its entirety.

DATED:  July 23, 2010                          Respectfully submitted,

                                               PLAINTIFFS


                                               By:  s/Marvin A. Miller
                                               MARVIN A. MILLER

                                               MILLER LAW LLC
                                               115 S. LaSalle Street, Suite 2910
                                               Chicago, IL  60603
                                               Telephone:  312/332-3400
                                               312/676-2676 (fax)

                                               Liaison Counsel

---

[12]     Defendants strangely suggest that a more cogent inference is that Boeing would have just sat on its
hands, stopped all unrelated testing (*i.e.*, engine testing), and accepted defeat upon hearing the failed test
results and their ramifications.  Defs.' Mem. at 7-8.

[13]     Defendants agree that if the general claims are upheld in this action, Count II, the §20 "control
person" claims, should proceed as well.  Defs.' Mem. at 15 n.4.

- 15 -

THOMAS E. EGLER
TRIG R. SMITH
SHANNON M. MATERA
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

RANDI D. BANDMAN
ROBBINS GELLER RUDMAN
  & DOWD LLP
52 Duane Street, 7th Floor
New York, NY  10007
Telephone:  212/693-1058
212/693-7423 (fax)

Lead Counsel for Plaintiff

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES OF BERNARD M.
  GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on July 23, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

  I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on July 23, 2010.

        <u>s/ MARVIN A. MILLER</u>
        MARVIN A. MILLER

        MILLER LAW LLC
        115 S. LaSalle Street, Suite 2910
        Chicago, IL  60603
        Telephone:  312/332-3400
        312/676-2676 (fax)

        E-mail: mmiller@millerlawllc.com

# Mailing Information for a Case 1:09-cv-07143

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randi D Bandman**
  randib@rgrdlaw.com

- **Thomas E Egler**
  tome@rgrdlaw.com,stremblay@rgrdlaw.com,kathyj@rgrdlaw.com

- **John A Eisenberg**
  john.eisenberg@kirkland.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Mark Robert Filip**
  mark.filip@kirkland.com,john.eisenberg@kirkland.com,sandra.gentile@kirkland.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Shannon Mckenna Matera**
  smatera@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Craig S. Primis**
  cprimis@kirkland.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)