**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case No. 1:09-cv-07143 |
| Plaintiffs, | ) ) | Judge Suzanne B. Conlon |
| v. | ) ) | Magistrate Judge Susan E. Cox |
| THE BOEING COMPANY, W. JAMES McNERNEY, JR. and SCOTT E. CARSON, | ) ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF FILING OF AFFIDAVIT OF STEVE Y. KOH

To: All Counsel of Record

**PLEASE TAKE NOTICE** that December 10, 2010, we filed the attached Affidavit of

Steve Y. Koh in connection with Defendants' Motion for Reconsideration.

Dated: December 10, 2010

Respectfully submitted,

/s/ David B. Tulchin

| | |
|---|---|
| Pravin B. Rao (#06230097) | David B. Tulchin (*Admitted Pro Hac Vice*) |
| Patrick M. Collins (#06206686) | Stephanie G. Wheeler (*Admitted Pro Hac Vice*) |
| Eric D. Brandfonbrener (#06195674) | SULLIVAN & CROMWELL LLP |
| PERKINS COIE LLP | 125 Broad Street |
| 131 South Dearborn Street | New York, New York 10004-2498 |
| Chicago, Illinois 60603-5559 | Tel: (212) 558-4000 |
| Tel: (312) 324-8400 | Fax: (212) 558-3588 |
| Fax: (312) 324-9400 | tulchind@sullcrom.com |
| prao@perkinscoie.com | wheelers@sullcrom.com |
| pcollins@perkinscoie.com | |
| ebrand@perkinscoie.com | *Attorneys for Defendants* |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case No. 1:09-cv-07143 |
|  | ) | Judge Suzanne B. Conlon |
| Plaintiffs, | ) ) | Magistrate Judge Susan E. Cox |
| v. | ) ) |  |
| THE BOEING COMPANY, W. JAMES McNERNEY, JR. and SCOTT E. CARSON, | ) ) ) ) |  |
| Defendants. | ) ) |  |

## AFFIDAVIT OF STEVE Y. KOH

STATE OF WASHINGTON )
                      ) ss:
COUNTY OF KING        )

STEVE Y. KOH, being duly sworn, deposes and states:

1.     I am a member of the bar of the State of Washington and of Perkins Coie LLP, attorneys for defendants The Boeing Company, W. James McNerney, Jr. and Scott E. Carson in this action.

2.     The matters set forth in this affidavit are based on my personal knowledge except as to matters stated on information and belief, and as to those matters, I believe them to be true. If I were called to testify as a witness, I could and would testify competently to the facts set forth herein.

3.     On October 19, 2010, I caused a Subpoena to Produce Documents (the "Subpoena") to be served on Mr. Bishnujee Singh, 18830 38th Avenue W, Lynnwood, Washington 98037.

The Subpoena requested that Mr. Singh produce specified documents at the offices of Perkins Coie LLP ("Perkins Coie"), 1201 Third Avenue, Suite 4800, Seattle, Washington 98101, at 9:30 a.m. on November 1, 2010. Counsel for plaintiffs in this action were notified of the service of the subpoena at about the time it was served on Mr. Singh.

4. Prior to November 1, 2010, I had no contact with Mr. Singh other than to cause the Subpoena to be served on him. On information and belief, before November 1, 2010, neither defendants nor any of their representatives had any contact with Mr. Singh concerning this action, except for service of the Subpoena on him.

5. On November 1, 2010, without any prior notice, Mr. Singh appeared at Perkins Coie's Seattle office, asked to see me, and handed me the documents that he was producing in response to the Subpoena. (Defendants scanned those documents and produced copies to plaintiffs on November 4, 2010.) Mr. Singh also gave me a copy of the Subpoena that was annotated with his handwritten notes. A true and correct copy of the annotated Subpoena that Mr. Singh gave to me on November 1, 2010 is attached hereto as Exhibit 1. It was also produced to plaintiffs on November 4, 2010.

6. I met with Mr. Singh for about 5-10 minutes on November 1. He volunteered that he did not have some of the documents that were requested by the subpoena. He further volunteered that plaintiffs' private investigator, Elizabeth Stewart, had become "angry" and "aggressive" with him, saying that he had to "admit" to seeing documents that he had never seen. At that point, I ended the discussion but asked if Mr. Singh would be willing to meet again with me and other attorneys for defendants to discuss the allegations attributed to him in plaintiffs' Second Amended Complaint ("SAC") and his interactions with Ms. Stewart, the investigator

2

who had been engaged by plaintiffs' counsel in this matter. Mr. Singh agreed to participate in such a meeting.

7.     On November 2, 2010, I met with Mr. Singh in a conference room in Lynnwood, Washington. Jeremy Ross, an associate at Perkins Coie, and Eric Wolff, Chief Counsel, Litigation, Labor, and Employment of The Boeing Company, also were present. I showed Mr. Singh paragraphs 139-42 of the SAC. He appeared surprised by them. Mr. Singh told me that he had never seen any part of the SAC prior to that day.

8.     During our meeting on November 2, Mr. Singh repudiated the allegations attributed to him in paragraphs 139-142 of the SAC and described his interactions with plaintiffs' investigator, Ms. Stewart. In particular, Mr. Singh explained that he specifically and repeatedly told plaintiffs' investigator that he had no knowledge of any emails or other documents to James McNerney or Scott Carson concerning the April and May 2009 static tests that are at issue in this action, and he stated in no uncertain terms that the allegations to the contrary in the SAC were "a lie."

