# EXHIBIT A

In Re: City of Livonia Employees' Retirement System v. Boeing Company
No.
Audio Transcription
February 25, 2013

1

IN RE:
CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM,

-and-

BOEING COMPANY, W. JAMES
MCNERNEY, JR., and SCOTT E.
CARSON,

No. 12-1899

ORIGINAL

The following document has been created via transcription of an audio recording of proceedings had in the above-referenced matter. These proceedings were not reported by a Certified Shorthand Reporter, and as such this transcription is uncertified. It should be noted that inaudible portions may be contained herein due to inadequate audio quality resulting from circumstances not addressed at the time of recording.

BEFORE:

William J. Bauer, Circuit Judge
Richard A. Posner, Circuit Judge
Diane S. Sykes, Circuit Judge

casalereporting.com
312.332.7900

In Re: City of Livonia Employees' Retirement System v. Boeing Company
No.

Audio Transcription
February 25, 2013

2

PRESENT:

ROBBINS GELLAR RUDMAN & DOWD, LLP
BY MR. ERIC A. ISAACSON
200 South Wacker Drive
31st Floor
Chicago, Illinois 60606
(312) 674-4674

on behalf of the Appellant;

PERKINS COIE, LLP
BY MR. ERIC B. WOLFF
131 South Dearborn Street
Suite 1700
Chicago, Illinois 60603
(312) 324-8400

on behalf of the Appellees.

*****

casalereporting.com
312.332.7900

HONORABLE POSNER: First case, City of Livonia Employees' Retirement Fund vs. Boeing.

Mr. Isaacson.

MR. ISAACSON: Good morning, your Honor. May it please the Court. I'm Eric Isaacson representing the City of Livonia Retirement Fund as lead plaintiff in this securities fraud class action concerning the statements that Boeing Company made about the Dreamliner 787 back in May and June of 2009.

The central question presented by the appeal is whether the complaint states facts that raise a strong inference of the defendants scienter with respect to those statements. That means that it has to plead facts that make the defendants' knowledge of falsity or recklessness with respect to the falsity or false or misleading character of their statements at least as strong as any opposing inference.

I think that the inference on the facts that are pleaded is quite compelling.

HONORABLE POSNER: Why didn't a lawyer talk to Singh?

MR. ISAACSON: Well --

HONORABLE POSNER: Your whole case --

MR. ISAACSON: Well, for a number of reasons, your

Honor.

Singh was not available at the time that the initial complaint in the case was filed. The case was filed in November --

HONORABLE POSNER: I mean after the investigator reports on him, why didn't a lawyer talk to him?

MR. ISAACSON: Because Singh didn't want to cooperate further.

Mr. Singh was terminated at Boeing on January 15th, 20 --

HONORABLE POSNER: When did she turn in her report to you?

MR. ISAACSON: She sent the report to us on February 21st.

We were subject to the Court's order when we were appointed on January 15th as lead plaintiff to file an amended complaint by February 22nd, so we were finalizing the complaint for filing on the 22nd when we received the email on the 21st.

We immediately evaluated what was in that email, made the decision that we probably should follow up further with Singh and include some allegations concerning Singh. In a further amended

complaint --

HONORABLE POSNER: And when was it that you could no longer talk to Singh, he wouldn't talk to you anymore?

MR. ISAACSON: In April.

HONORABLE POSNER: Well, between February and April, why didn't you -- why didn't you speak to him before you filed your complaint -- well, maybe -- you had to file on the 22nd, but why didn't you speak to him as soon as you could?

MR. ISAACSON: Well, we had to file the complaint -- amended complaint on the 22nd of February. We're getting to the end of February. We start evaluating the information that we had gotten from Singh --

HONORABLE POSNER: How could you evaluate it without a lawyer talking to him?

MR. ISAACSON: We could evaluate what our investigator had told us. The Supreme Court is --

HONORABLE POSNER: Why didn't you want -- this is your key guy, why didn't you want to talk to him?

MR. ISAACSON: Your Honor, the fact that we sent the investigator back to contact Singh to see if we could talk with him in April --

HONORABLE POSNER: I don't understand. We're in February, February 21st, you got this report. You should realize this is key, you have to have something more than what you had without Singh, so why wouldn't you want to talk to Singh forthwith?

MR. ISAACSON: Well, we filed an amended complaint on the 22nd. We went to go talk with Singh in April, he won't talk with us --

HONORABLE POSNER: Why the interval between February 22nd and April?