9.     During the November 2 meeting, with Mr. Singh's permission, I wrote into a document Mr. Singh's own words describing his interactions with Ms. Stewart, what he had told her, and his reactions to the allegations in paragraphs 139-42 of the SAC. During the course of this process, Mr. Singh reviewed and authorized each sentence of the document. At the conclusion of our meeting on November 2, Mr. Singh executed the document, titled Declaration of Bishnujee Singh (the "Declaration"). During his deposition in this matter on November 17, 2010, Mr. Singh made several small corrections to his Declaration and he initialed those corrections on the Declaration. A true and correct copy of the Declaration of Bishnujee Singh, executed on November 2, 2010 as corrected on November 17, 2010, is attached hereto as Exhibit

2. Mr. Singh provided the Declaration voluntarily and was not compensated in any way in connection with providing the Declaration. No promises of any compensation were made, nor was any other inducement offered.

10. On November 19, 2010, following the deposition of Mr. Singh, I had a telephone conversation with Thomas E. Egler, one of the counsel for plaintiffs. During that conversation, I asked Mr. Egler to withdraw paragraphs 139-42 of the SAC in light of Mr. Singh's deposition testimony.

11. I am informed by Boeing and believe that, on November 29, 2010, representatives of Boeing met with Mr. Egler in person and requested that he withdraw paragraphs 139-42 of the SAC in light of Mr. Singh's deposition testimony.

12. On November 30, 2010, I sent Mr. Egler a letter in which I requested, on behalf of Boeing, that he withdraw paragraphs 139-42 of the SAC in light of Mr. Singh's deposition testimony. A true and correct copy of that letter is attached hereto as Exhibit 3.

13. To date, Plaintiffs have declined to withdraw paragraphs 139-42 of the SAC.


EXECUTED at Seattle, Washington on December ___3___ 2010.

_____
STEVE Y. KOH

SUBSCRIBED AND SWORN to before me this 3rd day of December, 2010.

Julia Dawn Wood
_____
(Print Name of Notary)

_____
(Signature of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: November 19, 2012

4

# Exhibit 1

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| City of Livonia Employees' Retirement System | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:09-cv-07143 |
| The Boeing Company, W. James McNerney, Jr. and Scott E. Carson | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Northern District of Illinois             ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Bishnujee Singh, 18830 38th Ave W, Lynnwood, Washington 98037.

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Schedule A attached.

| Place:  Perkins Coie LLP 1201 Third Avenue, Suite 4800 Seattle, Washington 98101-3099 | Date and Time: 11/01/2010 9:30 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___10/19/2010___

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Defendants The Boeing Company, W. James McNerney, Jr. and Scott E. Carson                      , who issues or requests this subpoena, are:
Steve Koh, Perkins Coie LLP, 1201 Third Avenue, Suite 4800, Seattle, Washington 98101, skoh@perkinscoie.com, (206) 359-8530.

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:09-cv-07143

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## **SCHEDULE A**

## **DEFINITIONS**

1.     "Communications" means every manner of transmitting or receiving information, including but not limited to conversations (in person or by phone or other means), meetings, conferences, consultations, discussions, negotiations, letters, email, instant messages, memoranda, documents and oral or written contacts.

2.     "Concerning" means relating to, referring to, describing, discussing, evidencing, reflecting, indicating, containing, demonstrating, supporting, consisting of or constituting.

3.     "Individual Defendants" shall refer to W. James McNerney, Jr. and Scott E. Carson.

4.     "Boeing" means The Boeing Company, its predecessors, affiliates, and successors, and its current or former officers, members, principals, directors, managers, employees, representatives and agents, or any one of them.

5.     "Document" shall have the broadest possible meaning accorded to it by Rule 26 of the Federal Rules of Civil Procedure, and shall include any written, printed, recorded or graphic matter, photographs, audio or video recordings and material contained in databases and other electronic storage media, including email. It shall further include the original, a copy if the original is not available, all copies that are not identical to the original and drafts.

6.     "Infotech" means Infotech Enterprises America, Inc., its predecessors, affiliates, and successors, and its current or former officers, members,

principals, directors, managers, employees, representatives and agents, or any one of them.

7.      "CTS Technical" means CTS Technical, its predecessors, affiliates, and successors, and its current or former officers, members, principals, directors, managers, employees, representatives and agents, or any one of them.

8.      "Robbins Geller" means Robbins Geller Rudman & Dowd LLP, its predecessors, affiliates, and successors, and its current or former officers, members, principals, directors, managers, employees, representatives and agents, or any one of them.

9.      "LRH&A" means L.R. Hodges & Associates, its predecessors, affiliates, and successors, and its current or former officers, members, principals, directors, managers, employees, representatives and agents, or any one of them.

10.      "Cayley Aerospace" means Cayley Aerospace Inc., its predecessors, affiliates, and successors, and its current or former officers, members, principals, directors, managers, employees, representatives and agents, or any one of them.

11.      "787" means any version of Boeing's jet airliner, the 787-Dreamliner series, including the 787-8 and the 787-9.