MR. ISAACSON: Because it's a firm that has a lot of cases and a lot of work to do and is following up a lot of leads. It's not like Singh is the only part of the investigation that's going on in this case and it's not like it's the only case that the lawyers have.

We typically rely on investigators to develop initial leads and then to follow up --

HONORABLE POSNER: At what point do you talk to the person whom the investigators interviewed?

MR. ISAACSON: Well, here it would have been in April, quite frankly, and then it's in May after Singh will not speak to us that we end up, I think on May 20th, seeking leave to file the amended complaint with the facts that were obtained from Singh that were

corroborated by what was in the public record. It was corroborated by what Boeing itself had said on June 23rd when it said that they had known for weeks --

HONORABLE POSNER: The problem you have with Singh is he wasn't employed by Boeing, right?

MR. ISAACSON: He was employed by Infotech, but with a contract --

HONORABLE POSNER: Don't fence with me.

I asked you. He's not employed by Boeing; is that correct?

MR. ISAACSON: As a matter of labor law, he was not employed by Boeing.

HONORABLE POSNER: What do you mean it's a matter of labor law? He's not an employee of Boeing?

Just say yes or no.

MR. ISAACSON: He's not an employee of Boeing.

HONORABLE POSNER: Okay. Not an employee of Boeing.

What is the likelihood that Boeing would give access to its trade secrets to a nonemployee?

MR. ISAACSON: You have a stress engineer working on the midbody section of the plane who appeared to have access to those facts. He knew the details and provided considerable detail in his description of it.

It was in the midbody section, the plane -- midbody integration section that he's working on, the plane's wings attach to that part of the plane, and Boeing itself in its public statements said this is a very complex area.

HONORABLE POSNER: My impression is that you think he had access to much more than just, you know, the engineering drawings or engineering analyses just of that single -- the single issue, those stringers on the wing assembly.

MR. ISAACSON: Well --

HONORABLE POSNER: Can you assert that he had access to more extensive files of Boeing?

MR. ISAACSON: We asserted what he told our investigator. His online resume indicated that he was a Boeing chief engineer. He had a bio online with Sheffield University that said that he was a chief engineering with Boeing working on the Dreamliner 787-8 and -9. We thought that we had sufficient corroboration of his position in the company. It's only after we identified him or volunteered his identity to Boeing that --

HONORABLE POSNER: No, that's not my question. You know now that he's not an employee of Boeing, never

an employee of Boeing.

How likely is -- how extensive access to a company's files will a nonemployee be given?

MR. ISAACSON: I am not in Boeing, so I can't say that I know that.

HONORABLE POSNER: Well, you could ask Boeing, right?

MR. ISAACSON: Well, that would be in discovery, and it would be nice if we could take some depositions. We haven't taken any depositions here, your Honor.

HONORABLE POSNER: Did you ask the judge to let you have, by analogy to Twombly Iqbal, to allow you to have some preliminary discovery to enable you to file a complaint that might withstand 12(b)(6)?

MR. ISAACSON: We opposed their motion citing rule 12(d) --

HONORABLE POSNER: That's not my question. I asked you a simple question.

Did you seek preliminary discovery to discover, to learn, whether you might be able to file a complaint that would withstand a motion to dismiss?

MR. ISAACSON: No, your Honor. We were already in discovery at the point that this issue came up, and, you know, depositions were going to start in May when

the District Court issued its order.

We also know for a fact at this point that Singh was right about many of the details that somebody outside of the company wouldn't know, but if you're talking about what we had a reasonable --

HONORABLE POSNER: How likely is it that Singh would know of communications between Boeing employees and their CEO?

MR. ISAACSON: Well, he's working with a midbody integration team saying -- telling us that he's working on a wing and midbody integration group to, basically, do stress analysis, which is exactly what we're talking about.

HONORABLE POSNER: No, but why would he be privy to emails to the CEO of Boeing?

MR. ISAACSON: Because, if -- I'm not certain that he would be privy to emails as in copied on them, but that doesn't mean he's not going to see them or know of them in the course of his work, your Honor.

HONORABLE POSNER: Why? Why would he know about something being sent to the CEO?

MR. ISAACSON: Because they need to keep the CEO in the loop on problems that are as important as this --

HONORABLE POSNER: They do, but they don't have to -- they don't have to tell this contractor about their communications with their -- with the CEO of their company.