12.      "Side-of-body joint" means the joint that is located inside of the plane's wing and attaches to the center wing box inside the fuselage. The side-of-body joint is responsible for carrying "wing bending loads," which are loads due to wing upbending or downbending.

13. "Full-scale static stress tests" means tests conducted on the full-scale static 787 article, including tests in which the wing and trailing edges of the airframe are subjected either to their limit load -- the highest loads expected to be seen in service -- or their ultimate load -- 150 percent of the highest loads expected to be seen in service -- or both.

14. "Person" means any natural person or any business, legal or governmental entity or association.

15. "You" and "Your" means Bishnujee Singh.

## **INSTRUCTIONS**

1. Each paragraph herein should be construed independently and not with reference to any other paragraph for the purposes of limitation, except where express limitations are stated.

2. Unless otherwise specified, each document request herein seeks production of the documents called for in their entirety, including all attachments or affixations thereto. If any of the documents cannot be produced in full, you are requested to produce them to the extent possible.

3. If there are no documents responsive to a particular request, please state so in response to that request.

4. This request shall be deemed continuing and you are required to supplement promptly any production of documents responsive to these requests with documents subsequently acquired or located.

- 3 -

5.      In construing these requests, (i) the words "and" and "or" shall be construed either disjunctively or conjunctively so as to bring within the scope of these requests all documents that otherwise might be construed to be outside its scope; (ii) the use of a word in its singular form shall be deemed to include the plural and vice versa; (iii) the words "any" and "all" shall be read to mean each and every; (iv) the present tense of any verb shall include its past tense and vice versa.

6.      Produce all documents responsive to the requests that are within your direct or indirect possession, custody or control.

7.      If any documents requested herein were formerly in your possession, custody or control, but are no longer, please state in writing for each such document: (a) the type of document, *e.g.*, letter or memorandum; (b) the date of the document; (c) the author of the document; (d) the persons who have seen or had possession of the document; (e) a detailed description of the subject matter of the document; (f) why the document is no longer in your possession; (g) who last had possession of the document; and (h) what person currently has possession of the document.

8.      All documents produced pursuant to this request shall be produced by source of file and in the manner in which they are or were maintained in the ordinary course of business.

9.      Any document stored electronically in the ordinary course of business shall be produced electronically in the same file format in which it is stored.

10.     As to any document withheld from production due to a claim of privilege or work product, state: (i) the reason for withholding the document; (ii) the

- 4 -

author of the document; (iii) each person to whom the original or a copy of the document

was sent; (iv) the date of the document; and (v) the subject matter of the document.

11.    If you object to any request, state with specificity the grounds for

each objection and the request or requests to which each objection applies.  Any request

to which an objection is made should be responded to insofar as it is not deemed

objectionable.

12.    Unless otherwise indicated, this request covers the time period

from October 1, 2004 until the date of your response to these document requests.

### DOCUMENTS TO BE PRODUCED

1.    All Documents Concerning the Individual Defendants.  *NOT AVAILABLE*

2.    All Documents Concerning the lawsuit that is the basis for this

subpoena, City of Livonia v. The Boeing Company, No. 1:09-cv-07143 (N.D. Ill.), which

has been filed in the United States District Court for the Northern District of Illinois.  *NOT AVAILABLE*

3.    All Documents Concerning the following teams at Boeing:

    a.    The Wing Integration Team;  *N/A*

    b.    The Mid-Body Fuselage/Wing Integration Team;  *N/A*

    c.    The Wing Team;  *N/A*

    d.    The Mid-Body Integration Team;  *STRESS REPORT RETURNED TO BOEING GROUP AT END OF*

    e.    The Side of Body Team.  *N/A.*  *EMPLOYMENT, SO NO LONGER AVAILABLE.*

4.    All Documents Concerning the full-scale static stress tests on the

787-8 on April 21, 2009, May 22, 2009, and June 12, 2009.  *(WAS NOT EMPLOYED AT BOEING SITE SO NO KNOWLEDGE OF ABOVE DETAILS & INFORMATION) N/A*

- 5 -

5. All Documents Concerning Your employment relationship with Infotech, including, but not limited to:

    a. All Documents evidencing Your dates of employment, job title(s), and responsibilities at Infotech; ✓ *PROVIDED*

    b. All Documents Concerning any offer of employment extended to You by Infotech; ✓ *PROVIDED*

    c. All Documents Concerning Your termination from Infotech. ✓ *PROVIDED*

6. All Documents Concerning Your work relationship with Boeing between 2004-2007, and 2009-2010, or at any other time, including, but not limited to:

    a. All Documents evidencing Your dates of contract work or employment, job title(s), and responsibilities as a contract worker for or an employee of Boeing; ✓ *PROVIDED*

    b. All Documents evidencing Your responsibilities, if any, with regard to 787 side-of-body joint; ✓ *PROVIDED STRESS ENGINEER ROLE*

    c. All Documents Concerning the circumstances under which You ceased to be a contract worker for or employee of Boeing. ✓ *WAS NOT EMPLOYEE OF BOEING, CONTRACT AT BOEING, LEFT GROUP AT OWN WISH*

7. All Documents, including those that you have posted on any website or the Internet, in which You describe, refer to, or discuss Your work Concerning Boeing or the 787. *NOT AVAILABLE AS STRESS REPORT RETURNED TO BOEING AT END OF CONTRACT*

8. All Documents Concerning the Person(s) to whom You reported at Boeing and at Infotech. *NOT AVAILABLE AS ANY DOCUMENT AS WAS NEVER AVAILABLE AFTER END OF CONTRACT*

-6-

9.   A copy of Your Boeing or Infotech identification card or security

access card.   *NOT AVAILABLE (RETURNED TO BOEING)*

10.   All Communications between You and any current or former

employee of Boeing or Infotech or any current or former contract worker for Boeing,

including Communications Concerning Boeing, the 787, or the lawsuit City of Livonia v.