MR. ISAACSON: They may not have to tell him, but it seems to me fairly likely if he's working on the problem with them, that they will let him know that they're doing it and --

HONORABLE POSNER: That to me is extraordinary. You mean these people -- these lowdown engineer people, they must be very reluctant to be sending emails to their boss, let alone -- to the CEO of the company, let alone showing them to a contractor. Does that strike you as odd?

MR. ISAACSON: That does not strike me as odd given what we knew about him at the point that we filed the second amended complaint that he knew what he was telling us. He was not telling us at that point that he was a contractor. At that point he was telling us that he was a Boeing chief engineer, and that's what his resume said, which was online, which he apparently put online shortly after he was terminated, the same day the City of Livonia Pension System was appointed as lead plaintiff. It was, you know, further corroborated

by the online bio at Sheffield University website --

HONORABLE POSNER: You admit he's not -- that his biography is phony, right?

MR. ISAACSON: Well --

HONORABLE POSNER: He wasn't employed by Boeing. He's not a Boeing chief engineer, he never was.

I don't know how that helps your case that he has a phony resume.

MR. ISAACSON: I don't think that it helps our case that Boeing contends he has a phony resume --

HONORABLE POSNER: What do you mean Boeing contends?

MR. ISAACSON: Boeing has presented --

HONORABLE POSNER: Boeing contends?

Are you really still suggesting that he is employed by Boeing or was employed?

MR. ISAACSON: I think he's probably not, your Honor. But Boeing presented declarations of their employees to contradict the complaints and allegations, and the judge cited those declarations and Mr. Singh's testimony, which is deposition testimony, saying in her opinion that a conflict between plaintiff's allegations and later developed facts had arisen.

That's not a basis for dismissing a

complaint under Rule 12(b)(6), that's a basis for having a hearing on summary judgment after full discovery that's necessary for summary judgment, your Honor.

I see I'm going into my rebuttal time?

HONORABLE POSNER: I have another question.

What would Boeing -- suppose Boeing learns before the Paris Air Show that, you know, they have the real problem with the wing and they're not going to be able to fly, so -- and that means that that first flight, which was scheduled for sometime after the Paris Air Show is not going -- will have to be cancelled, suppose they know that, if they know that, what is the gain to them from concealing that information until after the Paris Air Show? What do they -- what do they gain by that?

MR. ISAACSON: The Paris Air Show is all about public relations, and it would have been very bad public relations to go to the Paris Air Show and say, We're not ready for first flight like we've been telling you.

HONORABLE POSNER: Why is that any worse than saying afterwards, Oops, we may have thought at the Paris Air Show that we were all set for our first

flight but we have to cancel it? Why is that -- why is that better than telling -- than saying in advance?

MR. ISAACSON: For one thing, your customers who have committed to buy your Dreamliner product will go over to the booth that Airbus has there and start talking with them about the competing A350.

HONORABLE POSNER: As soon as the announcement is made after the Paris Air Show, they still can cancel. It's not as if the Paris Air Show is the deadline for cancellation.

MR. ISAACSON: It's not a deadline for cancellation.

HONORABLE POSNER: We are talking about a couple of weeks. What do they gain by a couple of weeks of deception?

MR. ISAACSON: It's a question of good press versus bad press at the Paris Air Show.

HONORABLE POSNER: They're not selling to -- they're not selling potato chips to consumers, they're -- how much does this plane cost?

MR. ISAACSON: A lot.

HONORABLE POSNER: What's the sales price?

MR. ISAACSON: I don't -- I don't have it.

HONORABLE POSNER: It's many millions.

MR. ISAACSON: Yes.

HONORABLE POSNER: It's tens of millions.

So you think the people who buy a plane for tens of millions of dollars and have a right of cancellation are not going to cancel because they're told about this after the Paris Air Show instead of before the Paris Air Show?

MR. ISAACSON: I think that at the margin, if you might, that's not the major concern. It's a lot like the Tellabs case --

HONORABLE POSNER: I don't believe that. These people -- we know it's happened recently with Dreamliner. These companies, if they think there's something wrong with a plane, they're going to cancel, and it's going to be the same cost to Boeing whether this happens two weeks earlier or two weeks later.

MR. ISAACSON: In Tellabs, this Court observed --

HONORABLE POSNER: Not Tellabs. Talk about this case.

MR. ISAACSON: They may have hoped they would come up with a fix, your Honor.