The Boeing Company, No. 1:09-cv-07143 (N.D. Ill.).   *NOT AVAILABLE*

11.   All employment, confidentiality or non-disclosure agreements that

You entered Concerning Boeing or Infotech, including any such agreement with a

contractor or placement agency.   *[illegible handwriting]*

12.   All Boeing Documents in Your possession, including Documents

You removed or copied from Boeing while employed as a contractor conducting work for

Boeing.   *NO DOCUMENT TAKEN BY ME OF BOEING IN MY COMPUTER LEADING TO BOEING OR ANY OF CONTRACT.*

13.   Any Documents, including emails, sent or received by W. James

McNerney, Jr. or Scott E. Carson (or which appear to be sent or received by one or both

of them) and any Boeing employee or contract worker Concerning the 787.   *NEVER INVOLVED IN SUCH MAILS AS MY ROLE WAS JUST STRESS ENGINEER JB.*

14.   All Documents Concerning Your interviews with the Federal

Bureau of Investigation ("FBI") in 2010 relating to Your possession and unauthorized

disclosure of Boeing proprietary information.   *NOT AVAILABLE AS DOCUMENTS WERE RETURNED BACK TO BOEING*

15.   All Documents Concerning CTS Technical, including, but not

limited to:   *GROUP WORK PAPERWORK DOCUMENTS ATTENDOF JOB.*

a.   All Documents evidencing Your dates of employment, job

title(s), and responsibilities at CTS Technical;   *✓ PROVIDED*

b.   All Documents Concerning the circumstances under which

You ceased to be a contract worker for Boeing while
employed by CTS Technical;   ✓ PROVIDED

c.   All Documents Concerning the termination of Your
employment from CTS Technical.   ✓ PROVIDED

16.   All Communications between You and Elizabeth Stewart or any
current or former member of LRH&A, including Communications Concerning Boeing,
the 787, or the lawsuit City of Livonia v. The Boeing Company, No. 1:09-cv-07143
(N.D. Ill.), as well as any handwritten or electronic notes, emails, or other Documents
that You generated Concerning those Communications.   NO SUCH NOTATION COMMUNICATION
STATEMENTS

17.   All Communications between You and any current or former
member of Robbins Geller, including Communications Concerning Boeing, the 787, or
the lawsuit City of Livonia v. The Boeing Company, No. 1:09-cv-07143 (N.D. Ill.), as
well as any handwritten or electronic notes, emails, or other Documents that You
generated Concerning those Communications.   NO SUCH DOCUMENT WRITTEN AM
AWARE OF I NEVER

18.   Your copy of any report, email, handwritten or electronic notes, or   SEEN ANY
THING
other Documents generated by Elizabeth Stewart, any current or former member of   LIKE
THIS.
LRH&A, or any current or former member of Robbins Geller, Concerning
Communications with You.   NO SUCH DOCUMENT EXISTED OR
PROVIDED

19.   Documents sufficient to show all email addresses (work or
personal) used by You since October 1, 2004.   ✓ PROVIDED

20.   All Internal Revenue Service ("IRS") Form W-2s or other
equivalent documents evidencing the names of the companies from which You earned
taxable income. You may redact the amounts of income.   ✓ REQUIRED

21. All Documents Concerning Your educational and employment history, including, but not limited to all versions and drafts of Your resume and curriculum vitae, and all diplomas You have received from any university, college, trade school, or aeronautical society. *PROVIDED*

22. All Documents Concerning Your receipt of the Cayley Scholar Award (2003). *PROVIDED*

23. All Documents evidencing any professional licenses that You hold, including, but not limited, to: *PROVIDED*

    a.    Chartered Engineer (Engineering Council-UK);

    b.    Chartered Scientist (Science Council-UK);

    c.    Chartered Physicist (IOP-UK);

    d.    Professional Engineer (NPER);

    e.    PE (Engineers Australia).

24. All Documents evidencing any membership that You have in any professional organizations, including, but not limited, to: *PROVIDED*

    a.    FIE Australia;

    b.    RAS (UK);

    c.    Canadian Aeronautics and Space Institute;

    d.    The Royal Aeronautical Society (London);

    e.    The Aeronautical Society of India;

    f.    American Institute of Aeronautics & Astronautics.

25. All Documents Concerning Your application for membership in the American Institute of Aeronautics & Astronautics, including Documents Concerning the outcome of that application.

26. All Documents Concerning Your employment relationship with Cayley Aerospace, including but not limited to all Documents evidencing Your dates of employment, job title(s), and responsibilities.

27. Documents sufficient to show the names of all current and former employees of and contract workers for Cayley Aerospace.

28. Documents sufficient to show the annual revenue or the annual turnover of Cayley Aerospace.

29. All Documents Concerning work or services that Cayley Aerospace provides to, has provided to, or has solicited from Boeing.