HONORABLE POSNER: Okay. That's a whole other weakness of your case.

MR. ISAACSON: That's not a good defense.

HONORABLE POSNER: That's a whole other weakness of your case. If they think this is fixable, if they think they may be able to make the first flight date, then fine, they don't have to disclose every uncertainty that they have, right?

MR. ISAACSON: Well, they've said that it's passed the tests, your Honor --

HONORABLE POSNER: No. They said the tests were complete. That's not the same thing as saying they passed the tests. The tests were complete.

What they didn't say was that the tests revealed problems that they hoped they could fix but they're not sure they could fix them, right?

MR. ISAACSON: They said all necessary tests for first -- structural tests for first flight were complete.

HONORABLE POSNER: Yes. But to say that a test is complete doesn't tell you what the results of the test. You can -- you know, you can take a Bar exam, you've completed the test and you flunk, right?

MR. ISAACSON: If -- yes, I suppose, but it's misleading if you --

HONORABLE POSNER: I don't understand. You're supposed to say the tests are incomplete?

MR. ISAACSON: Well, if the test has failed, you don't put out a press release bragging about how the initial results are positive and you don't --

HONORABLE POSNER: Suppose the tests are completed -- what do you mean initial results are positive? They say the test is complete, they think that there's a chance, you know, a non-negligible chance that this problem can be solved in time for the flight. What's this -- why is that fraud?

MR. ISAACSON: Because they went to Paris and said the plane was ready to fly when they were trying to find a fix for a problem that they knew was serious.

HONORABLE POSNER: What do you mean? They said, Ready to fly, is that a quotation?

MR. ISAACSON: They said that they were -- McNerney on May 27th said, It will fly in June. Scott Carson at the Paris Air Show said they were absolutely committed to first flight within the next two weeks. He said, I believe it could fly today, and he said, It definitely will fly this month. Those are direct quotes of the defendant Mr. Carson, who certainly was in the loop on these things. It's hard to believe that he was not informed about the product that was one of the company's most important that he had been sent to

Paris to discuss and talk about.

They put out a press release saying that they were beginning to build the first planes for delivery to customers on June 17th. I think that the inference that they knew there was a serious problem that caused these positive statements to be misleading is an extraordinarily strong one, just like the inference was strong that Notebaert knew what was going on and the company was --

HONORABLE POSNER: How long was the first flight delayed?

MR. ISAACSON: It was delayed until mid-December of 2009.

HONORABLE POSNER: So six months?

MR. ISAACSON: Yeah.

HONORABLE SYKES: I need to clarify one chronological point before you sit down, and that is that you were aware at the time that the second amended complaint was filed that the confidential source Singh was no longer cooperating?

MR. ISAACSON: We were aware that he said -- he told our investigator he did not wish to cooperate further because he was working on a project with Boeing. She asked him if he wanted to withdraw any of

the statements that he had made previously, and he said, No, he did not want to.

So given the fact that he did not at that point wish to repudiate what he had said, given the fact that he provided enough detail that it seemed to us that he had access to this information and that it was corroborated by what the Wall Street Journal said, that the top executives and engineers both had known since May of the problems, what the Seattle Times reported that their supplier of the wings --

HONORABLE SYKES: I just asked a chronological point. You did have that knowledge?

MR. ISAACSON: We had the knowledge that he would not cooperate further, so we would have to go without having lawyers speak with him if we're going to plead the complaint with those additional paragraphs, but we believe --

HONORABLE SYKES: That was all my questions.

HONORABLE POSNER: Did you ask to be able to conduct -- to depose him?

MR. ISAACSON: No, your Honor. I mean, there was a deposition after we disclosed his identity. The defendant's noticed his deposition.

HONORABLE POSNER: Wait. I don't understand. You

did not -- when you discovered that he won't cooperate with you, what steps would you have liked to take?

MR. ISAACSON: I would have liked to have found a further witness who would cooperate or take further discovery to verify what he had said.

HONORABLE POSNER: So you wouldn't have wanted to do anything more with Singh, you'd drop Singh and look for someone else, is that what you're saying?

MR. ISAACSON: We would continue to develop all the sources that we could, your Honor.

HONORABLE POSNER: But you dropped Singh?

MR. ISAACSON: We did not notice Singh's deposition.

HONORABLE SYKES: You did not drop Singh?

MR. ISAACSON: Well, we certainly did not notice his deposition.