30. All Documents Concerning the establishment of Cayley Aerospace, including the year in which Cayley Aerospace was established.

31. All Documents evidencing Your dates of employment, job title(s), and responsibilities with BaySys Technologies, or with or at the NASA Goddard Space Center or the Wallops Flight Facility.

32. All Documents evidencing Your dates of employment, job title(s), and responsibilities with Heath Tecna Inc., Bellingham, Washington.

33. Copies of Your home and cellular telephone records, starting as of January 1, 2010 and continuing until the present.

34. All Documents You provided to Intota or Intota.com Concerning Your educational or work experience.

- 10 -

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CITY OF LIVONIA EMPLOYEES' )
RETIREMENT SYSTEM, Individually and on )
Behalf of All Others Similarly Situated, )  Case No. 1:09-cv-07143
               Plaintiff, )
     v. )  Judge Suzanne B. Conlon
                  )
THE BOEING COMPANY, W. JAMES )
McNERNEY, JR. and SCOTT E. CARSON, )
                  )
          Defendants. )
                  )

## DECLARATION OF BISHNUJEE SINGH

STATE OF WASHINGTON    )
                ) ss.
COUNTY OF SNOHOMISH   )

Bishnujee Singh hereby declares as follows:

1. I am over the age of eighteen (18) years and make this declaration based on personal knowledge, and am competent to do so.

2. Before yesterday, I had not spoken with anyone from Boeing or anyone working on behalf of Boeing, including its counsel, regarding this lawsuit. Yesterday, and without any advance notice, I visited the offices of Boeing's outside counsel in Seattle to let them know of my concerns about the conduct of the plaintiffs' investigator. They asked to meet with me today, I told them the information set forth herein, and I discussed and authorized each sentence of this declaration. I believe this declaration to be true and correct to the best of my knowledge. I have not asked for anything from Boeing, and nothing has been offered or suggested to me, in



exchange for me telling the truth about what transpired with plaintiffs' investigator and the other information contained herein.

## My Interaction with Plaintiffs' Investigator

3.    I spoke with plaintiffs' investigator, Elizabeth Stewart, on two occasions, in 2010. Initially, I received a call from a man who said he was Ms. Stewart's husband. He asked if I would meet with Ms. Stewart for dinner and I declined because I was too busy. She then showed up at my door in Lynnwood, Washington, unannounced in February 2010. She was friendly in this conversation which lasted for approximately 35-40 minutes in total. Ms. Stewart did not tell me that she was working for plaintiffs who were suing Boeing.

4.    In our meeting in February 2010, Ms. Stewart asked me about wing tests that were performed in April and May of 2009 on the 787-8. Ms. Stewart asked me whether the results and findings from the wing tests were communicated to James McNerney, Scott Carson or any other executives during April, May and June of 2009. I told her that I had no knowledge on that subject and did not have access to, or awareness of, such communications. I told her that I was an Infotech employee and began work on the 787 program in September 2009.

5.    On approximately the next day, Ms. Stewart called me and said that she was working for plaintiffs who were suing Boeing. She asked if I would speak with her again and I declined, saying that I did not wish to participate in the lawsuit. She then showed up at my door, again unannounced, a day or two later. I told my wife to tell her that I was unavailable, and Ms. Stewart left.

6.    Perhaps a month later, Ms. Stewart called me and asked me the same question again about my access to test files and test findings and I gave her the same response. She became angry and her tone became aggressive. She insisted that I "admit" that I had seen documents

2

which communicated the wing test results or findings to Mr. McNerney, Mr. Carson or other executives. I refused to say what she wanted me to say. I told her that if she were to claim that I said things that are untrue I would testify that she lied. I also told her that I could not control what she might say about our conversation. As I said, she was angry and aggressive. I hung up the phone to end the call.

7.  I wish to make very clear that if the Court has the impression that I know something about what was communicated to Boeing executives in the spring or summer of 2009 regarding the April, May or June 2009 wing tests, any anomaly with the side of body joint, or any impact such anomalies might have on first flight or customer delivery of the 787, that impression is completely wrong. I know nothing about that subject and I do not want the Court to be misled into believing that I am a source for those allegations by plaintiffs in this case.

8.  I discuss in further detail below what I did and did not tell Ms. Stewart. I have not spoken to her since our meeting in April 2010. I have never spoken with anyone else who I understood to be working with the plaintiffs in this lawsuit.

9.  I received a subpoena from Boeing on October 19, 2010. I was asked in item 13 of the subpoena for: "Any Documents, including emails, sent or received by W. James McNerney, Jr., or Scott E. Carson (or which appear to be sent or received by one or both of them) and any Boeing employee or contract worker Concerning the 787." As I wrote on my copy of the subpoena, I was never involved in such emails given that my role was just a stress engineering job.

**Plaintiffs' Confidential Source Allegations in the Second Amended Complaint**

10.  Neither Ms. Stewart, plaintiffs nor anyone working for the plaintiffs ever showed me what plaintiffs claim they learned from me. I saw plaintiffs' allegations today for the first

3

time. I understand from Boeing that I am the "confidential source (CS)" referenced by plaintiffs in paragraphs 139-142 of their Second Amended Class Action Complaint ("Complaint"). Much of the information attributed to me is untrue. I focus here on the allegations that are in my view the most misleading.