HONORABLE SYKES: Well --

MR. ISAACSON: We identified to the defendants, he was a party who had some knowledge of what was going on.

HONORABLE SYKES: The sole difference between the iteration of the complaint that had preceded this one are the Singh allegations, so you did not drop him despite knowing that he was no longer cooperating?

MR. ISAACSON: We did not drop him from the complaint that we then filed, that didn't mean that he wasn't going to be deposed. We were pretty certain that he was going to be deposed. We told the defendants who he was on August 30 before they served any discovery on the point.

HONORABLE POSNER: But what could you do with Singh at a trial?

MR. ISAACSON: With Singh at a trial would depend on what he would be saying at that point. Right now -- right now I don't think that anyone would be wanting to call Singh at a trial.

HONORABLE POSNER: But you didn't want to nail him down in a deposition?

MR. ISAACSON: Well, we did nail him down in a deposition. In the deposition we pointed out that his resume said he was a Boeing chief engineer. We pointed out that his resume said he worked on the 787-8 and 787-9. He said, Oh, those are typos. My resume has hundreds of typos. I'm not responsible for the contents of my resume.

HONORABLE POSNER: So what would you do at a trial with Singh?

MR. ISAACSON: We probably would not be doing much

at a trial with Singh, your Honor.

HONORABLE POSNER: Okay. Well, thank you very much. I'll give you more time, Mr. Isaacson.

MR. ISAACSON: Thank you very much, your Honor.

HONORABLE POSNER: Mr. Wolff.

MR. WOLFF: Good morning, your Honor. May it please the Court. I'm Eric Wolff, counsel for the defendants in this case.

Your Honor, this case is about plaintiff's fundamental and material misrepresentations, and those misrepresentations were made directly to the Court and they were about Singh's being in a position to know and that he had firsthand access to internal Boeing documents, including emails to the CEO. Those were the District Court words, fundamental misrepresentations; material misrepresentations directly to the Court, and those were unquestionably the reason the first -- the second amended complaint was not dismissed, and the District Court was very clear about that, but the misrepresentations were not just on the face of those allegations, they were statements made in briefing and in open court.

Confidential sources are troubling, and

this Court and others have struggled with the PSLRA and how do you assess these confidential sources.

What's really notable about this case is they only had one, only one. Not 26 or 5 like other notable cases in this Circuit. The way they got over the hurdle was that they vouched to the District Court, they really vouched to the District Court and they assured the District Court that they had -- and this is their own words, and as Mr. Isaacson discussed, this is about someone they never met and who was no longer going to have any contact with them and really nothing had changed since that February meeting, they just went back and said, Will you confirm this, but having never met him, when it came time to defend the second amended complaint, they filed a brief and twice in that brief they said, This is smoking gun evidence, that was a direct quote. We should be able to survive on one source because it's a smoking gun source.

And then there was a hearing later in the case where they stood up, again, speaking about a witness they've never met, and they said directly to the Court as the Court is exploring is this person enough, they said, He's seen the documents, he's seen the documents. They said that in open court. There

was no basis for saying that.

They also said at the same hearing, given the way they had alleged things and the wing integration team and mentioning various Boeing vice presidents, or, actually, just one, they got one wrong, the District Judge observed to Boeing, I'm surprised given the specificity of the allegations that you don't know who this is, clearly thinking that this is somebody fairly high up that given the description Boeing would know who this would be, and plaintiffs, again, having never met this person, having corroborated nothing he said told the District Court in open court, We believe they know who it is. We believe based on the allegations that they know who this is. Basically confirming the Judge's misperception that this is somebody fairly high-ranking.

And, finally -- and this was a fairly pernicious inference that was drawn.

Once Singh's name was revealed and within 24 hours on the defense side, all we can think is, This has been a fraud on the Court. It is -- the allegations are nowhere close to who this person is. It's all wrong. He's not who they say he is. He hasn't seen what they said he had seen. It is

extremely implausible, even on the face of it, but if you believe he's a very high ranking person, then it becomes more plausible.

We filed declarations, they're in the record. One of them, your Honor, is by Mr. O'Grady at Boeing, it talks all about the access to emails on the side-of-body and how restricted that is, and there's a person who keeps a list and there's special ID badges and everything, and the notion that Singh had access to that is absurd.