11. In paragraph 139, I have the following comments:

- "Plaintiffs' confidential source ('CS') is a former Boeing Senior Structural Analyst Engineer and Chief Engineer, who worked on the Mid-Body Fuselage/Wing Integration team for the 787." I have never been a Boeing employee. I told Ms. Stewart that fact. From September 2009 to January 2010, I was employed by Infotech, an outside contractor of engineering services. I also told Ms. Stewart that fact. I have never been a Boeing Chief Engineer, which is a very high level position, nor have I been a Boeing Senior Structural Analyst Engineer. I did not claim to Ms. Stewart that I had such positions. I did not work on the 787-8. I worked only on the 787-9, and my work on that program was for section 41, not the section with the side of body joint.

- "The CS reported to Larry Hall, Boeing's Vice President of the Wing-Body Integration Team." I did not report directly to Larry Hall. I've never met him and I don't know what his job was at Boeing. I don't know where Ms. Stewart got this information from. I reported to Karim Mustafa of ~~Infotech~~ BOEING and Mr. Mustafa reported to Juli Meyers of Boeing. BA 11/17/2010·

- "As part of the CS's job, he had direct access to, as well as first-hand knowledge of the contents of, Boeing's 787 stress test files that memorialize the results of the failed 787 wing limit load test and subsequent re-test, which transpired on April 21, 2009 and May 17, 2009, respectively (individually referred to as a 'Wing Test" file and

4

collectively as the 'Wing Tests' files)." That is a lie. I did not have access to the stress

test files nor was it part of my job at Infotech to review such files. Vendors such as

Infotech are only permitted access to limited information in order to perform their job,

and I had not reason or need to see documents related to those tests. I don't even know

if there is a stress test file or wing test file where information regarding the tests is

contained. Further, it was not part of my job to have "first-hand knowledge" of

documents related to the tests, as I did not even start working at Boeing until

September 2009, and only then on the 787-9 program.]

12. In paragraph 140, I have the following comments:

- "Based on the CS's first-hand knowledge, Boeing's Wing Tests files are an organized

  set of documents in Boeing's direct control that contain the Wing Tests' technical

  results, internal communications among the engineers who participated in the

  conducting the Wing Tests and the internal communications of the Wing Integration

  team's management concerning the results of those tests." Again, I'm aware of no such

  file which contains such information. I recall generally that there are servers that are

  set up for different purposes and that access is generally limited to those with a need to

  know. I don't know if there were side of body servers, but I know I was not authorized

  to access them nor did I access them. I just received necessary files related to section

  41, specifically the fairing and clip fittings in order to do my job.

- "According to the CS, the Wing Test files include internal, contemporaneous

  communications regarding the specific results of the Wing Tests, and findings of the

  Wing Test Integration Team, which the Wing Test Integration Team sent directly to

  defendants McNerney and Carson." That is a lie. I have never seen any

5

communications regarding any wing tests or stress tests addressed to Mr. McNerney, Mr. Carson or any other Boeing executive. I do not want this assertion attributed to me.

■ "According to the CS, the Wing Integration Team members included Larry Hall, Terry Pham (who reported directly to Larry Hall) and Mike Denton (Vice President of Engineering for the 787 Program, who reported directly to defendant Carson)." I've heard the name Terry Pham, but do not know what that person does at Boeing (and I don't know whether that is a man or woman). If this sentence was meant to suggest that Hall, Pham and Denton were on the side of body team investigating the wing test results, that is not something I know. I have no knowledge whether these three individuals worked on the 787-8 side of body issues. I was working on the Mid-Body Integration team for the 787-9. I've not heard of the term "Wing Integration Team" – that is a term that Ms. Stewart has apparently created, not me.

13. In paragraph 141, I have the following comments:

■ "According to the first-hand knowledge of the CS, the April 21, 2009 load test file, which is in Boeing's direct control, indicates that the 787 wing structure failed at 30% below limit load." I don't know where Ms. Stewart got this information. I knew nothing about the 787-8 wing tests except that I learned in the fall of 2009 that the side of body for the 787-9 needed to be redesigned because of some problem with the side of body joint found at some time prior to September 2009 on the 787-8.

■ "Further, according to the CS, the April 21, 2009 Wing Test file contained copies of internal electronic communications to defendants McNerney and Carson, which were dated within a few days of April 21, 2009, informing defendants that the 787's wing

6

had failed at limit load and, as a result of that failed test, re-testing of the 787 wing assembly would be necessary." This is among the most outrageous statements in the four paragraphs attributed to me because it contains the assertion I specifically told Ms. Stewart was not true (which resulted in her becoming aggressive and insistent that I say that I saw certain documents that I did not see). Again, I have seen no communications to Mr. McNerney or Mr. Carson (or any other executive) regarding the 787 stress tests or wing tests, and certainly nothing dated within days of April 21, 2009. I have no knowledge of when Boeing became aware of an issue with the side of body joint, other than that it was sometime before September 2009. I feel strongly that it would be misleading for this allegation to be attributed to me.