And, in fact, the Boeing engineers who sat on top of the project that he was on, which had nothing to do with the side-of-body joint, it had to do with this aerodynamic piece that connects the frame to the wing, nothing to do with the side-of-body joint, but even those somewhat senior Boeing engineers, they note, this is in the Mustafa declaration and the Rossman declaration and the Meyer declaration, these are all in the appendix, they note that they didn't have access to any of that. They don't know why they would ever need it. So the access was exactly as restricted as your question suggested.

But we filed those declarations to tell the Court, This -- they have misled you. They have

misled you. What they stood up in court and told you, all this stuff about smoking gun evidence, they have misled you. And the brief that plaintiff's filed in response, the lead argument of that brief was, How can Boeing say this, they haven't even deposed him. They haven't even noticed his deposition. That is in bold italics in their brief, Boeing hasn't even noticed his deposition. Clearly implying to the District Court, We're not afraid of a deposition and we think this person will go to a deposition and say the things we pleaded. Even though they've never met him, never had any contact with him for months. He's part of a central dispute in the case, they don't reach out to him. The first time any attorney in the case had any contact with Singh was when he responded to Boeing's subpoena, didn't know what to do, he went to the offices of Perkins Coie in Seattle because that was the return address, and he had a few documents and he had an annotated subpoena, and that's all in the record under the affidavit of Steve Koh. That was the first time that any attorney met with him.

Then Boeing did a declaration with him and noticed his deposition, and in working on the declaration, that was the first time he had ever seen

the complaint, even though plaintiffs had said to the District Court, we went back to the source. And in their briefing, it is -- it is coy, in the briefing you will find expressions like, Plaintiff's lawyers and their investigator interviewed the sources, muddying up just who is doing what. There's lots of references to just plaintiffs, Plaintiffs twice confirmed with the source the information that was provided.

Well, it was when Boeing worked on his declaration, that was the first time that he had ever seen the complaint.

And then his deposition -- in his deposition he made abundantly clear through a day's worth of enormous frustration and anger and eventually just complete despair, he doesn't know anything. He -- there's no way that he provided the information that was put into the complaint, he doesn't know anything.

But plaintiffs -- after Boeing began the examination, plaintiffs showed up -- or plaintiffs were there and they were all over him, and they used the stuff from the internet and they cross-examined him on it clearly believing, as your Honor's question suggested, well, he has phony resumes and you knew they were phony.

So we believe the District Court had a duty to police the lawyers in the courtroom for the misrepresentations made directly to the Court. We believe the conduct and the District Court's findings about it do warrant sanctions.

HONORABLE POSNER: Well, Mr. Isaacson said at the very end of his argument he was quoting Boeing officials as saying that the plane would fly on schedule.

MR. WOLFF: So he quoted statements from the Paris Air Show, and there's a very important distinction that needs to be understood about first flight and the reason that everything was delayed.

The plane was not delayed -- first flight wasn't delayed because the plane couldn't fly, and so when Scott Carson is at the Paris Air Show and says, I personally believe the plane can fly today, and statements of that nature, if you're just talking about a ceremonial first flight or something like that, then the plane can fly.

The problems in testing occur at 105 percent of the design limit load, which the design limit load is the maximum load that any one plane in service of all the planes out there flying, that any

one plane would experience in its entire life, so it's meant to be something really, really bad, a storm, something of that nature. That's where the problems are showing up. Okay. First flight is nothing like that. First flight is a very simple flight, wheels down the whole time. So, if you're just talking about that, the plane can fly.

The reason it gets delayed and the reason there was all this analysis and what they're trying to figure out, they're analyzing the loads and then they're looking at what kind of loads do you need to do a productive flight test. Flight test is harrowing. Flight test is stall, it's -- they do flutter testing where they get the wings bouncing up and down, they have all kind of things they need to do on a flight test --

HONORABLE BAUER: I didn't know that's how planes flew.

MR. WOLFF: It's scary.

That's what they're analyzing. That's what they need to understand. And they're -- the conclusion that they reach and the reason it got delayed was that looking at the strain gauge data, they're getting results that are not matching their

models and they need to figure that out. They decide that the plane -- the wing needs a fix.

Now, if you -- at that point you're at a crossroads because if you still think you can do some flying, you can do some testing and you can test the systems and whatnot, you can still be productive, but if it's too restricted, and this is what was announced on June 23rd, if the flight envelope is too restricted, then it's just not worth it. Go make the change, get it set, and then do productive flight testing, do everything in flight testing that you want to do, and that's the choice that was made, but that internal debate within the company, I mean, it's not -- none of this stuff is as depicted in the complaint or as it was depicted from the podium, like it's some green light/red light test. It was a test, Oh, green light, we passed. It's not like that. They have thousands of strain gauges on this joint, they have to figure out what's going on.