- "According to the CS, the contents of the April 21, 2009 Wing Test file, including the contemporaneous communications from the Wing Integration Team to defendants McNerney and Carson, are clear in the finding that the failed April 21, 2009 limit load test and necessary re-testing placed the plane's scheduled June 30, 2009 First Flight at risk." This statement is as outrageous and false as the one immediately above, for the same reasons. In particular, not only did I not see any "contemporaneous" communications to any executives, but I never saw anything dated from April or May 2009 regarding impact of any test anomaly on the first flight of the 787. I was living in St. Louis and didn't return to the Seattle area until August 4, 2009. Thereafter, I never saw any communications regarding the wing tests that were sent to any Boeing executives.

14. In paragraph 142, I have the following comments

7

- "According to the CS, the May 17, 2009 Wing Test file (*i.e.*, the re-test) indicates that the 787 passed the limit load test on May 17, 2009, but failed the ultimate limit load test at about 125% of limit load." I heard about the May test in the fall of 2009. I did not hear about the percentage at which the test failed. I know no details of the test.

- "According to the CS, the fact that the 787 wing failed at 125% of limit load was generally known by the Wing Integration Team immediately upon completion of the May 17, 2009 test and was characterized by the Wing Test file documents as a 'weight optimization issue.' Further, according to the CS, the May 17, 2009 Wing Test file contains detailed analysis evidencing that nine days after the failed May 17, 2009 test, 'delamination' of the 787 wing stringers were also identified as a serious engineering issue." I have no knowledge of this and don't know where Ms. Stewart got this information.

- "According to the CS, the May 17, 2009 Wing Test file contains copies of internal electronic communications, dated around May 26, 2009, from the Wing Integration Team to defendants McNerney and Carson, which specifically informed defendants McNerney and Carson that the 787 wing failed the ultimate load test, as well as the fact that additional re-work of the wing attachment design was required to correct the delamination problem." Again, this is a lie. I did not say that I saw communications from around May 26, 2009 (or any time) to Mr. McNerney and Mr. Carson (or any executive) relating to the May 2009 wing test or any other wing test. I told Ms. Stewart this but she became angry and demanded that I say that I had seen such a document. As stated above, I refused.

8

▪ "These late May 2009 contemporaneous communications contained in the May 17, 2009 test file, from the Wing Integration Team to defendants McNerney and Carson, clearly communicated the Wing Integration Team's conclusion that Boeing would be unable to conduct a June 30, 2009 First Flight." Again, this is false for the reasons stated above.

15. I was shown the following statement plaintiffs made to the court, in which they claim that before filing the Second Amended Complaint, *"plaintiffs' investigator returned to the source, and Mr. Singh did not recant or deny any facts that were pleaded in the Complaint."* (Dkt. No. 101 at 1). That is not true. Since plaintiffs and Ms. Stewart never showed me what they were alleging in the Complaint, I have never had an opportunity until now to comment upon or deny the accuracy of the statements that plaintiffs have attributed to me. Now that I have, I can state firmly that they are either misleading or entirely false.

**Plaintiffs' Investigator's Declaration and Notes**

16. As noted above, I did convey some information to Ms. Stewart that was accurate to the best of my knowledge. Before today, I had not seen her declaration and handwritten notes filed in this case. Now that I have seen them, I wish to make the following statements.

17. In paragraphs 11 and 12 of her declaration, Ms. Stewart states that on April 13, 2010, she gave me "the opportunity to deny, disavow, recant or alter any of the information [I] provided to [her] on February 19, 2010." Again, since Ms. Stewart never showed me the information she claimed I had given on February 19, I did not actually have the opportunity to "deny, disavow, recant or alter" what she claims I said. I do not even recall her asking me on April 13 whether I wanted to withdraw anything I had told her on February 19. It would have

9

been easy for her to send me paragraphs 139-42 of the Complaint and I could then have told her

that many of the statements, including those identified above, are false.

18. In her typed memo dated February 21, 2010, Ms. Stewart makes a number of false

statements. As stated above, I did not work on the 787-8 or on the side of body issues and

retrofit and had no details on the April or May tests. Thus, many of the statements attributed to

me regarding those subjects are not based on my knowledge or anything I told Ms. Stewart. I

focus here on the ones of significance, in which she falsely claims that I told her of

communications from April-June 2009 involving Boeing executives.

19. On page 2, she claims I said that the April 21, 2009 wing test file

included one or more emails reporting [a test failure] within a couple of days after
the test took place, and that both Defendant Company CEO **Jim McNerney** and
Defendant BCA CEO **Scott Carson** were on the distribution list for this email.
He could not recall who specifically this email was from but said it was from
someone on the Wing Integration Team He said Boeing's email system was
Microsoft Outlook. When asked, Singh said he could not recall the specific
words used but that this email indicated that a lot of design re-work on the wing
would be necessary at this point, and indicated that this would extend the plane's
schedule for First Flight *[which at the time was publicly reported would take
place before the end of the second quarter/end of June 2009.]*

20. As mentioned above, this information was precisely what Ms. Stewart wanted me to

"admit" but which I told her I knew nothing about. I certainly have no knowledge that Boeing

executives believed "within a couple days" of the April 21, 2009 test that the test results would

require a delay of the first flight of the 787. I don't know when they ever became aware of the

side of body issues. Her handwritten notes appear to state: "saw emails to McNerney indicating

failure w/in couple days. Part of package w/test results—memos, w/related emails attached.