On May 3rd what was announced was exactly what your Honor said, The test was complete. They bent the wing 18 feet up in the air. It was complete. The initial results were positive. They didn't see anything initially that was wrong. The data

are still being analyzed. That was the public announcement. There's nothing false in that announcement.

They went on and there was a different test, not for first flight, it was on May 22nd. There was an anomaly near 105 percent of design limit load. And, by the way, this repeated statement here today and in their brief that the sealed appendix corroborates what they pleaded and corroborates a source, that is absolutely not true, and, in fact, you can go through the sealed appendix and you'll hear exactly the story -- you'll see on the original documents exactly the story I'm telling you, there was an anomaly on a May 22nd test. It was at 104 percent of design limit load, not 125 percent, like the complaint says. There was no failed April test that everyone knew about, they don't have a single document --

HONORABLE SYKES: Counsel, if I can interrupt for a minute. This whole discussion is sort of getting into the weeds of the merits of the claim here. It illustrates the procedural anomalies pursuant to which this case comes to us.

There was a denial -- initial denial of the motion to dismiss the second amended complaint, the

judge in the ordinary course of deciding that took the Singh allegations as true and said that they were enough to cure the deficiencies in the prior iteration of the complaint and then that opened the discovery spigot, and so now we have a more developed factual record, but what we really still have before us is a motion to dismiss that's supposed to be decided on the pleadings, and I don't know how you propose to resolve that. The way this all unfolded was somewhat unorthodox.

MR. WOLFF: Yes, it was.

Well, let me speak directly to the procedural issue. I only talk about the sealed appendix because statements were made about what can be found there that are inaccurate.

But on the procedural question, we have a 12(b)(6), the Judge has to apply the PSLRA, which is sort of beyond the normal 12(b)(6) standard because you have to evaluate inferences and competing inferences. You have the face of the allegations. They are presented in a way that is ambiguous. He is a Boeing chief engineer. That's what they say. What does that mean? That could mean very senior engineer within Boeing, high ranking insider with lots of access to

emails and things like that or it could mean some fellow who works for a contractor whom we can find a resume on the internet where he's calling himself a Boeing chief engineer. That's your range of inferences as you decide a 12(b)(6) motion.

The judge hears from the lawyers and plaintiffs tell the judge, These allegations, we want the highest amount of inferences for our side. They are, Quote, Smoking gun. They say that twice. They lead her to believe that when they say Boeing chief engineer, it's a high ranking insider. Those are the inferences that the judge brings to deciding the 12(b)(6) motion.

With those inferences, if you can get by with just one confidential source, they would have to be really strong inferences like that.

The judge learns that they misrepresented those things. The judge learns that those inferences should not have been drawn, and so what we ultimately have in the dismissal, and the District Court described this very well, it's not so much that she's considering facts, she is correcting for misrepresentations in court, which is beyond 12(b)(6).

HONORABLE SYKES: As a sanction then are we to construe this decision as a dismissal of the second amended complaint as a sanction for fraud on the Court or as a revisitation of the Rule 12(b)(6) motion or just what is its core?

MR. WOLFF: Well, the order is ambiguous on this, but any -- there are any number of pathways out. The Court does say, I can reopen this and reconsider for three different reasons, and the three that are given are fraud on the Court, carelessness of counsel, misperceptions by the Court itself. Those are three that are given. Any of those will do.

In the end what she -- what the Court has to do, it becomes very, very narrow because the complaint can only survive if you give maximum weight to those confidential source allegations and you treat them as credible and compelling and you believe this is a high ranking insider. As soon as you take away almost anything from those allegations, if she had asked at a hearing, for example, of plaintiff's counsel, When you say Boeing chief engineer, are you telling me this is somebody high up in Boeing, like a vice president, and they had just stepped back and said, Our investigator has found a resume on the

internet where he has described himself as a chief engineer, I think at that point, it's over.

HONORABLE POSNER: Well, aren't you really saying the second amended complaint, that's the one we're talking about, is a fraud and when you get rid of it, you're back to the first amended complaint, which is already dismissed, right?

MR. WOLFF: Yes, that's exactly right.