Carson also on this email." I do not know how Ms. Stewart can claim that this information came

from me, since I told her the opposite. I can only assume that she was recording her belief that

there may have been such communications.

10

21. Ms. Stewart discusses next the May 2009 wing test. She writes:

He said a 'detailed analysis' of the May 17 test results took place after the test, and he recalled the May 17 test file reflected that delamination was identified as the specific problem about nine days after the test was completed. *[so, around May 26]* Singh said there were emails in the May 17 re-test file on or around the date the delamination was discovered that stated that re-work of the wing attachment design was required to correct the delamination problem, and stated more definitively that the scheduled First Flight could not be met. These emails included Defendants Carson and McNerney on the distribution.

22. This statement is also false—I did not see any emails involving any Boeing executives from the April-June timeframe that related to the wing tests or side of body issues, or any impact they might have on first flight. I find it interesting that Ms. Stewart's handwritten notes include nothing about what she claims I said regarding emails to Mr. Carson and Mr. McNerney on the subject of the May 2009 stress tests.

23. On page 3, Ms. Stewart claims that she explained to me the role of a confidential source in a lawsuit. I do not recall that discussion. She writes that she told me that information from the confidential source is used to "demonstrate to the judge that the [confidential source] was in a position to know the factual information that he or she provided, and therefore that the information is credible and reliable as true." Yet, as discussed above, I was not in a position to know nearly all of the information contained in paragraphs 139-142 of the Complaint and therefore that information is not credible and true. Ms. Stewart claims that I "had reviewed the test results and related communications from the April and May 2009 wing load level tests," but that was Ms. Stewart's contention, not mine.

24. On page 4 of her memo, Ms. Stewart says that I stated a belief that "Boeing's public statements about what happened in these two tests didn't fully explain what really happened and seem misleading." I don't know to what public statements Ms. Stewart refers. I'm not aware of public statements made by Boeing regarding the April and May 2009 static tests.

11

**Summary and Conclusion**

25. To repeat, I have no knowledge of what information was transmitted within Boeing from the start of the full scale static testing on the 787-8 through at least the end of June 2009 regarding any issues with the side of body. As I stated, in particular, I have no knowledge of what Boeing executives, including Mr. Carson and Mr. McNerney, may have been told regarding the side of body, any anomalies from the testing in April, May and June of 2009, and any impact such anomalies might have on the first flight of the 787 or customer deliveries of that aircraft. I was not at Boeing during that time, and in my work as a stress analyst in the fall of 2009 on the 787-9, I never saw or even heard about any such communications involving Boeing executives.

26. I was simply too busy and too focused on my unrelated work on the 787-9 to have any views about the plaintiffs' claim that Boeing sought to mislead the public about the side-of-body joint, the full scale static test anomaly involving that joint, or the first flight and customer delivery of the 787. I know of nothing that would support plaintiffs' claim.

12

27.  In closing, I wish to repeat that I am very concerned that the Court has been misled by statements made by plaintiffs and their investigator.  Specifically, I am concerned that the Court has received false statements that have been incorrectly attributed to me.  I have no knowledge regarding what Boeing executives knew or were told in April-June 2009 regarding the static test results and findings, the side of body anomaly, or the impact of that anomaly on first flight or customer delivery of the 787.  If it is possible, I would ask that the Court withdraw or ignore paragraphs 139-142 of the Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Lynwood, Washington on November 0 2, 2010.

_____
Bishnujee Singh

## <u>CERTIFICATE OF SERVICE</u>

I, Stephanie G. Wheeler, one of the attorneys for defendants, hereby certify that on December 10, 2010, I authorized the electronic filing of the foregoing Affidavit of Steve Y. Koh and accompanying exhibits with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to defendants' counsel and the following:

Lori A. Fanning
Marvin A. Miller
MILLER LAW LLC
115 S. LaSalle Street
Suite 2910
Chicago, Illinois  60603
Tel. (312) 332.3400
Fax. (312) 676-2676
lfanning@millerlawllc.com
mmiller@millerlawllc.com

Randi D. Bandman
ROBBINS GELLER RUDMAN & DOWD
LLP
52 Duane Street
7th Floor
New York, New York  10007
randib@rgrlaw.com

Thomas E. Egler
Shannon M. Matera
Trig R. Smith
ROBBINS GELLER RUDMAN & DOWD
LLP
655 West Broadway
Suite 1900
San Diego, California 92101-3301
Tel. (619) 231-1058
Fax. (619) 231-7423
tome@rgrdlaw.com
smatera@rgrdlaw.com
trigs@rgrdlaw.com

**ADDITIONAL COUNSEL OF RECORD:**

Deborah R. Gross
Robert P. Frutkin
LAW OFFICES OF BERNARD M.
GROSS, P.C.
Wanamaker Building
Suite 450
100 Penn Square East
Philadelphia, Pennsylvania  19107
Tel. (215) 561-3600
Fax. (215) 561-3000
debbie@bernardmgross.com
rpf@bernardmgross.com

Michael J. VanOverbeke
Thomas C. Michaud
VANOVERBEKE MICHAUD &
TIMMONY, P.C.
79 Alfred Street
Detroit, Michigan  48201
Tel. (313) 578-1200
Fax. (313) 578-1201
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

Dated:  December 10, 2010

/s/ Stephanie G. Wheeler
Stephanie G. Wheeler