HONORABLE POSNER: I gather from what Mr. Isaacson said, maybe he can correct it, there's actually no factual dispute anymore about Singh. He's not a chief Boeing engineer and he doesn't provide any help for the plaintiffs and they don't plan to call him as a witness or anything like that.

So, it's as if the second amended complaint had never been filed, right? Isn't that --

MR. WOLFF: That's all fair, your Honor.

HONORABLE POSNER: Okay. Well, thank you, Mr. Wolff.

Mr. Isaacson, we'll give you another couple of minutes.

MR. ISAACSON: Thank you, your Honor.

The notion that they were just talking about, a ceremonial first flight at the Paris Air Show

is not how it was understood. Securities analyst said it was the biggest news of the day that the Boeing 787 was ready for first flight. Nobody interpreted it as a ceremonial first flight like the Wright Brothers of, you know, 59 seconds at Kitty Hawk or something like that.

We put the investigator's affidavit and notes before the Court in connection with their motions regarding Mr. Singh --

HONORABLE POSNER: You mean the Boeing stock price jumped on the announcement, is that --

MR. ISAACSON: There are instances where the stock price went up on the statements that the company was ready for first flight or was going to be flying soon, and we identified those in several paragraphs.

HONORABLE POSNER: What are you seeking in way of damages?

MR. ISAACSON: There's a 10 percent -- 10 to 12 percent stock drop at the end of the class period on the announcement, your Honor.

HONORABLE POSNER: So what are you seeking in damages?

MR. ISAACSON: I'm not certain what the total amount comes to, your Honor.

HONORABLE POSNER: I'm not asking for certainty.

MR. ISAACSON: Probably be hundreds of millions.

HONORABLE POSNER: Hundreds of millions?

MR. ISAACSON: Yes, your Honor.

HONORABLE POSNER: How large is your class?

MR. ISAACSON: I don't know the size of the class. It's a very large company, very actively traded, your Honor.

With respect to getting a deposition of Mr. Singh before we pleaded the information from him, we're subject to the PSLRA discovery standard --

HONORABLE POSNER: You don't want his deposition, you said to me he's not going to help you.

MR. ISAACSON: At this point I understand that he's not going to help me.

HONORABLE POSNER: So if he's not going to help you, your second amended complaint is out.

MR. ISAACSON: Well, your Honor --

HONORABLE POSNER: Look, she dismissed the first complaint because you didn't have the smoking gun, then you come back with Singh. Singh the smoking gun, the smoking gun is -- the smoke has wafted away and there's no more smoke, no more Singh. Without Singh, why aren't we back to the first complaint?

MR. ISAACSON: And the brief that we filed argues that the complaint states a claim even without Singh, your Honor.

HONORABLE POSNER: Well, that's fine. That simplifies the case, yeah.

MR. ISAACSON: Based on --

HONORABLE POSNER: These statements here.

MR. ISAACSON: Based on the statements from the defendants themselves and what was reported in the press, the Wall Street Journal and the Seattle Times, indicating that they knew in May, their announcement on June 23rd says that they had the data from the May test when they went to the Paris Air Show and that they postponed making a decision until after the Paris Air Show because the flight wouldn't be robust enough to be doing serious testing.

People at the Paris Air Show did not know that it was merely a ceremonial flight that was being talked about. They thought Boeing was talking about something serious.

There has been no fraud on the Court. We let the District Court know that it was an investigator that had spoken to Singh. We put in her affidavit, we put in her notes, we put in her emails to

In Re: City of Livonia Employees' Retirement System v. Boeing Company
No.

Audio Transcription
February 25, 2013

39

counsel, and we offered to have her come testify.

So, there's no fraud on the Court and no effort to mislead the judge at all, your Honor.

HONORABLE POSNER: Well, thank you very much to both counsel.

We'll move on to our next argument.

(Which were all the proceedings had in the above-entitled case.)

caseloreporting.com
312.332.7900

STATE OF ILLINOIS )
) SS:
COUNTY OF K A N E )

I, NICOLE M. BREYTSPRAAK, a Certified Shorthand reporter of the State of Illinois, do hereby certify that I transcribed from the audio of the proceedings had at the hearing aforesaid and that the foregoing is a true, complete, and correct transcript of the proceedings of said hearing as was heard through the audio recording and transcribed by me.

IN WITNESS WHEREOF, I do hereunto set my hand at Aurora, Illinois, this 12th day of September, 2013.

Certified Shorthand Reporter
State of Illinois

CSR License No. 084-003835.